MAYER BROWN LLP
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
ELSPETH HANSEN (SBN 292193)
elspeth.hansen@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000
Facsimile:  (650) 331-2060

KEVIN RANLETT (*pro hac vice*)
kranlett@mayerbrown.com
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

Attorneys for AT&T Mobility LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS A. ROBERTS,<br>KENNETH A. CHEWEY,<br>ASHLEY M. CHEWEY, AND<br>JAMES KRENN, on behalf of themselves and<br>all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T MOBILITY LLC,<br><br>Defendant. | Case No. 3:15-cv-03418-EMC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 1

STATEMENT OF ISSUE TO BE DECIDED.......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 2

BACKGROUND ..................................................................................................... 4

      A.    Plaintiffs Concede That Their AT&T Customer Agreements Require Arbitration On An Individual Basis .................................................. 4

      B.    Plaintiffs Sued AT&T Notwithstanding Their Obligation To Arbitrate................ 6

      C.    Plaintiffs' Claims Would Be Fairly Resolved In Arbitration ................................. 9

ARGUMENT ........................................................................................................ 14

I.     THE FAA REQUIRES ENFORCEMENT OF AT&T'S ARBITRATION PROVISION ........................................................................................ 14

II.    THIS LAWSUIT SHOULD BE STAYED PENDING ARBITRATION OF PLAINTIFFS' CLAIMS ......................................................... 19

CONCLUSION..................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  2011 WL 2886407 (N.D. Cal. July 19, 2011).........................................................................17

*In re Apple & AT&TM Antitrust Litig.*,
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) ................................................................................17

*In re Apple iPhone 3G Prods. Liab. Litig.*,
  859 F. Supp. 2d 1084 (N.D. Cal. 2012) ................................................................................17

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333, 131 S. Ct. 1740 (2011)............................................................................ *passim*

*Battels v. Sears Nat'l Bank*,
  365 F. Supp. 2d 1205 (M.D. Ala. 2005) ...............................................................................16

*Billups v. Bankfirst*,
  294 F. Supp. 2d 1265 (M.D. Ala. 2003) ...............................................................................16

*Blau v. AT&T Mobility*,
  2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ............................................................................17

*Boyer v. AT&T Mobility Servs., LLC*,
  2011 WL 3047666 (S.D. Cal. July 25, 2011) .......................................................................18

*Coneff v. AT&T Corp.*,
  673 F.3d 1155 (9th Cir. 2012) .........................................................................................2, 17

*Cruz v. Cingular Wireless, LLC*,
  648 F.3d 1205 (11th Cir. 2011) .....................................................................................17, 18

*Discover Bank v. Super. Ct.*,
  113 P.3d 1100 (Cal. 2005) ....................................................................................................16

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991).................................................................................................................18

*Gipson v. Cross Country Bank*,
  294 F. Supp. 2d 1251 (M.D. Ala. 2003) ...............................................................................16

*Hancock v. Am. Tel. & Tel. Co.*,
  804 F. Supp. 2d 1196 (W.D. Okla. 2011) .............................................................................18

*Hendricks v. AT&T Mobility, LLC,*
  823 F. Supp. 2d 1015 (N.D. Cal. 2011) ...................................................................17

*JSM Tuscany, LLC v. Super. Ct.,*
  123 Cal. Rptr. 3d 429 (Ct. App. 2011) .....................................................................14

*Kaltwasser v. AT&T Mobility, LLC,*
  812 F. Supp. 2d 1042 (N.D. Cal. 2011) ...................................................................17

*Laster v. T-Mobile USA, Inc.,*
  2013 WL 4082682 (S.D. Cal. July 19, 2013) ...........................................................18

*Lawrence v. Household Bank (SB), N.A.,*
  343 F. Supp. 2d 1101 (M.D. Ala. 2004) ...................................................................16

*Leonard v. Terminix Int'l Co.,*
  854 So. 2d 529 (Ala. 2002) .......................................................................................15

*Makarowski v. AT&T Mobility, LLC,*
  2009 WL 1765661 (C.D. Cal. 2009) ..........................................................................15

*Matthews v. AT&T Operations, Inc.,*
  764 F. Supp. 2d 1272 (N.D. Ala. 2011) ...................................................................16

*McArdle v. AT&T Mobility LLC,*
  2013 WL 5372338 (N.D. Cal. Sept. 25, 2013) .........................................................17

*Milligan v. Comcast Corp.,*
  2007 WL 4885492 (N.D. Ala. Jan. 22, 2007) ...........................................................16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) .......................................................................................................14

*Murphy v. DirecTV, Inc.,*
  724 F.3d 1218 (9th Cir. 2013) ..................................................................................14

*Nelson v. AT&T Mobility LLC,*
  2011 WL 3651153 (N.D. Cal. Aug. 18, 2011) .........................................................17

*O'Conner v. AT&T Corp.,*
  2013 WL 3107496 (M.D. La. June 18, 2013) ...........................................................18

*Pitchford v. AmSouth Bank,*
  285 F. Supp. 2d 1286 (M.D. Ala. 2003) ...................................................................16

*Powell v. AT&T Mobility, LLC,*
  742 F. Supp. 2d 1285 (N.D. Ala. 2010) ..............................................................15, 16

DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY ACTION
Case No. 3:15-cv-03418-EMC

*Rodriguez v. AT&T Servs., Inc.*,
    2015 WL 6163428 (D. Nev. Oct. 20, 2015) ..................................................18

*Sherman v. AT&T Inc.*,
    2012 WL 1021823 (N.D. Ill. Mar. 26, 2012) ..............................................18

*Shorts v. AT&T Mobility*,
    2013 WL 2995944 (W. Va. June 17, 2013) ...............................................18

*Taylor v. First N. Am. Nat'l Bank*,
    325 F. Supp. 2d 1304 (M.D. Ala. 2004) ...................................................16

*United States v. Nader*,
    542 F.3d 713 (9th Cir. 2008) ...................................................................14

**Statutes and Rules**

Federal Arbitration Act, 9 U.S.C. §§ 1-16 *et seq.* .................................................. *passim*

    9 U.S.C. § 2 ............................................................................................14

    9 U.S.C. § 3 ........................................................................................4, 18

Fed. R. Civ. P. 11(b) ..........................................................................................9, 10

Ala. Code §§ 8-19-1 *et seq.* ......................................................................................6

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...............................................................6

Cal. Civ. Code §§ 1750 *et seq.* ................................................................................6

**Other Authorities**

American Arbitration Association, *Analysis of the AAA's Consumer Arbitration*
    *Caseload*, http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_004325. ..........................12, 13

California Dispute Resolution Institute, *Consumer and Employment Arbitration in*
    *California: A Review of Website Data Posted Pursuant to Section 1281.96 of*
    *the Code of Civil Procedure* (2004) ......................................................................13

Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA*
    *Consumer Arbitrations*, 25 Ohio St. J. on Disp. Resol. 843, 898 (2010) ...............13

Ernst & Young, *Outcomes of Arbitration: An Empirical Study of Consumer*
    *Lending Cases* (2004) ..........................................................................................13

Mark Fellows, *The Same Result as in Court, More Efficiently: Comparing*
    *Arbitration and Court Litigation Outcomes*, Metropolitan Corporate Counsel,
    July 2006 ..............................................................................................................13

iv

David Sherwyn *et al.*, *Assessing the Case for Employment Arbitration: A New Path for Empirical Research*, 57 Stan. L. Rev. 1557 (2005)...................................................13

*U.S. District Court—Judicial Caseload Profile* (2012), http://www.uscourts.gov/ Statistics/FederalCourtManagementStatistics.aspx ................................................................12

1

## NOTICE OF MOTION AND MOTION

2    PLEASE TAKE NOTICE that on February 18, 2016, at 1:30 p.m., in Courtroom 5 of the

3 above-entitled Court, defendant AT&T Mobility LLC ("AT&T") hereby moves the Court for an

4 order: (i) compelling plaintiffs Marcus Roberts, Kenneth Chewey, Ashley Chewey, and James

5 Krenn to arbitrate their claims in accordance with their arbitration agreements with AT&T; and

6 (ii) staying this action pending the outcome of arbitration.

7    This motion is authorized by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and

8 supported by the accompanying Memorandum of Points and Authorities; the declarations of

9 David Browne, Stacie Dobbs, Beth Headley, Angela Kilpatrick, Joseph Munzenrider, and Jeffrey

10 Redfern; and by such other written and oral argument as may be presented to the Court.

11

12

## STATEMENT OF ISSUE TO BE DECIDED

13    Whether the FAA requires enforcement of the plaintiffs' agreements to arbitrate their

14 disputes with AT&T on an individual basis in light of the Supreme Court's ruling in *AT&T*

15 *Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740 (2011), that the FAA preempts state

16 law deeming AT&T's arbitration provision to be unconscionable.

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

The claims in this case belong in arbitration. The arbitration agreement governing the parties has been upheld by the U.S. Supreme Court. And the unique circumstances of each of the named plaintiffs—Marcus Roberts, Kenneth and Ashley Chewey, and James Krenn—exemplify why their challenges to AT&T's network management program should be adjudicated in separate arbitrations. Individual scrutiny of each plaintiff's claims is not only contractually mandated, but necessary and appropriate.

These four AT&T customers acknowledge in the complaint that their Wireless Customer Agreements require them to arbitrate disputes with AT&T on an individual basis. Am. Compl. ¶ 48. They do not deny that the arbitration provision covers their claims. Rather, they suggest that AT&T's arbitration provision is unconscionable (*id.*), while ignoring the fact that the Supreme Court, the Ninth Circuit, and numerous other courts—including six judges in this District alone—have rejected the contention that AT&T's arbitration provision is unenforceable because it bars class proceedings. *See*, *e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740 (2011); *Coneff v. AT&T Corp.*, 673 F.3d 1155 (9th Cir. 2012). Overwhelming authority establishes that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, requires enforcement of AT&T's arbitration provision, notwithstanding any argument that individual arbitration would be unconscionable or violate state public policy. Plaintiffs cannot evade this binding precedent.

Moreover, the circumstances of each of these four plaintiffs confirm the wisdom of applying that precedent here. Having enjoyed for as many as seven years the low monthly rate of $30 regardless of how much wireless data they have used (Am. Compl. ¶ 16), plaintiffs now allege that they were duped into accepting a term of the unlimited data plan implemented back in 2011. Specifically, they challenge the network management term by which AT&T *temporarily* reduces data speeds if a customer consumes a high amount of data during their monthly billing cycle (which plaintiffs refer to as "throttling"). *E.g.*, *id.* ¶ 21. Plaintiffs contend that they were unaware that AT&T's unlimited data plan included this potential speed reduction and that they would not have paid $30 per month for the plan had they known about it. *Id.* ¶¶ 70, 80, 87. Their

account history, however, indicates just the opposite:

- Lead plaintiff, Marcus Roberts, entered into his current two-year contract for the unlimited data plan on September 20, 2014 *after* having personally experienced "throttling" on **25 separate occasions** and receiving multiple notices about the network management program—including text messages sent to his phone. Decl. of Jospeh Munzenrider ¶¶ 13-14.

- Kenneth and Ashley Chewey similarly entered into a two-year contract *after* experiencing throttling and receiving text-message notices about throttling, including a message advising that "Your data usage is near 3GB this month. Exceeding 3GB during this or future billing cycles will result in reduced data speeds." *Id.* ¶¶ 6-7.

- James Krenn also received a text message notice regarding throttling before entering into his current contract. *Id.* ¶¶ 19, 21. He alleges to have been an unlimited data plan subscriber for the last seven years. Am. Compl. ¶ 81. However, he experienced reduced data speeds due to AT&T's network management program for at most a total of eight days. Munzenrider Decl. ¶ 21. Nonetheless, he demands a refund of all of the money he has ever paid AT&T—including for "wireless data plans, phones and other products." Am. Compl. ¶¶ 128, 135, 139, 159.

These plaintiffs are a far cry from the *hypothetical* class members they purport to represent—that is, hapless consumers who were tricked into purchasing the unlimited data plan for which they would not have paid $30 per month had they only known about "throttling." Am. Compl. ¶ 80. Plaintiffs may seek to masquerade as such hypothetical consumers by seeking to litigate on a class-wide basis. But the arbitration process would provide a more individualized—and accurate—resolution of their *actual* claims.

Moreover, the individualized attention paid to plaintiffs' claims through AT&T's pro-consumer arbitration process would actually inure to their benefit. As the Supreme Court has recognized, AT&T customers are "*better off* under their arbitration agreement with AT&T than they would" be "as participants in a class action." *Concepcion*, 131 S. Ct. at 1753 (internal quotation marks omitted). Plaintiffs would be able to arbitrate their individual claims for free in

an expeditious process: They fill out a few lines on a couple forms; choose a desk, telephonic, or local in-person hearing; and challenge AT&T to make them a generous settlement offer that would take into account AT&T's costs of defense *and* beat whatever the arbitrator could predictably award them. Barring settlement, one to two hearings on an expedited basis would yield a swift resolution. And if the arbitrator were to award a plaintiff greater relief than AT&T's settlement offer, the plaintiff's minimum recovery would swell to ***$10,000*** and ***double*** attorneys' fees. That $10,000 minimum recovery is hundreds of times greater than the $30 monthly fee of AT&T's unlimited data plan. Neither that heightened remedy—nor double attorneys' fees— would be available if plaintiffs litigated in court.

In deference to binding precedent and the parties' agreements to arbitrate, AT&T respectfully requests an order compelling plaintiffs to arbitrate their claims in accordance with their arbitration agreements. In the meantime, this action should be stayed pursuant to Section 3 of the FAA, 9 U.S.C. § 3.

## **BACKGROUND**

### A. **Plaintiffs Concede That Their AT&T Customer Agreements Require Arbitration On An Individual Basis.**

Plaintiffs concede, as they must, that AT&T's "Wireless Customer Agreement" includes an arbitration provision requiring that disputes be "individually arbitrated." Am. Compl. ¶ 48. AT&T's records confirm that the arbitration provisions in each of the plaintiffs' contracts are identical: Each requires the parties—as well as "all authorized or unauthorized users or beneficiaries of service"—to "arbitrate **all disputes and claims** between us." Decl. of Beth Headley Ex. 2 § 2.2(1); *see also id.* Ex. 1 at 14, Ex. 3 § 2.2(1), Ex. 4 § 2.2(1), Ex. 5 § 2.2(1), Ex. 6 § 2.2(1). The provision states that "[t]his agreement to arbitrate is intended to be broadly interpreted," and "includes * * * [c]laims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory" and "[c]laims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising)." *E.g.*, *id.* Ex. 2 § 2.2(1). There is no dispute that plaintiffs' grievances against AT&T's network management program fall squarely within this

agreement to arbitrate.

AT&T's arbitration provision further specifies that "**YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding." *E.g.*, Headley Decl. Ex. 2 § 2.2(6).

AT&T's records also confirm that the plaintiffs agreed to AT&T's arbitration provision and the other terms of their Wireless Customer Agreements as a condition to receiving AT&T's services. For example, in 2012, plaintiffs Marcus Roberts, Ashley Chewey,[1] and James Krenn purchased unlimited data plans and iPhones at AT&T retail stores. Munzenrider Decl. ¶¶ 6, 12, 18. During those transactions, each plaintiff was presented with an electronic signature-capture device that displayed the entire Wireless Customer Agreement. They could scroll through the entire document on the device or elect to print it by pressing an on-screen "Print" button. Decl. of Angela Kilpatrick ¶¶ 3-6. After plaintiffs each pressed the on-screen "Accept" button, they each signed his or her name under the following acknowledgment: "I have reviewed and agree to the rates, terms, and conditions for the wireless products and service described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) and the Customer Service Summary, both of which were made available to me prior to my signing. If buying an iPhone, I agree that use of the iPhone acts as an acceptance of the Apple and third party terms and conditions included with the iPhone." *Id.* Ex. 2.

In addition, with each transaction, the AT&T store employee would give each plaintiff a copy of his or her Customer Service Summary, which is a short plain-English document highlighting some of the key terms of the Wireless Customer Agreement. Decl. of David Browne

---

[1]     According to AT&T's records, plaintiff Kenneth Chewey is not an AT&T account holder, but instead receives wireless service on a line on the AT&T account of his wife, plaintiff Ashley Chewey. Munzenrider Decl. ¶ 5.

¶ 5. The Customer Service Summaries notified plaintiffs that their contracts consist of (among other things) "[t]he Wireless Customer Agreement * * * **and its arbitration clause**." Munzenrider Decl. Ex. 2 at 3; *accord id.* Ex. 7 at 3, Ex. 8 at 3, Ex. 10 at 3, Ex. 15 at 3, Ex. 17 at 3.

### B.    Plaintiffs Sued AT&T Notwithstanding Their Obligation To Arbitrate.

In breach of their agreement to arbitrate, plaintiffs filed this proposed class action lawsuit in July 2015. Plaintiffs purport to represent a nationwide class—with California and Alabama subclasses—of consumers who "purchased an unlimited data plan" and whose "data usage was throttled." Am. Compl. ¶¶ 51-53. They assert common law claims for misrepresentation, fraudulent concealment, breach of contract, and unjust enrichment, as well as statutory claims under Alabama's Deceptive Trade Practices Act (Ala. Code §§ 8-19-1 *et seq.*), and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), False Advertising Law (*id.* §§ 17500 *et seq.*), and Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 *et seq.*). Am. Compl. ¶¶ 88-161. Plaintiffs demand restitution, compensatory and punitive damages, injunctive relief, and attorneys' fees and costs. *Id.* at 29-30.

As noted above, plaintiffs allege in their amended complaint that they were unaware that AT&T's unlimited data plan included potential speed reduction. *E.g.*, Am. Compl. ¶¶ 64, 69, 77-78, 84. Yet their customer records show that they were aware. Plaintiffs also allege they would not have paid $30 per month for the plan had they known about the network management program. *Id.* ¶¶ 70, 80, 87. Yet they did exactly that. Plaintiffs further allege that AT&Ts "throttling of the data speed of its unlimited data plan customers is of such a degree that consumers, including Plaintiffs and the Class, are effectively unable to access data for the remainder of a billing cycle." *Id.* ¶ 4. Yet their bills show they continued to use plenty of data even after being throttled. For example:

- **Marcus Roberts.** Mr. Roberts entered into his current two-year contract for the unlimited data plan on September 20, 2014, despite the fact that he had been "throttled" *25 times* before entering into his current contract. Munzenrider Decl. ¶¶ 13-14. In addition, between January and September 2014 (before he entered his current contract), Mr. Roberts used

1    between **9GB** and **13GB** of data per month (*id.* ¶ 15), despite the fact that he was

2    "throttled" after using **3GB** per month. These facts contradict his assertions that he was

3    unaware that his plan was subject to throttling and that he was "unable to access data"

4    after he was "throttled." Am. Compl. ¶ 4.



**Figure 1. Marcus Roberts Used Much Data and Entered a New Contract after Throttling**

• **Kenneth and Ashley Chewey.** The Cheweys received two text messages in **December
2011** warning them to "[u]se Wi-Fi to help avoid reduced speeds," as well as text
messages in **February, March**, **May,** and **August 2012**, and **November 2013** informing
them that they had used 3GB of data and that continued usage would result in "reduced
speeds." Munzenrider Decl. ¶ 7. In May 2012, they also spoke with AT&T customer
service regarding AT&T's network management policy. *Id.* ¶ 9. In addition, they had
experienced speed reductions as early as **December 2011**. *Id.* ¶ 7. Nevertheless, the
Cheweys decided in **October 2012** to enter into a new two-year contract for the unlimited
data plan, despite knowing how the unlimited plan and its speed-reduction policies
worked. *Id.* ¶ 6. As with Mr. Roberts, these facts contradict the Cheweys' allegations that
they were somehow tricked into purchasing the unlimited data plan and that they would

not have paid $30 per month for the plan had they known that excessive usage would be subject to "throttling." Am. Compl. ¶ 80.



**Figure 2. The Cheweys Entered Their Current Contract With Eyes Wide Open to the Network Management Program.**

- **James Krenn.** Mr. Krenn similarly entered his latest contract on June 30, 2015 **after** receiving a text message notice of the network management program and **after** he contacted AT&T customer service to obtain an explanation of AT&T's network management policy on February 14, 2015. Munzenrider Decl. ¶¶ 19-20. Moreover, although he alleges that he has had an unlimited data plan since 2008 (Am. Compl. ¶ 81), he has been *potentially* subject to throttling only **once**—for **an eight–day period** in **July 2015**, during which he actually would have experienced reduced speeds only if he used his phone on a congested cellular tower. Munzenrider Decl. ¶ 21. Yet he now demands a full refund for all AT&T "wireless data plans, phones and other products." Am. Compl. ¶¶ 128, 135, 139, 159. In other words, he insists on over seven years of free service and numerous free iPhones because he experienced at most eight days of reduced speed.

1
2
3
4
5
6
7
8
9



10 **Figure 3. James Krenn Entered His Current Contract After Receiving A Throttling Warning.**

11

12    These examples are not meant to litigate the merits of plaintiffs' claims or present a

13 comprehensive account of AT&T's defenses. What they demonstrate, however, is that the

14 schism between plaintiffs' allegations and their actual account histories underscores the need for

15 individualized scrutiny in separate arbitrations.

16    **C.    Plaintiffs' Claims Would Be Fairly Resolved In Arbitration.**

17    In addition to a clear-eyed assessment of the merits, individual arbitration also offers

18 plaintiffs greater opportunity for a more efficient and consumer-friendly resolution than a class

19 action could provide. AT&T has tailored its arbitration process to favor consumers—including

20 ones with claims such as those asserted here. For example, AT&T's arbitration provision

21 includes a number of features designed to make arbitration easy and attractive for consumers

22 (*e.g.*, Headley Decl. Ex. 2 §§ 2.1-2.2):

23    • **Cost-free arbitration**: For claims up to $75,000, "AT&T will pay all [American

24       Arbitration Association ('AAA')] filing, administration, and arbitrator fees" unless

25       the arbitrator determines the customer's claim "is frivolous or brought for an

26       improper purpose (as measured by the standards set forth in Federal Rule of Civil

27

28

Procedure 11(b))";[2]

- **$10,000 minimum award**: If the arbitrator issues an award in favor of a customer that is greater than "AT&T's last written settlement offer made before an arbitrator was selected," AT&T will pay the customer $10,000 rather than any smaller arbitral award;

- **Double attorneys' fees**: If the arbitrator awards the customer more than AT&T's last written settlement offer made before an arbitrator was selected, then "AT&T will * * * pay [the customer's] attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs), that [the] attorney reasonably accrues for investigating, preparing, and pursuing [the] claim in arbitration";[3]

- **Small claims court option**: Either party may bring a claim in small claims court as an alternative to arbitration;

- **Flexible consumer procedures**: Arbitration will be conducted under the AAA's Consumer Arbitration Rules, which the AAA designed with consumers in mind;[4]

- **Choice of in-person, telephonic, or no hearing**: For claims of $10,000 or less, the customer has the exclusive right to choose whether the arbitrator will conduct an in-

---

[2]     Even if an arbitrator concludes that a customer's claim is frivolous, if the claim is for less than $10,000, the arbitration provision would cap the amount of costs the customer would have to pay at $200, the amount the consumer is responsible for under the AAA's consumer arbitration rules. *See* Decl. of Jeffrey Redfern Ex. 1 at 33 (AAA Consumer Arbitration Rules fee schedule).

[3]     The contractual entitlement to double attorneys' fees "supplements any right to attorneys' fees and expenses [the customer] may have under applicable law." *E.g.*, Headley Decl. Ex. 2 § 2.2(5). Thus, even if an arbitrator were to award a customer less than AT&T's last settlement offer, the customer would still be entitled to an attorneys' fee award to the same extent as if the claim had been brought in court.

[4]     The arbitration provision references the AAA's Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes. *E.g.*, Headley Decl. Ex. 2 § 2.2(3). But in September 2014, the AAA replaced those rules for administering consumer disputes with its new Consumer Arbitration Rules. Redfern Decl. Ex. 2 at 1. The AAA applies the Consumer Arbitration Rules "whenever" an agreement has "provided for arbitration by the American Arbitration Association ('AAA'), and" the agreement has "specifie[d] that the Supplementary Procedures for Consumer-Related Disputes shall apply." Redfern Decl. Ex. 1 at 9.

person hearing, a telephonic hearing, or a "desk" arbitration in which "the arbitration will be conducted solely on the basis of documents submitted to the arbitrator";

- **Conveniently located hearing**: Arbitration will take place "in the county * * * of [the customer's] billing address";

- **AT&T disclaims right to seek attorneys' fees**: "Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award";

- **No confidentiality requirement**: Either party may publicly disclose the arbitration and its result;

- **Full individual remedies available**: The arbitrator can award any form of relief on an individualized basis (including statutory and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone) that a court could award; and

- **Right to written decision**: "Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based."

These features of AT&T's arbitration provision will facilitate the fair and prompt resolution of the plaintiffs' individual claims. In fact, this is the reason the U.S. Supreme Court noted that AT&T's customers were "*better off* under their arbitration agreement with AT&T than they would have been as participants in a class action." *Concepcion*, 131 S. Ct. at 1753 (internal quotation marks omitted). A review of how AT&T's dispute-resolution process would work in this case illustrates the point:

**STEP ONE:** The first step is for each plaintiff to notify AT&T of the dispute in writing. *E.g.*, Headley Decl. Ex. 2 § 2.2(2). This is as simple as mailing a letter to AT&T or submitting a one-page Notice of Dispute form that AT&T has posted online (at http://www.att.com/arbitration-forms). Redfern Decl. Ex. 4; *see also Concepcion*, 131 S. Ct. at 1744.

**STEP TWO:** Within 30 days, AT&T would respond to the Notice of Dispute. AT&T has every economic incentive to offer to settle the case to the customer's satisfaction. As noted above, if the plaintiff were to reject the offer and initiate arbitration of claims seeking $75,000 or

- 11 -

1   less—such as the plaintiffs' individual claims here—then AT&T would be required to pay the

2   *full cost* of the arbitration proceeding. Redfern Decl. Ex. 1 at 33-34. (AAA Consumer Arbitration

3   fee schedule). And if the arbitrator were to award the plaintiff an amount that exceeds AT&T's

4   settlement offer, then the plaintiff's minimum recovery would be $10,000 and double attorneys'

5   fees. *E.g.*, Headley Decl. Ex. 2 § 2.2(4). Thus, AT&T has a strong financial incentive to settle all

6   remotely colorable claims.

7        **STEP THREE:** If the dispute is not resolved to the plaintiff's satisfaction within 30

8   days, then the plaintiff may commence arbitration. To do so, the plaintiff need only fill out a one-

9   page Demand for Arbitration form and send copies to the AAA and to AT&T. Customers may

10   obtain a copy of the demand form from the AAA's web site (at http://www.adr.org) or use the

11   simplified form that AT&T has posted on its web site (at http://www.att.com/arbitration-forms).

12   Redfern Decl. Ex. 4; *see also Concepcion*, 131 S. Ct. at 1744. To further assist its customers,

13   AT&T has posted on its web site a layperson's guide on how to arbitrate a claim. Redfern Decl.

14   Ex. 5 (http://www.att.com/arbitration-information).

15        Plaintiffs each can choose to arbitrate by mail, by phone, or via a local in-person hearing.

16   *E.g.*, Headley Decl. Ex. 2 § 2.2(3). The AAA would then appoint a qualified and impartial

17   arbitrator from its roster of retired judges and experienced lawyers. Redfern Decl. Ex. 1 § R-16.

18   Each plaintiff also would have an opportunity to object to the selected arbitrator. *Id.* § R-19.

19   Once the arbitrator is selected, he or she would proceed to resolve the dispute. The process is

20   expeditious. Indeed, AAA arbitrators typically resolve consumer arbitrations in a quarter of the

21   time (or less) than it takes a federal court to resolve a civil action, much less a complex class

22   action.[5] And because of the informality of the process—which frees consumers from the

23   procedural and evidentiary hurdles that often stymie plaintiffs in court—consumers generally

24   fare well in arbitration. Indeed, studies of the AAA docket show that consumers who bring

25

26   [5]      The typical civil action in federal court takes 25.7 months to reach trial. *U.S. District

27   Court—Judicial      Caseload      Profile      (2012),      http://www.uscourts.gov/Statistics/
     FederalCourtManagementStatistics.aspx*. By contrast, AAA consumer arbitrations are resolved

28   on average in between four to six months. AAA, *Analysis of the AAA's Consumer Arbitration
     Caseload*, at 1, at http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_004325.

1    claims in arbitration tend to win more often than people who file lawsuits in court.[6]

2        In sum, AT&T's dispute-resolution process offers customers with colorable claims a

3    swift recovery that likely would far exceed the value of the pennies on the dollar—if that—that

4    consumers typically receive in a class action.

5                                    **ARGUMENT**

6    **I.    THE   FAA   REQUIRES   ENFORCEMENT   OF   AT&T'S   ARBITRATION**
        **PROVISION.**
7

8        Plaintiffs' claims must be arbitrated as a matter of law. Plaintiffs concede (Am. Compl.

9    ¶ 48)—and AT&T's records confirm (*see* pages 4-6, *supra*)—that their AT&T contracts include

10   arbitration provisions.[7] And plaintiffs' underlying dispute regarding the marketing of their

---

11       [6]    A study of AAA arbitrations initiated by consumers resolved between January and
12   August 2007 found that consumers obtained settlements in 60 percent of cases and prevailed in
     48 percent of the remainder. AAA, *Analysis of the American Arbitration Association's Consumer*
13   *Arbitration Caseload* 1, at http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_004325. Other
     studies of arbitrations during different time periods have found even higher win rates for
14   consumers. *See, e.g.*, Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA*
     *Consumer Arbitrations*, 25 Ohio St. J. on Disp. Resol. 843, 898 (2010) (reporting consumer win
15   rate of 53.3 percent in consumer-initiated arbitrations that reached a decision between April and
     December 2007); Mark Fellows, *The Same Result as in Court, More Efficiently: Comparing*
16   *Arbitration and Court Litigation Outcomes*, Metropolitan Corporate Counsel, July 2006, at 32
     (finding 65.5 percent consumer win rate in consumer-initiated arbitrations that reached a
17   decision); California Dispute Resolution Institute, *Consumer and Employment Arbitration in*
     *California: A Review of Website Data Posted Pursuant to Section 1281.96 of the Code of Civil*
18   *Procedure* (2004) (finding 71 percent win rate for consumers in consumer-initiated arbitrations);
     Ernst & Young, *Outcomes of Arbitration: An Empirical Study of Consumer Lending Cases*
19   (2004) (finding 55 percent consumer win rate in consumer-initiated arbitrations that reached a
     decision). Moreover, as an article in the *Stanford Law Review* surveying the empirical research
20   concludes, "[w]hat seems clear from the results of these studies is that the assertions of many
     arbitration critics" that plaintiffs "would not fare well in arbitration" and would enjoy a better
21   "win/loss rate[]" in court were "either overstated or simply wrong." David Sherwyn *et al.*,
22   *Assessing the Case for Employment Arbitration: A New Path for Empirical Research*, 57 Stan. L.
     Rev. 1557, 1567 (2005).
23
24       [7]    Although plaintiff Kenneth Chewey alleges that he is an "existing customer[]" of AT&T
25   who "purchased" AT&T service (Am. Compl. ¶ 71), AT&T's records show that Mr. Chewey is
     not an account holder, but rather a user on the account of his wife, plaintiff Ashley Chewey.
26   Munzenrider Decl. ¶ 5. He nonetheless is required to arbitrate his claims. The contract under
     which he receives service specifies that "all authorized and unauthorized users or beneficiaries of
27   services or Devices," such as Mr. Chewey, must arbitrate disputes with AT&T. Headley Decl.
     Ex. 2 § 2.2(1). And it is settled under California law that "a nonsignatory can be compelled to
28   arbitrate when"—as here—that nonsignatory "is suing as a third-party beneficiary of the contract

wireless data plans falls comfortably within the scope of their agreement to arbitrate "all disputes and claims between" them and AT&T, including claims involving "advertising." Headley Decl. Ex. 2 § 2.2(1). Even if there were any uncertainty as to whether the plaintiffs' claims are arbitrable—and there is none—the Supreme Court has held that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The FAA requires enforcement of AT&T's arbitration provision. The FAA applies to any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) AT&T's arbitration provision is in writing (*see* pages 4-6, *supra*), and (ii) contracts for wireless service involve interstate commerce, because even when used intra-state, "[t]elephones are instrumentalities of interstate commerce." *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). Indeed, AT&T's arbitration provision specifies that the contract "evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision." *E.g.*, Headley Decl. Ex. 2 § 2.2(1).

Under the FAA, plaintiffs' arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As the Supreme Court has explained, "[t]he overarching purpose of the FAA * * * is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1748. And this "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 1749 (internal quotation marks omitted); *accord*, *e.g.*, *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1225 (9th Cir. 2013).

Here, no grounds "exist at law or in equity for the revocation of" (9 U.S.C. § 2) AT&T's arbitration provision. Plaintiffs assert that AT&T's arbitration provision is "unenforceable" because its "require[ment] that certain disputes be individually arbitrated" is "substantively and

containing the arbitration clause." *JSM Tuscany, LLC v. Super. Ct.*, 123 Cal. Rptr. 3d 429, 444 (Ct. App. 2011).

1    procedurally unconscionable and/or is against public policy." Am. Compl. ¶ 48. But that

2    contention cannot be squared with binding precedent.

3         To begin with, plaintiff James Krenn is an Alabama resident suing under Alabama law.

4    Am. Compl. ¶¶ 9, 53, 155. His contract also specifies that "[t]he law of the state of [his] billing

5    address"—which is in Alabama (Munzenrider Decl. ¶ 22)—"shall govern this Agreement except

6    to the extent that such law is preempted by or inconsistent with applicable federal law" (Headley

7    Decl. Ex. 4 § 9.3.2). Under Alabama law, agreements to arbitrate consumer disputes on an

8    individual basis are not categorically unconscionable or against public policy. To the contrary,

9    the plaintiff must prove that "the costs of pursuing her claim in arbitration are so great in

10   comparison to the potential recovery that she is precluded from a meaningful remedy." *Powell v.

11   AT&T Mobility, LLC*, 742 F. Supp. 2d 1285, 1292 (N.D. Ala. 2010) (citing *Leonard v. Terminix

12   Int'l Co.*, 854 So. 2d 529, 537 (Ala. 2002)). Mr. Krenn cannot make that showing: to the

13   contrary, he can arbitrate cost-free and potentially obtain minimum recoveries of $10,000 and

14   double attorneys' fees in arbitration (*see* page p10, *supra*)—which are remedies unavailable in

15   court. Indeed, a federal judge has remarked that a materially identical version of AT&T's

16   arbitration agreement to the one at issue here "contains perhaps the most fair and consumer-

17   friendly provisions this Court has ever seen." *Makarowski v. AT&T Mobility, LLC*, 2009 WL

18   1765661, at *3 (C.D. Cal. 2009) (Feess, J.). And the U.S. Supreme Court has lauded the fairness

19   of AT&T's arbitration procedures, observing that "aggrieved customers who filed claims would

20   be 'essentially guarantee[d]' to be made whole," and that AT&T customers were "*better off*

21   under their arbitration agreement with AT&T than they would have been as participants in a

22   class action." *Concepcion*, 131 S. Ct. at 1753.[8] Unsurprisingly, every court to consider the

23   question has held that AT&T's arbitration provision or a materially identical version is fully

24

25

26   [8]        In *Concepcion*, the Supreme Court was considering an earlier version of AT&T's
27   arbitration provision than the one at issue here. But the principal difference between the two
     versions of AT&T's arbitration provision is that the amount of the minimum recovery paid to
28   customers to whom the arbitrator awards more than AT&T's settlement offer has been increased
     from $7,500 to $10,000. *See Concepcion*, 131 S. Ct. at 1744-45 & n.3 (discussing the change).

enforceable under Alabama law. *See Powell*, 742 F. Supp. 2d at 1292; *Matthews v. AT&T Operations, Inc.*, 764 F. Supp. 2d 1272, 1280-81 (N.D. Ala. 2011).[9]

The other plaintiffs, who are California residents (Am. Compl. ¶¶ 7-8, 52), fare no better under California law. To be sure, California once deemed form consumer contracts requiring arbitration on an individual basis to be unconscionable under its so-called "*Discover Bank* rule." *Concepcion*, 131 S. Ct. at 1746 (citing *Discover Bank v. Super. Ct.*, 113 P.3d 1100 (Cal. 2005)). But the Supreme Court held in *Concepcion*—in a decision involving an AT&T arbitration provision materially identical to the one at issue here—that "California's *Discover Bank* rule is preempted by the FAA." *Id.* at 1753. As the Supreme Court explained, a state-law rule "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748. "States," the Court added, "cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons," such as the goal of ensuring that "small-dollar claims" do not "slip through the legal system." *Id.* at 1753.

The *Concepcion* decision shuts the door on any argument by plaintiffs that AT&T's "individual[] arbitrat[ion]" requirement is "unconscionable" or "against public policy" (Am. Compl. ¶ 48)—whether under California or Alabama law. As the Ninth Circuit has explained, "*Concepcion* is broadly written." *Coneff*, 673 F.3d at 1158. "The [Supreme] Court observed that individualized proceedings are an inherent and necessary element of arbitration * * *, and concluded that ***a rule banning class-action waivers is therefore impermissible***." *Id.* (emphasis added) (citing *Concepcion*, 131 S. Ct. at 1748, 1750-52). Plaintiffs cannot resuscitate the *Discover Bank* rule declared preempted in *Concepcion* via a functionally equivalent public-

---

[9]      In fact, courts have concluded that far less consumer-friendly provisions than AT&T's provision are enforceable under Alabama law. *See, e.g., Milligan v. Comcast Corp.*, 2007 WL 4885492, at *2 (N.D. Ala. Jan. 22, 2007); *Battels v. Sears Nat'l Bank*, 365 F. Supp. 2d 1205, 1217 (M.D. Ala. 2005); *Lawrence v. Household Bank (SB), N.A.*, 343 F. Supp. 2d 1101, 1112 (M.D. Ala. 2004); *Taylor v. First N. Am. Nat'l Bank*, 325 F. Supp. 2d 1304, 1319-22 (M.D. Ala. 2004); *Billups v. Bankfirst*, 294 F. Supp. 2d 1265, 1276-77 (M.D. Ala. 2003); *Gipson v. Cross Country Bank*, 294 F. Supp. 2d 1251, 1263-64 (M.D. Ala. 2003); *Pitchford v. AmSouth Bank*, 285 F. Supp. 2d 1286, 1296 (M.D. Ala. 2003).

policy or unconscionability theory. As the Eleventh Circuit observed—in language that the Ninth Circuit soon quoted—such an argument would merely rehash "the very public policy arguments that were expressly rejected by the Supreme Court in *Concepcion*—namely, that the class action waiver will be exculpatory, because most of these small-value claims will go undetected and unprosecuted." *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1214 (11th Cir. 2011) (quoted in *Coneff*, 673 F.3d at 1160).

In light of the Supreme Court's decision in *Concepcion* and the Ninth Circuit's decision in *Coneff*, every single judge in this District to consider the question—six so far—has concluded that AT&T's arbitration provision is enforceable even though it requires arbitration on an individual basis:

- Hon. Charles R. Breyer: *Blau v. AT&T Mobility*, 2012 WL 10546, at *5 (N.D. Cal. Jan. 3, 2012); *Hendricks v. AT&T Mobility, LLC*, 823 F. Supp. 2d 1015, 1019-23 (N.D. Cal. 2011);

- Hon. Jeremy Fogel: *Kaltwasser v. AT&T Mobility, LLC*, 812 F. Supp. 2d 1042, 1046-51 (N.D. Cal. 2011), *recons. denied*, 2011 WL 5417085 (N.D. Cal. Nov. 8, 2011), *pet. for mandamus denied*, No. 11-73752 (9th Cir. Jan. 9, 2012);

- Hon. Thelton E. Henderson: *Nelson v. AT&T Mobility LLC*, 2011 WL 3651153, at *2-4 (N.D. Cal. Aug. 18, 2011);

- Hon. James Ware: *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084, 1093-97 (N.D. Cal. 2012); *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1174-75 (N.D. Cal. 2011), *pet. for leave to appeal denied*, No. 12-80012 (9th Cir. Apr. 27, 2012);

- Hon. Claudia Wilken: *McArdle v. AT&T Mobility LLC,* 2013 WL 5372338, at *4 (N.D. Cal. Sept. 25, 2013); and

- Hon. Ronald M. Whyte: *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 2011 WL 2886407, at *3-4 (N.D. Cal. July 19, 2011).[10]

---

[10]    In the *iPad* case, the court granted a motion to compel arbitration as to all but one of the plaintiffs; as to the last plaintiff, the court concluded that because the plaintiff had not agreed to

1    The authority establishing that federal law requires the enforcement of AT&T's

2  arbitration provision extends beyond this District. In fact, since *Concepcion*, every court from

3  other jurisdictions also has enforced AT&T's arbitration provision and its requirement of

4  individual arbitration.[11]

5    As these decisions across the country confirm, binding precedent forecloses plaintiffs'

6  contention here that AT&T's arbitration provision is unenforceable because it requires that

7  "disputes be individually arbitrated" (Am. Compl. ¶ 49).

8  **II.    THIS LAWSUIT SHOULD BE STAYED PENDING ARBITRATION OF**
9  **        PLAINTIFFS' CLAIMS.**

10    When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims,

11 Section 3 of the FAA directs the district court to compel arbitration and stay the lawsuit. *See* 9

12 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see*

13 *also*, *e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (FAA "provides for

14 stays of proceedings in federal district courts when an issue in the proceeding is referable to

15 arbitration, § 3").

16

17

18

19 ────────────────────

20 arbitration in connection with his Apple iPad purchase, his dispute with AT&T was outside the
   scope of an arbitration agreement he accepted when he obtained AT&T separate service on an
21 iPhone account. But on the question of the enforceability of the arbitration agreement, the court
   had little trouble concluding that "Plaintiffs fail to identify any terms of AT&T's arbitration
22 agreement that might preclude enforcement after *Concepcion*." *In re Apple & AT&T ipad,* 2011
   WL 2886407, at *4. Notably, lead counsel for the plaintiffs in the *iPad* case are the same lead
23 counsel representing plaintiffs in this action.

24 [11]    *See*, *e.g.*, *Cruz*, 648 F.3d at 1214; *Laster v. T-Mobile USA, Inc.*, 2013 WL 4082682, at
   *1-3 (S.D. Cal. July 19, 2013); *O'Conner v. AT&T Corp.*, 2013 WL 3107496, at *2-3 (M.D. La.
25 June 18, 2013); *Shorts v. AT&T Mobility*, 2013 WL 2995944, at *6 (W. Va. June 17, 2013);
   *Boyer v. AT&T Mobility Servs., LLC*, 2011 WL 3047666, at *3 (S.D. Cal. July 25, 2011); *see*
26 *also Rodriguez v. AT&T Servs., Inc.*, 2015 WL 6163428, at *4-6 (D. Nev. Oct. 20, 2015)
   (enforcing arbitration clause and class waiver in AT&T business agreement); *Sherman v. AT&T*
27 *Inc.*, 2012 WL 1021823, at *4 (N.D. Ill. Mar. 26, 2012) (AT&T residential Internet service
   contract); *Hancock v. Am. Tel. & Tel. Co.*, 804 F. Supp. 2d 1196, 1205 (W.D. Okla. 2011)
28 (AT&T U-Verse contract), *aff'd*, 701 F.3d 1248 (10th Cir. 2012).

1

## **CONCLUSION**

2        The Court should compel the plaintiffs to arbitrate their claims in accordance with the

3 arbitration provision in the contracts governing their wireless service, and this litigation should

4 be stayed pending the resolution of those arbitrations.

5

6 Dated: November 2, 2015                          MAYER BROWN LLP

7                                                   /s/  Donald M. Falk
                                                    DONALD M. FALK (SBN 150256)
8                                                   dfalk@mayerbrown.com
                                                    ELSPETH HANSEN (SBN 292193)
9                                                   elspeth.hansen@mayerbrown.com
                                                    Two Palo Alto Square, Suite 300
10                                                  3000 El Camino Real
                                                    Palo Alto, CA 94306-2112
11                                                  Telephone: (650) 331-2000
                                                    Facsimile:  (650) 331-2060
12
                                                    KEVIN RANLETT (*pro hac vice*)
13                                                  kranlett@mayerbrown.com
                                                    1999 K Street, N.W.
14                                                  Washington, DC 20006
                                                    Telephone: (202) 263-3000
15                                                  Facsimile: (202) 263-3300

16                                                  *Attorneys for Defendant AT&T Mobility LLC*

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY ACTION