1
Michael W. Sobol (State Bar No. 194857)
Roger N. Heller (State Bar No. 215348)
2
Nicole D. Sugnet (State Bar No. 246255)
LIEFF CABRASER HEIMANN
3
& BERNSTEIN LLP
275 Battery Street, 29th Floor
4
San Francisco, CA 94111
Telephone: (415) 956-1000
5

6
John A. Yanchunis
(Pending Admission *Pro Hac Vice*)
7
Rachel Soffin
(Pending Admission *Pro Hac Vice*)
8
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
9
201 North Franklin Street, 7th Floor
Tampa, FL 33602
10
Telephone: (813) 223-5505

11
Jean Sutton Martin
(Admitted *Pro Hac Vice*)
12
LAW OFFICE OF
JEAN SUTTON MARTIN PLLC
13
2018 Eastwood Road, Suite 225
Wilmington, North Carolina 28403
14
Telephone: (910) 292-6676

15
*Attorneys for Plaintiffs and the Proposed Class*

Alexander H. Schmidt (Admitted *Pro Hac Vice*)
Michael M. Liskow (State Bar No. 243899)
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600

Rachele R. Rickert (State Bar No. 190634)
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
750 B. Street, Suite 2770
San Diego, California 92101
(619) 239-4599

16

## UNITED STATES DISTRICT COURT

17

## NORTHERN DISTRICT OF CALIFORNIA

18

19
MARCUS A. ROBERTS,
KENNETH A. CHEWEY,
20
ASHLEY M. CHEWEY, AND JAMES
KRENN, on behalf of themselves and
21
all others similarly situated,

22
                    Plaintiffs,

23
v.

24
AT&T MOBILITY LLC,

25
                    Defendant.

26

27

28

Case No. 3:15-cv-3418-EMC

**PLAINTIFFS' OPPOSITION TO
DEFENDANT'S NOTICE OF MOTION AND
MOTION TO COMPEL ARBITRATION AND
STAY ACTION**

Date:        February 18, 2016
Time:        1:30 p.m.
Courtroom:   5 - 17th Floor
Judge:       The Hon. Edward M. Chen

1282696.9

1

# TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................................................... 1

4

FACTS .................................................................................................................................... 2

ARGUMENT ......................................................................................................................... 3

5

I.       As a Threshold Matter, State Action Exists Here. ................................................. 3

6

II.      The First Amendment Establishes a Right to Petition Courts................................ 5

7

A.      The Petition Clause Guarantees a Right to Petition Courts for
Redress of Private Claims. ............................................................................ 5

8

B.      Resolving Disputes in Court Advances Several First Amendment
Interests that are Not Advanced by, and are in Fact Curtailed by,

9

Private Arbitration......................................................................................... 7

10

III.     A Court Order Requiring Plaintiffs to Arbitrate Their Claims Would
Violate Their Right First Amendment Right to Petition Courts. ......................... 10

11

A.      Plaintiffs Have Not Knowingly and Voluntarily Waived Their
Right to Petition Courts. ............................................................................. 10

12

B.      The Small Claims Court Exception to AT&T's Arbitration Clause
Does Not Provide the Access to or Redress in Court Required by

13

the Petition Clause. ..................................................................................... 14

14

IV.      Interpreting the FAA to Require Enforcement of Consumer Adhesion
Arbitration Clauses Conflicts with the Petition Clause, a Result that is

15

Impermissible Under the Constitutional Avoidance Doctrine. ............................ 15

16

A.      The FAA's Text  Does Not Evidence a Clear Congressional Intent
to Infringe the Petition Clause.................................................................... 19

17

B.      The FAA's Legislative History Does Not Evidence a Clear
Congressional Intent to Infringe the Petition Clause ................................. 21

18

CONCLUSION .................................................................................................................... 25

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alexander v. United States,*
   509 U.S. 544 (1993) ............................................................................................... 18

*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
   513 U.S. 265 (1995) ................................................................................ 17, 19, 20

*American Express Co. v. Italian Colors Restaurant,*
   133 S. Ct. 2304 (2013) ........................................................................................ 1, 24

*AT&T Mobility LLC v. Bernardi,*
   Nos. 11-03992 and 11-04412, 2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) ........................... 9

*AT&T Mobility LLC v. Bushman,*
   No. 11-80922, 2011 WL 5924666 (S.D. Fla. Sept. 23, 2011) ................................................. 9

*AT&T Mobility LLC v. Fisher,*
   No. 11-02245, 2011 WL 5169349 (D. Md. Oct. 28, 2011) ........................................................ 9

*AT&T Mobility LLC v. Gonnello,*
   No. 11-05636, 2011 WL 4716617 (S.D.N.Y. Oct. 7, 2011) ....................................................... 9

*AT&T Mobility LLC v. Hidalgo,*
   No. 11-03907, Dkt. No. 49 (E.D.N.Y. Oct. 31, 2011) ............................................................... 9

*AT&T Mobility LLC v. Princi,*
   No. 11-11448, 2011 WL 6012945 (D. Mass., Dec. 2, 2011) ...................................................... 9

*AT&T Mobility LLC v. Smith,*
   No. 11-05157, 2011 WL 5924460 (E.D. Pa. Oct. 7, 2011) ....................................................... 9

*Atalese v. U.S. Legal Servs. Group, L.P.,*
   99 A.3d 306 (N.J. 2014) .................................................................................... 11, 13

*Attard Indus. v. United States Fire Ins. Co.,*
   No. 1:10cv121 (AJT/TRJ), 2010 U.S. Dist. LEXIS 80785 (E.D. Va. Aug. 5,
   2010 ........................................................................................................................... 12

*Barrows v. Jackson,*
   346 U.S. 249 (1953) ................................................................................................ 4

*BE&K Constr. Co. v. NLRB,*
   536 U.S. 516 (2002) ..................................................................................... passim

# TABLE OF AUTHORITIES
### (continued)

Page

*Bill Johnson's Rests., Inc. v. NLRB,*
   461 U.S. 731 (1983) ............................................................................................ 5, 7

*Borough of Duryea v. Guarnieri,*
   131 S. Ct. 2488 (2011) ...................................................................................... 5, 6, 7

*Bosinger v. Phillips Plastics Corp.,*
   57 F. Supp. 2d 986 (S.D. Cal. 1999) ..................................................................... 12

*Bounds v. Smith,*
   430 U.S. 817 (1977) ................................................................................................. 6

*Bradley v. Hall,*
   64 F.3d 1276 (9th Cir. 1995) ................................................................................... 5

*California Motor Transp. Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) ............................................................................................. 5, 7

*Cannon v. Wells Fargo Bank, N.A.,*
   917 F. Supp. 2d 1025 (N.D. Cal. 2013) ................................................................. 11

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) ................................................................................... 8

*Carnley v. Cochran,*
   369 U.S. 506 (1962) ............................................................................................... 10

*Chambers v. Baltimore & Ohio R.R Co.,*
   207 U.S. 142 (1907) ................................................................................................. 5

*Circuit City Stores, Inc. v. Adams,*
   532 U.S. 105 (2001) ............................................................................................... 17

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ........................................................................................... 5, 16

*Cohen v. Wedbush, Noble, Cooke, Inc.,*
   841 F.2d 282 (9th Cir. 1988) ................................................................................. 12

*Collazo v. Estelle,*
   940 F.2d 411 (9th Cir. 1991) ................................................................................. 10

*Cremin v. Merrill Lynch Pierce Fenner & Smith,*
   957 F. Supp. 1460 (N.D. Ill. 1997) ....................................................................... 12

*Daniels v. Arcade, L.P.,*
   477 F. App'x 125 (4th Cir. 2012) ............................................................................ 5

- iii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Denver Area Educ. Telecomm. Consortium v. FCC*,
   518 U.S. 727 (1996) ........................................................................................................ 4

*Desiderio v. NASD*,
   191 F.3d 198 (2d Cir. 1999) ........................................................................................... 4

*Dispenziere v. Kushner Companies*,
   101 A.3d 1126 (N.J. Super. Ct. App. Div. 2014) ........................................................ 13

*Duffield v. Robertson Stephens & Co.*,
   144 F.3d 1182, 1200-02 (9th Cir. 1998) *overruled on other grounds by*
   *E.E.O.C. v. Luce, Forward, Hamilton & Scripps,* 345 F.3d 742 (9th Cir. 2003) ...................... 4

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades
   Council*,
   485 U.S. 568 (1988) .................................................................................. 16, 18, 19, 21

*EJS Props, LLC v. City of Toledo*,
   698 F.3d 845 (6th Cir. 2012) ......................................................................................... 6

*FCC v. Fox TV Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................................... 16

*Ferguson v. Corinthian Colleges, Inc.*,
   733 F.3d 928 (9th Cir. 2013) ....................................................................................... 14

*Frankel v. Citicorp. Ins. Servs., Inc.*,
   No. 11-cv-2293 (NGG)(RER), 2015 WL 6021534 (E.D.N.Y. Oct. 14, 2015) ........................... 2

*Fuentes v. Shevin*,
   407 U.S. 67 (1972) ....................................................................................................... 10

*Gathright v. City of Portland, Or.*,
   439 F.3d 573 (9th Cir. 2006) ......................................................................................... 4

*Geldermann, Inc. v. Commodity Futures Trading Com.*,
   836 F.2d 310 (7th Cir. 1987) ....................................................................................... 12

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
   74 F. Supp. 3d 699 (D.N.J. 2014) ............................................................................... 11

*Hammer v. Dagenhart*,
   247 U.S. 251 (1918) ..................................................................................................... 20

*Hooper v. California*,
   155 U.S. 648 (1895) ..................................................................................................... 16

**TABLE OF AUTHORITIES**
(continued)

Page

*Johnson v. Atkins*,
  999 F.2d 99 (5th Cir. 1993)................................................................. 6

*Johnson v. Zerbst*,
  304 U.S. 458 (1938)........................................................................ 10

*Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*,
  132 S. Ct. 1997 (2012).................................................................... 19

*Legal Aid Soc'y v. City of New York*,
  114 F. Supp. 2d 204 (S.D.N.Y. 2000)................................................ 10

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993)............................................................. 10

*Maracich v. Spears*,
  133 S. Ct. 2191 (2013).................................................................... 19

*Marbury v. Madison*,
  5 U.S. 137 (1803)........................................................................... 12

*Marsh v. First USA Bank, N.A.*,
  103 F. Supp. 2d 909 (N.D. Tex. 2000).............................................. 12

*Milliner v. Bock Evans Fin. Counsel, Ltd.*,
  No. 15-CV-01763-TEH, 2015 WL 4089853 (N.D. Cal. July 6, 2015).... 13

*Morris v. N.Y.C. Emps. Ret. Sys.*,
  129 F. Supp. 2d 599 (S.D.N.Y. 2001)............................................... 13

*Mortensen v. Bresnan Commc'ns., LLC*,
  722 F.3d 1151 (9th Cir. 2013).......................................................... 11

*Murray v. Town of N. Hempstead*,
  853 F. Supp. 2d 247 (E.D.N.Y. 2012) .............................................. 10

*Naoko Ohno v. Yuko Yasuma*,
  723 F.3d 984 (9th Cir. 2013)............................................................. 3

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)......................................................................... 4

*NLRB v. Drivers*,
  362 U.S. 274 (1960)........................................................................ 16

*Ostlund v. Bobb*,
  825 F.2d 1371 (9th Cir. 1987).......................................................... 10

# TABLE OF AUTHORITIES
## (continued)

Page

*Parsons v. Ambos*,
   48 S.E. 696 (Ga. 1904) ......................................................................................... 24

*Paul v. Virginia*,
   75 U.S. 168 (1869) ............................................................................................... 20

*Phx. Leasing v. Sure Broad.*,
   843 F. Supp. 1379 (D. Nev. 1994) ....................................................................... 11

*Pierson v. Dean, Witter, Reynolds*,
   742 F.2d 334 (7th Cir. 1984) ............................................................................... 12

*Pradier v. Elespuru*,
   641 F.2d 808 (9th Cir. 1981) ............................................................................... 10

*Protect Our Mountain Env't, Inc. v. Dist. Court of County of Jefferson*,
   677 P.2d 1361 (Colo. 1984) ................................................................................... 7

*Ringgold-Lockhart v. Cty. of Los Angeles*,
   761 F.3d 1057 (9th Cir. 2014) ............................................................................... 5

*Ryland v. Shapiro*,
   708 F.2d 967 (5th Cir. 1983) ................................................................................. 5

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) ................................................................................................... 4

*Silva v. Di Vittorio*,
   658 F.3d 1090 (9th Cir. 2011) ............................................................................... 6

*Snyder v. Nolan*,
   380 F.3d 279 (7th Cir. 2004) ................................................................................. 6

*Southland Corp. v. Keating*,
   465 U.S. 1 (1984) ................................................................................................. 21

*Struthers v. UBS Fin. Servs., Inc.*,
   No. 08-CV-1381HJMA, 2009 WL 1286333 (S.D. Cal. May 7, 2009) .................... 4

*Swekel v. City of River Rouge*,
   119 F.3d 1259 (6th Cir. 1997) ............................................................................... 6

*Thomas v. Collins*,
   323 U.S. 516 (1945) ............................................................................................... 5

*Thompson v. Thompson*,
   484 U.S. 174 (1988) ............................................................................................. 19

**TABLE OF AUTHORITIES**
(continued)

Page

*Travelers Cas. & Sur. Co. of Am. v. Highland P'ship, Inc.*,
  No. 10-cv-2503 AJB (DHB), 2013 U.S. Dist. LEXIS 32798 (S.D. Cal. Mar. 8,
  2013) ................................................................................................................... 11

*United Mine Workers v. Ill. State Bar Ass'n*,
  389 U.S. 217 (1967) ........................................................................................ 5, 6

*United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*,
  213 U.S. 366 (1909) .......................................................................................... 16

*United States ex rel. Collins Plumbing v. Turner-Penick Joint Venture*,
  No. 3:11-cv-2834-GPC-MDD, 2013 U.S. Dist. LEXIS 141730 (S.D. Cal. Sep.
  30, 2013) ............................................................................................................ 12

*United States v. Cruikshank*,
  92 U.S. 542 (1876) .............................................................................................. 5

*United States v. Enas*,
  255 F.3d 662 (9th Cir. 2001).............................................................................. 2

*United States v. Hamilton*,
  391 F.3d 1066 (9th Cir. 2004)........................................................................... 10

*United States v. Jin Fuey Moy*,
  241 U.S. 394 (1916) .......................................................................................... 16

*United Trans. Union v. State Bar of Michigan*,
  401 U.S. 576 (1971) ............................................................................................ 5

*Walls v. Cent. Contra Costa Transit Auth.*,
  653 F.3d 963 (9th Cir. 2011).............................................................................. 10

*Wiloil Corp. v. Commonwealth*,
  294 U.S. 169 (1935) .......................................................................................... 20

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. AMEND. I. ......................................................................................... 5, 6

**STATUTES**

29 U.S.C. § 158(b)(4)(ii)(B) ................................................................................. 18

9 U.S.C. § 1 ............................................................................................................ 20

9 U.S.C. § 2 ..................................................................................................... 17, 19

# TABLE OF AUTHORITIES
### (continued)

Page

Ala. Code § 12-12-31 ............................................................................................................ 15

Ala. Code § 12-19-71 ............................................................................................................ 15

Ala. Code § 8-19-10(c) ......................................................................................................... 14

Ala. Code § 12-12-30 ............................................................................................................ 15

Ala. Code 1975 §§ 8-19-1 *et seq.* ........................................................................................... 3

Cal. Civ. Code § 1750 *et seq.* .................................................................................................. 3

Cal. Code Civ. Proc. § 116.220(a)(5) .................................................................................... 15

Cal. Code Civ. Proc. § 116.221 ............................................................................................. 15

Cal. Code Civ. Proc. 116.230 ................................................................................................ 15

California Bus. & Prof. Code § 17200 *et seq.* ......................................................................... 3

California Bus. & Prof. Code § 17500 *et seq.* ......................................................................... 3

# LEGISLATIVE MATERIALS

65 Cong. Rec. 1931 (1924) ................................................................................................... 25

66 Cong. Rec. 2759 (1925)u ................................................................................................. 24

*Arbitration of Interstate Commercial Disputes: Hearings on S. 1005 and H.R. 646*
    *Before the J. Comm. of Subcomms. on the Judiciary*, 68th Cong. 16 (1924) .............. 21, 23, 24

*Courting Big Business: The Supreme Court's Recent Decisions on Corporate*
    *Misconduct and Laws Regulating Corporations,*
    S. Hrg. 110-783 (July 23, 2008) ..................................................................................... 9

S. Rep. 68-536 (1924) ..................................................................................................... 24, 25

*Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal*
    *Commercial Arbitration: Hearings on S. 4213 and S. 4214 Before a Subcomm.*
    *of the S. Comm. on the Judiciary*, 67th Cong. (1923) ................................................ 21, 22, 23

# OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of
    Legal Texts 247-51 (2012) ........................................................................................ 16, 19

**TABLE OF AUTHORITIES**
(continued)

Page

Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 OHIO ST. L.J. 557 (1999) ................................................................................. 5, 7

Consumer Financial Protection Bureau, *Arbitration Study, Report to Congress, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act*, §4.9 (March 2015) ................................................................................. 7, 8, 9, 10

David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 LAW & CONTEMP. PROB. 5 (2004) ................................................. 21, 22, 24, 25

Eisenberg, *et al.*, *Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts*, 41 U. MICH. J.L. REFORM 871 (2008) ........................................................ 8

James Madison, House Debates (Aug. 15, 1789), *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 1096 (1971) ......................... 7

Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 STAN. L. REV. 1631 (2005) ........................................................ 8

Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial*, 16 OHIO ST. J. ON DISP. RESOL. 669 (2001) ........................................... 12

Jessica Silver-Greenberg and Robert Gebeloff, *Arbitration Everywhere, Stacking the Deck of Justice*, N.Y. TIMES, Nov. 1, 2015 .................................................................. 8

Margaret L. Moses, *Statutory Misconstruction: How The Supreme Court Created A Federal Arbitration Law Never Enacted By Congress*, 34 FLA. ST. U.L. REV. 99 (2006) ................................................. 7, 21, 22

*Webster's Encyclopedic Unabridged Dictionary of the English Language* 1617 (1996) ......................................................................... 5, 6, 16

*Webster's New Modern English Dictionary (Illustrated)* 188 (1925) ................... 20, 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>INTRODUCTION</u>**

Forcing Plaintiffs to arbitrate their claims would leave them without a remedy for their monetary losses and would disable them from obtaining the public injunction needed to prevent Defendant AT&T Mobility, LLC ("AT&T") from continuing to harm millions of other customers enrolled in its falsely advertised "unlimited" data plans. AT&T intentionally began to throttle its customers' data shortly after the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ("*Concepcion*"), confident that *Concepcion* would prevent its customers from being able to effectively challenge its practices. Indeed, notwithstanding ATTM's assertions to the contrary, studies on arbitration undertaken after the Supreme Court's rulings in *Concepcion* and *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013) ("*Italian Colors*") have unequivocally shown that, far from being beneficial to consumers, arbitration enables companies to bypass our justice system and frequently leaves consumers without *any* recourse for the harms inflicted upon them.

The First Amendment's Petition Clause guarantees a fundamental Constitutional right to access justice and seek redress in a government court. The Petition Clause bars enforcing AT&T's arbitration clause with respect to Plaintiffs' claims for two independent reasons. First, AT&T cannot demonstrate that Plaintiffs have "knowingly and voluntarily" waived this fundamental constitutional right. AT&T's arbitration clause—contained in a consumer contract of adhesion—does not make clear to consumers the nature of the fundamental First Amendment right being abandoned and the consequences of such abandonment, and it therefore does not meet the strict standards for showing a waiver of a constitutional right. Because Plaintiffs did not knowingly and voluntarily give up their right to have a court adjudicate their claims, and because they would not be able to bring their claims in small claims court, a court order forcing them to arbitrate their claims would violate the Petition Clause.

Second, the "constitutional avoidance doctrine" precludes the FAA from being interpreted in a manner that would interfere with consumer rights under the Petition Clause.  Because enforcing AT&T's arbitration provision would infringe on the right to petition courts, interpreting

1   the FAA to require its enforcement would conflict with the rights guaranteed by Petition Clause.

2   Under the constitutional avoidance doctrine, a reasonable interpretation of the FAA that avoids a

3   conflict must be adopted, absent clear evidence of a contrary intent by Congress. Here, the FAA

4   may reasonably be interpreted in a manner to exclude AT&T's adhesive arbitration contract from

5   its scope, and Congress, in fact, *unequivocally rejected* applying the FAA to such consumer

6   adhesion contracts.

7       Plaintiffs have not located any case where a court has considered whether requiring

8   consumers to arbitrate claims where they have not knowingly and intentionally waived their First

9   Amendment right to petition courts would violate the Petition Clause, or whether applying the

10   FAA to enforce arbitration clauses contained in any consumer contract of adhesion would violate

11   the Petition Clause.[1] As such, these issues are matters of first impression that were not considered

12   in, and are not governed by, the *Concepcion* or *Italian Colors* decisions.[2]

13                                   **FACTS**

14       Plaintiffs allege that AT&T falsely advertised that its "unlimited" mobile phone plans

15   provide "unlimited" data, while purposefully obfuscating or failing to disclose the fact that it

16   regularly "throttles" (*i.e.* intentionally slows) customers' data speed once they reach certain data

17   usage thresholds (between 2GB and 5GB per billing cycle). Amend. Compl. ¶¶ 1-2, 15-25. The

18   prominent representation of "unlimited" data—in conspicuous, bold lettering on AT&T's

19   advertisements and product packaging—induced Plaintiffs and Class members to subscribe to

20   AT&T's plans and to renew their subscriptions. *Id.* ¶¶ 2, 16-19. Instead of honoring its "unlimited"

21   data promise, in late 2011—shortly after the Supreme Court's April 2011 *Concepcion* opinion—

22   AT&T began to throttle customers' data to speeds so slow that they are unable to use their phones

23

24   _____

25   [1] The issue was raised in *Frankel v. Citicorp. Ins. Servs., Inc.*, No. 11-cv-2293 (NGG)(RER), 2015 WL 6021534 (E.D.N.Y. Oct. 14, 2015), but the court declined to reach it as not being "appropriately before the court." *Id.* at *3-4. None of the Ninth Circuit district court cases that

26   AT&T cites as enforcing its arbitration clause considered a Petition Clause argument.
     [2] As the Ninth Circuit noted in another context: "It would be extraordinary indeed if those were

27   constitutional decisions that simply neglected to mention the Constitution. . . . If there is a constitutional dimension to those decisions, we cannot divine it from the language of the

28   opinions. *United States v. Enas*, 255 F.3d 662, 674 (9th Cir. 2001).

1    for certain intended and advertised purposes, such as streaming video or music or even browsing

2    webpages. *Id.* ¶ 21.

3         At no point did AT&T adequately disclose its throttling practices. *Id.* ¶ 27. AT&T's

4    Wireless Customer Agreement—a consumer contract of adhesion that imposes substantial early

5    termination fees if a consumer elects to end the two-year subscription term—does not disclose the

6    data usage caps applicable to "unlimited" customers or AT&T's throttling practices. *Id.* ¶ 28. And,

7    while AT&T purports to have made some disclosures on its website and certain customers' July

8    or August 2011 monthly bill, these disclosures falsely stated that either only the top 5% of data

9    usage customers would be throttled or that customers would be throttled only during periods of

10   network congestion. *Id.* ¶¶ 29-32. Even the few text messages that AT&T sometimes elected to

11   send to already contractually-bound customers as they approached the secret data usage caps did

12   not inform customers of either the data usage thresholds or the speeds at which customers will be

13   throttled. *Id.* ¶ 33. In any event, AT&T cannot unilaterally revoke the central feature of its

14   "unlimited" service plan agreements with Plaintiffs by sending post-contractual text messages or

15   making other post-contractual disclosures that contradict the plain terms of those agreements.

16        The named Plaintiffs' experience of AT&T's conduct is typical of those of millions of

17   other consumers. AT&T's promise of "unlimited" data induced all four Plaintiffs to subscribe to

18   AT&T's "unlimited" plans. *Id.* ¶¶ 61-62, 72-73, 82-83. It wasn't until 2015, after the Plaintiffs

19   renewed their contracts, that they first learned of AT&T's throttling practices. *Id.* ¶¶ 66, 78, 86.

20   Plaintiffs bring various common law claims and also bring claims under California's Unfair

21   Competition Law and False Advertising Law (Bus. & Prof. Code §§ 17200 *et seq.*, 17500 *et seq.*),

22   California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*) and Alabama's

23   Deceptive Trade Practices Act (Ala. Code 1975 §§ 8-19-1 *et seq.*).

24                                    **ARGUMENT**

25   I.    **As a Threshold Matter, State Action Exists Here.**

26        A court order requiring Plaintiffs to arbitrate their claims would be a state action.[3] For

27   example, court orders enforcing racially restrictive housing covenants entered between private

28   _____

[3] *See Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 993 (9th Cir. 2013) ("Decisions of a domestic

*Footnote continued on next page*

1  parties have been found to be state actions.[4] Court orders implicating First Amendment rights

2  have also been found to be state actions.[5]

3        In addition, Congress's enactment of the FAA and a court's construction of it are also

4  state actions subject to constitutional challenge. A congressional statute, or a court's

5  interpretation of a statute, that enables private actors to restrict citizens' First Amendment rights

6  constitutes a state action.[6]

7        Cases that have found a lack of state action in constitutional challenges to arbitration are

8  distinguishable because the "specific conduct" challenged in those cases was a private entity's

9  conduct in requiring arbitration or in seeking to enforce a mutually agreed upon arbitration clause,

10  not a court order compelling arbitration in the context of an *involuntary* and *unknowing* waiver of

11  a constitutional right.[7] Plaintiffs do not generally challenge AT&T's use of an arbitration clause

12  in its consumer agreement, but instead assert that any court order requiring them to arbitrate their

13  claims would deprive them of their constitutional right of access to courts, which they have not

14  waived, and thus would be a state action.

15

16

17

18

---

19  *Footnote continued from previous page*
    court in the United States do constitute governmental action.").

20  [4] *See, e.g., Shelley v. Kraemer*, 334 U.S. 1, 19 (1948); *Barrows v. Jackson*, 346 U.S. 249, 254 (1953).

21  [5] *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964) (court application of a state rule of law which restricted freedoms of speech and press was a state action); *Gathright v. City of*

22  *Portland, Or.,* 439 F.3d 573, 576 n.2 (9th Cir. 2006) (court-ordered injunction restricting event permit holders from exercising First Amendment rights was a state action).

23  [6] *See Denver Area Educ. Telecomm. Consortium v. FCC*, 518 U.S. 727, 737-40 (1996) (statute that permits private actors to restrict citizens' free speech can be state action challengeable under

24  First Amendment); *id.* at 782 (Kennedy, J., concurring in part, dissenting in part).

    [7] *See, e.g. Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182, 1185, 1200-02 (9th Cir. 1998)

25  *overruled on other grounds by E.E.O.C. v. Luce, Forward, Hamilton & Scripps,* 345 F.3d 742 (9th Cir. 2003) (allegation that SEC encouraged adoption of securities rules that required

26  mandatory arbitration in broker-dealer employment contracts did not state a sufficient nexus to a government action); *Struthers v. UBS Fin. Servs., Inc*., No. 08-CV-1381HJMA, 2009 WL

27  1286333, at *5 (S.D. Cal. May 7, 2009) (challenging defendant's conduct of conditioning employment on agreement to arbitrate); *Desiderio v. NASD*, 191 F.3d 198, 200, 206-07 (2d Cir.

28  1999) (same).

## II.     The First Amendment Establishes a Right to Petition Courts.

### A.     The Petition Clause Guarantees a Right to Petition Courts for Redress of Private Claims.

The First Amendment protects the right of the people to petition the government, including courts, for a redress of grievances, and prohibits a state actor from "abridging" that right.[8] To "abridge" means "to reduce or lessen . . . ; diminish; curtail."[9] Thus, an action need not amount to a total prohibition of the right to pursue a claim in court to be unconstitutional. Actions that obstruct, hinder, chill or discourage access to courts also potentially violate the First Amendment.[10] Here, AT&T's arbitration clause, if enforced, would wholly prevent Plaintiffs from having their claims resolved in this Court.

Since our nation's birth, jurists have "viewed the right of access to court as 'fundamental'" to our democracy.[11] "In an organized society" the "right to sue and defend in the courts" is "the right conservative of all other rights, and lies at the foundation of orderly government."[12] This "right of access to the courts," the Supreme Court has firmly held,[13] is grounded in the First Amendment right to "petition the Government for a redress of grievances,"[14] "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'"[15]

---

[8] U.S. CONST. AMEND. I. *See also Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to *courts* and other forums established by the government for resolution of legal disputes.") (citations omitted) (emphasis added).

[9] Plaintiffs' Request for Judicial Notice ("Judicial Notice"), Exhibit A (*Webster's Encyclopedic Unabridged Dictionary of the English Language* 1617 (1996)) ("*Webster's*") at 6.

[10] *See, e.g., Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014) (overturning order declaring litigants to be vexatious and imposing pre-filing conditions as violating the Petition Clause); *Bradley v. Hall*, 64 F.3d 1276, 1281 (9th Cir. 1995) (rule that punished prisoner for using certain language in a written grievance infringed prisoner's First Amendment right to access courts). *See also Citizens United v. FEC*, 558 U.S. 310, 336-37 (2010) (citing examples of statutes that unconstitutionally chilled the right to freedom of speech, despite not outright banning speech).

[11] Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 OHIO ST. L.J. 557, 563 (1999). Professor Andrews' seminal article has been cited in Supreme Court opinions. *See, e.g., Guarnieri*, 131 S. Ct. at 2503, 2504 (Scalia, J., concurring); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002).

[12] *Chambers v. Baltimore & Ohio R.R Co.*, 207 U.S. 142, 148 (1907). *Accord Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012).

[13] *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). *See also BE&K Constr.*, 536 U.S. at 524; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

[14] U.S. CONST. AMEND. I.

[15] *BE&K Constr.*, 536 U.S. at 524-25 (citing *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967); *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)).

The right of petition is "inseparable" from the freedoms of speech, press, and assembly and is one of four "cognate rights . . . united in the First [Amendment's] assurance."[16] The right of petition, therefore, is "a fundamental right within the protection of the First Amendment."[17]

The Petition Clause establishes the right to access *government* tribunals. In a 2011 opinion joined by seven Justices—issued two months after *Concepcion* was decided—the Supreme Court reiterated that its "precedents confirm that the Petition Clause protects the rights of individuals to appeal to *courts* and other forums *established by the government* for resolution of legal disputes."[18] This is so whether the claim at issue involves a "personal grievance" or "seek[s] to advance political, social, or other matters of great public import and interest."[19]

Critically, the Petition Clause guaranties Plaintiffs a right to sue in this Court "for *a redress* of grievances."[20] The "redress" of a grievance is "the setting right of what is wrong . . . relief from wrong or injury . . . compensation or satisfaction for a wrong or injury."[21] Plaintiffs' First Amendment right to seek "redress" in court against AT&T, therefore, literally means that Plaintiffs have a fundamental right to have this Court adjudicate this dispute on its merits. The Ninth Circuit and other circuit courts have recognized that this right to seek redress—coupled with due process—ensures "meaningful" access to the courts.[22] Thus, where a statute or other state action interferes with the right to access courts in a way that a person can no longer obtain redress for his claim in court, the Petition Clause is violated.[23]

---

[16] *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

[17] *United Trans. Union v. State Bar of Michigan*, 401 U.S. 576, 585 (1971). *See also Ryland v. Shapiro*, 708 F.2d 967, 971 (5th Cir. 1983).

[18] *Guarnieri,* 131 S. Ct. at 2494 (emphasis added).

[19] *Id.* at 2490.

[20] U.S. CONST. AMEND. I (emphasis added).

[21] Judicial Notice, Exhibit A, *Webster's* at 1617.

[22] *Silva v. Di Vittorio*, 658 F.3d 1090, 1101-03 (9th Cir. 2011). *See also Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997) (quoting *Bounds v. Smith*, 430 U.S. 817, 822 (1977)) ("Access to courts does not only protect one's right to physically enter the courthouse halls, but also insures that the access to courts will be 'adequate, effective and meaningful.'"); *EJS Props, LLC v. City of Toledo*, 698 F.3d 845, 863-64 (6th Cir. 2012); *Snyder v. Nolan*, 380 F.3d 279, 291 (7th Cir. 2004); *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993).

[23] *See, e.g., United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222–23 (1967) (lower court's decision enjoining union from providing collective legal services to its members conflicted with the Petition Clause because the union's actions were undertaken to secure meaningful access to courts); *Silva*, 658 F.3d at 1104 (allegations that defendants seized and withheld prisoner's legal files and repeatedly transferred him between different prisons in order to hinder his ability to litigate pending civil lawsuits stated Petition Clause claim); *Swekel*, 119 F.3d

*Footnote continued on next page*

**B.      Resolving Disputes in Court Advances Several First Amendment Interests that are Not Advanced by, and are in Fact Curtailed by, Private Arbitration.**

The right to sue in court merits constitutional protection for several reasons, none of which apply to private arbitration. The Framers viewed petitions as a check on government power that enable citizens to "communicate their will" to those who control the levers of government.[24] The Petition Clause empowers citizens to "have their voices heard" by public officials, including members of "the judiciary," which, "like the other branches of government, make and apply laws in ways that impact the everyday lives of American citizens."[25] Providing individuals with direct access to government courts "gives people a feeling of justice and order in their government."[26] The ability to file lawsuits in court advances several "first amendment interests involved in private litigation," including (i) the "public airing of disputed facts";[27] (ii) enabling "groups" of citizens to "use . . . *courts* to advocate their causes and points of view respecting resolution of their business and economic interests";[28] and (iii) to otherwise "raise matters of public concern . . . [and] promote the evolution of the law . . . [, all of which] adds legitimacy to the court system as a designated alternative to force."[29] Absent access to the courts, "the right to petition would have little significance in the constitutional scheme of things" because "[a]ccess to the courts is often the only method by which a person or a group of citizens may seek vindication of federal and state rights and ensure accountability in the affairs of government."[30]

---

*Footnote continued from previous page*
at 1262 (a state official's actions in covering-up or destroying evidence may amount to a denial of meaningful access to the courts).
[24] James Madison, House Debates (Aug. 15, 1789), *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 1096 (1971). *See also* Andrews, *supra* note 11, at 623 (the right of petition "started in England as a check on the King's power" and grew to become "a tool of individual justice").
[25] Andrews, *supra* note 11, at 624-25 (citations omitted).
[26] *Id.* at 624.
[27] *Bill Johnson's Rests.*, 461 U.S. at 743 (internal quotation and citation omitted).
[28] *BE&K Constr.*, 536 U.S. at 525 (quoting *California Motor Transport*, 404 U.S. at 511) (internal quotation marks omitted) (emphasis added in *BE&K*). *See also Guarnieri*, 131 S. Ct. at 2500 (litigation facilitates "effective political expression" and "the informed public participation that is a cornerstone of democratic society") (internal quotation marks and citation omitted).
[29] *BE&K Constr.*, 536 U.S. at 532 (citing Andrews, *supra* note 11, at 656).
[30] *Protect Our Mountain Env't, Inc. v. Dist. Court of County of Jefferson*, 677 P.2d 1361, 1365 (Colo. 1984).

Compulsory arbitration before private arbitrators serves none of these core First

Amendment interests. Private arbitrations are usually confidential, providing no public forum for

airing disputed facts or advancing legal causes.[31] Arbitrators' decisions are not reviewable by

courts on the merits and have no precedential effect, so they do not develop the law.[32] Private

arbitration simply cannot be construed as advancing the same Constitutional interests protected

through the right to petition governmental courts for redress.

In view of the effect that compulsory arbitration has had on consumers' ability to obtain

*any* redress for harms inflicted upon them and to check corporate malfeasance, it becomes clear

why access to courts continues to warrant constitutional significance. Consumer adhesion

arbitration clauses usually contain class action bans.[33] Without the ability to aggregate

consumers' claims as a class, the practical availability for relief is non-existent.[34] Insulating

corporate misbehavior from consumer claims was precisely the goal of adhesion arbitration

clauses with class action bans,[35] and the strategy has been very effective.[36]

---

[31] *See* Consumer Financial Protection Bureau, *Arbitration Study, Report to Congress, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act*, §4.9 (March 2015) ("CFPB Study").

[32] *See* Margaret L. Moses, *Statutory Misconstruction: How The Supreme Court Created A Federal Arbitration Law Never Enacted By Congress*, 34 FLA. ST. U.L. REV. 99, 144 (2006); Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 STAN. L. REV. 1631, 1661-62 & nn.146-52, 1664 & nn.165-66, 1672 (2005) (citations omitted).

[33] Eisenberg, *et al.*, *Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Nonconsumer Contracts*, 41 U. MICH. J.L. REFORM 871, 884 (2008) (80% of consumer contracts that contain an arbitration clause also contain a class action ban); CFPB Study, §1.4.1 ("85–100% of the contracts with arbitration clauses—covering close to 100% of market share subject to arbitration in the six product markets studied—include such no-class arbitration provisions.").

[34] As Brian Fitzpatrick, a former law clerk to Justice Scalia, noted, "without a class action, if someone loses $500, they will not be able to do anything about it." Jessica Silver-Greenberg and Robert Gebeloff, *Arbitration Everywhere, Stacking the Deck of Justice*, N.Y. TIMES, Nov. 1, 2015, at A1. Judge Posner similarly noted that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

[35] The move to block class actions through arbitration clauses was more than a decade in the making and was the result of strategic planning by a Wall Street-led coalition of credit card companies, retailers, and lawyers, according to the NY Times' interviews with coalition members and its review court records. Silver-Greenberg, *supra* note 34, at A1.

[36] The NY Times found that, from 2010 to 2014, Verizon, with 125 million customers, faced only 65 consumer arbitrations where the dispute was less than $2,500; Time Warner Cable, with 15 million customers, faced only 7 arbitrations in the same time period for the same amount; and Sprint, with 57 million customers, faced only six arbitrations total in that time period, regardless of amount. *Id.* The CFPB Study similarly found that, from 2010 through 2012, an average of 616 AAA arbitrations were filed per year for six product markets combined, and not all of these were

*Footnote continued on next page*

PTFS' OPP. TO MOT. TO COMPEL ARBITRATION
CASE NO. 3:15-CV-3418

While AT&T touts the supposed "consumer-friendly" aspects of its arbitration clauses, implying that its arbitration clause makes arbitration a realistic—and even a better—way for consumers to obtain relief for claims, the numbers show otherwise. In response to Plaintiffs' interrogatories, AT&T could locate only 3,819 instances in which one of its tens of millions of customers initiated arbitration between April 27, 2011 (the date of the *Concepcion* opinion) and December 24, 2015.[37] Of these, only 1,218 arbitrations concerned disputes "regarding the functioning, quality, or value of a mobile phone service or AT&T's alleged breach of a representation or agreement to provide such a service."[38] The American Arbitration Association's ("AAA") statistics on consumer arbitrations filed after January 1, 2003 similarly lists only 1,335 total consumer-initiated arbitrations against AT&T.[39] 1,147 (86%) of those arbitrations were initiated by clients of the law firm Bursor & Fisher, who were attempting to prevent a proposed merger between AT&T and T-Mobile.[40] AT&T successfully obtained injunctions against these arbitrations, as violating its arbitration clause, in seven different federal courts.[41] With respect to the remaining 188 arbitrations, only 44.4% were for claims of less than $1,000, only 30.5% were for claims of less than $500, and only 12.8% were for claims of less than $250.[42]

In the rare event that consumers do try to challenge corporate wrongs through arbitration,

---

*Footnote continued from previous page*
filed by consumers. 40% of these filings concerned solely disputed debts. Only 25 disputes a year involved consumer claims of $1,000 or less. CFPB Study, §1.4.3.
[37] Declaration of Michael Sobol ("Sobol Decl.") Exhibit 1 (AT&T's Resp. to ROG 1).
[38] *Id.* (AT&T's Resp. to ROG 2).
[39] These statistics are available at https://www.adr.org/aaa/faces/aoe/gc/consumer/consumerarbstat?_afrLoop=970610391025242&_afrWindowMode=0&_afrWindowId=null#%40%3F_afrWindowId%3Dnull%26_afrLoop%3D970610391025242%26_afrWindowMode%3D0%26_adf.ctrl-state%3Da1sfo5teo_4. Plaintiffs do not know the reason for the lower number of arbitrations listed in the AAA's statistics versus AT&T's discovery responses, but suspect that a portion of the arbitration initiations were settled or withdrawn before they were initiated with the AAA.
[40] *See* http://www.fiercetelecom.com/press-releases/bursor-fisher-law-firm-announces-more-1000-att-customers-file-arbitration-c.
[41] *AT&T Mobility LLC v. Princi*, No. 11-11448, 2011 WL 6012945 (D. Mass., Dec. 2, 2011); *AT&T Mobility LLC v. Smith*, No. 11-05157, 2011 WL 5924460 (E.D. Pa. Oct. 7, 2011); *AT&T Mobility LLC v. Bushman*, No. 11-80922, 2011 WL 5924666 (S.D. Fla. Sept. 23, 2011); *AT&T Mobility LLC v. Bernardi*, Nos. 11-03992 and 11-04412, 2011 WL 5079549 (N.D. Cal. Oct. 26, 2011); *AT&T Mobility LLC v. Fisher*, No. 11-02245, 2011 WL 5169349 (D. Md. Oct. 28, 2011); *AT&T Mobility LLC v. Gonnello*, No. 11-05636, 2011 WL 4716617 (S.D.N.Y. Oct. 7, 2011); *AT&T Mobility LLC v. Hidalgo*, No. 11-03907, Dkt. No. 49 (E.D.N.Y. Oct. 31, 2011).
[42] Sobol Decl., ¶ 3. The incompleteness of the AAA data makes it difficult to determine how these arbitrations were resolved. *See id.* ¶ 4.

1   the process is inherently unfair to consumers. As a former arbitrator explained to the Senate

2   Judiciary Committee, the corporations foot the bill for arbitrations, and the result is a bias in favor

3   of those corporations.[43] The CFPB Study confirms this bias.[44] Because arbitrations are private and

4   court review of arbitrators' decisions are limited,[45] this bias continues unchecked. This manifestly

5   unfair and largely secret system for resolving disputes between powerful parties and weaker

6   parties is precisely what the Petition Clause was meant to prevent by guaranteeing a right to

7   access public courts to air and resolve grievances. Thus, arbitration clauses that are contained in

8   consumer contracts of adhesion and include class action bans—like AT&T's— inherently

9   infringe on consumers' First Amendment right to petition courts.

10  **III.**   **A Court Order Requiring Plaintiffs to Arbitrate Their Claims Would Violate Their Right First Amendment Right to Petition Courts.**

11

12  **A.**   **Plaintiffs Have Not Knowingly and Voluntarily Waived Their Right to Petition Courts.**

13          AT&T's adhesion arbitration agreement does not operate to waive Plaintiffs' fundamental

14  First Amendment right to petition courts. In determining whether a waiver of a constitutional

15  right has occurred, the Court must (1) "indulge every reasonable presumption against" a finding

16  of a waiver;[46] (2) determine that any such waiver was "knowing, voluntary and intelligent";[47] and

17  (3) base any finding of a waiver "upon clear and compelling evidence."[48] In addition, the party

18  seeking enforcement of the supposed waiver must show that "the waiver [was] made with a full

19  awareness both of the nature of the right being abandoned and the consequences of the decision to

20  abandon it."[49] "[A] waiver should not be implied and should not be lightly found."[50] The same

---

21  [43] Judicial Notice, Exhibit B, *Courting Big Business: The Supreme Court's Recent Decisions on Corporate Misconduct and Laws Regulating Corporations*, S. Hrg. 110-783 (July 23, 2008) (testimony of Elizabeth Bartholet).

22  [44] Of the disputes involving an arbitrator resolution, consumers prevailed on their affirmative claims only about 10-20% of the time while companies won on affirmative claims or counter-claims about 93% of the time. Companies also received about 91 cents for every dollar claimed, whereas consumers received about 12 cents for every dollar claimed. CFPB Study, §1.4.3, §5.2.2.

23  [45] *See id.*, §4.9.

24  [46] *United States v. Hamilton,* 391 F.3d 1066, 1071 (9th Cir. 2004) (citing *Carnley v. Cochran,* 369 U.S. 506, 514 (1962) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938))); *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981).

25  [47] *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993); *Ostlund v. Bobb*, 825 F.2d 1371, 1373 (9th Cir. 1987).

26  [48] *Leonard*, 12 F.3d at 889.

27  [49] *Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991).

28

standards apply to all contracts that purport to waive constitutional rights, including *pre*-dispute arbitration agreements.[51]

The constitutional waiver standards are much more stringent than the simple "mutual contractual assent" standard some courts have used in cases where enforcing an arbitration clause was alleged to deprive a party of the ability to vindicate *statutory* rights. The FAA's policy that courts must "rigorously enforce" agreements to arbitrate does not change the constitutional waiver standard, as the FAA does not (and cannot) operate to trump *constitutional* rights. As such, neither *Concepcion* nor *Italian Colors* offer guidance in determining whether Plaintiffs have waived their constitutional right to meaningful access to courts under the Petition Clause.[52]

Similarly unenlightening are cases concerning waiver of the Seventh Amendment right to a jury trial. While the typical analysis for enforcing a jury waiver clause is clearly defined under federal law,[53] when asserted in the context of an arbitration provision, the jurisprudence becomes

---

*Footnote continued from previous page*

[50] *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) (agreement signed by public employee did not waive his due process rights to a pre-termination hearing, even though it stated that he could not "grieve or arbitrate this matter" and that non-compliance would result in "immediate" termination). *See also Fuentes v. Shevin*, 407 U.S. 67, 94-95 (1972) (consumer did not waive due process rights via corporate form contract); *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 259-60 (E.D.N.Y. 2012) (settlement agreement not sufficiently unequivocal to waive First Amendment claims); *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 227 (S.D.N.Y. 2000) (First Amendment rights not "explicitly mentioned" in contract not waived).

[51] *See, e.g., Atalese v. U.S. Legal Servs. Group, L.P.*, 99 A.3d 306, 313 (N.J. 2014) ("[A]ny contractual waiver-of-rights provision must reflect that [the party] has agreed clearly and unambiguously to its terms.") (internal quotations and citations omitted).

[52] The Ninth Circuit's opinion in *Mortensen v. Bresnan Commc'ns., LLC*, 722 F.3d 1151 (9th Cir. 2013) is also unhelpful. There, the court considered whether the FAA preempted a Montana law that operated to void all adhesion arbitration agreements as against public policy. While the Montana law that the plaintiffs sought to enforce was premised, at least in part, on notions of constitutional rights, *Mortensen* is inapplicable because Plaintiffs here do not seek enforcement of a *state* law that might operate to undermine the FAA's policy favoring arbitration agreements. Instead, Plaintiffs challenge AT&T's attempt to enforce its arbitration agreement because it deprives them of their First Amendment right to access courts, employing the same waiver standards that apply to any contract that impedes a constitutional right. *See also Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 74 F. Supp. 3d 699, 713 (D.N.J. 2014) (distinguishing *Mortensen* from *Atalese* because the former analyzed a state rule that arose from consideration of adhesion arbitration agreements, while the latter relied on existing state law that arose in contexts separate and distinct from arbitration).

[53] *See, e.g.*, *Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1057-58 (N.D. Cal. 2013) (considering the following factors in determined whether right to a jury trial had been waived "1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative

*Footnote continued on next page*

- 11 -

1   opaque at best and nonsensical at worst.[54] Some courts have found that the jury trial right is

2   waived, without regard to the typical analysis, because of the "strong federal policy in favor of

3   arbitration."[55] Yet, an esoteric federal "policy" in "favor" of an outcome—no matter how

4   "strong" it might be—cannot supersede a fundamental constitutional right.[56] In other instances,

5   courts have simply failed to articulate a reasoned basis for abandoning the stringent waiver

6   standards applicable to constitutional rights, stating, for example, only that the "loss of the right

7   to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate"[57] or that

8   a plaintiff's awareness of the consequences of his arbitration agreement "is not relevant."[58]

9         To the extent an arguably sound analytical framework can be derived from the existent

10   case law, it has its genesis in *Geldermann, Inc. v. Commodity Futures Trading Com.*, where the

11   Seventh Circuit found that because the plaintiff was required to arbitrate, hence placing the

12   plaintiff outside of an Article III forum, "the Seventh Amendment simply does not apply."[59]

13   Building on this conclusion, subsequent cases further clarify that Seventh Amendment concerns

14   are not triggered until the plaintiff is properly before a judicial, rather than an arbitral, forum:

> The Seventh Amendment does not confer the right to a trial, but only the right to
> have a jury hear the case once it is determined that the litigation should proceed
> before a court. If the claims are properly before an arbitral forum pursuant to an
> arbitration agreement, the jury trial right vanishes.[60]

---

*Footnote continued from previous page*

bargaining power of the parties; and 4) the business acumen of the party opposing the waiver.") (internal citations and quotation marks omitted); *Travelers Cas. & Sur. Co. of Am. v. Highland P'ship, Inc.*, No. 10-cv-2503 AJB (DHB), 2013 U.S. Dist. LEXIS 32798, at *6–9 (S.D. Cal. Mar. 8, 2013) (same); *Phx. Leasing v. Sure Broad.*, 843 F. Supp. 1379, 1384 (D. Nev. 1994) (same).

[54] *See, e.g.*, Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial*, 16 OHIO ST. J. ON DISP. RESOL. 669, 713 (2001) ("The vast majority of decisions, however, either entirely ignore the jury trial waiver cases in interpreting arbitration clauses, or else conclude that the jury trial doctrines are not relevant.").

[55] *United States ex rel. Collins Plumbing v. Turner-Penick Joint Venture*, No. 3:11-cv-2834-GPC-MDD, 2013 U.S. Dist. LEXIS 141730, at *26-27 (S.D. Cal. Sep. 30, 2013) (quoting *Attard Indus. v. United States Fire Ins. Co*., No. 1:10cv121 (AJT/TRJ), 2010 U.S. Dist. LEXIS 80785, at *9 (E.D. Va. Aug. 5, 2010)).

[56] *Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.").

[57] *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir. 1988) (quoting *Pierson v. Dean, Witter, Reynolds*, 742 F.2d 334, 339 (7th Cir. 1984)).

[58] *Bosinger v. Phillips Plastics Corp*., 57 F. Supp. 2d 986, 990-91 (S.D. Cal. 1999).

[59] *Geldermann, Inc. v. Commodity Futures Trading Com*., 836 F.2d 310, 323-24 (7th Cir. 1987).

[60] *Marsh v. First USA Bank, N.A*., 103 F. Supp. 2d 909, 921–22 (N.D. Tex. 2000) (quoting *Cremin v. Merrill Lynch Pierce Fenner & Smith*, 957 F. Supp. 1460, 1471 (N.D. Ill. 1997)).

1    In contrast, the First Amendment's Petition Clause establishes a fundamental right to proceed

2    before a judicial forum in the first place.

3        Importantly, courts are particularly hesitant to find waiver of the right to adjudicate claims

4    in court, even in cases where the Petition Clause is not addressed. For example, a plaintiff who

5    agreed to a "final and binding" agency review without being given "clear and explicit notice . . .

6    of the opportunity for redress" in court through a statutory right to judicial review lacked

7    "'awareness' of the consequences of the waiver," and thus he did not knowingly and voluntarily

8    waive his due process rights.[61] Similarly, there was no waiver of the constitutional right to sue in

9    court where an arbitration agreement did "not explain what arbitration is" or how arbitration

10   differed from and precluded a court proceeding, noting that the "average member of the public

11   may not know—without some explanatory comment—that arbitration is a substitute for the right

12   to have one's claim adjudicated in a court of law."[62]

13       Accordingly, any lesser constitutional waiver standard that courts have applied when

14   considering whether an arbitration clause waives the Seventh Amendment right to a jury trial

15   simply does not apply in determining whether Plaintiffs have waived their First Amendment right

16   to petition courts. Nevertheless, it should be noted some Seventh Amendment waiver cases have

17   held that the right to a jury trial is not waived where the waiver is not clearly stated in the

18   arbitration agreement itself, and is therefore not "knowing and voluntary."[63]

19       AT&T cannot present clear and convincing evidence that Plaintiffs knowingly and

20   intelligently waived their Petition Clause right to pursue redress in this Court. AT&T's arbitration

21   clause appears on pages 13 through 17 of a lengthy form contract of adhesion. Although the

22   clause states that the parties are "each waiving their right to a trial by jury or to participate in a

23   class action," no waiver of the Plaintiffs' First Amendment right to petition or to sue in court is

24

[61] *Morris v. N.Y.C. Emps. Ret. Sys.*, 129 F. Supp. 2d 599, 601-03, 609-10 (S.D.N.Y. 2001).

25   [62] *Atalese*, 99 A.3d at 312, 315. *See also Dispenziere v. Kushner Companies,* 101 A.3d 1126, 1132 (N.J. Super. Ct. App. Div. 2014) (declining to enforce arbitration clause where it "failed to

26   provide plaintiffs any notice that they were giving up their right to seek relief in a judicial forum").

27   [63] *See, e.g., Milliner v. Bock Evans Fin. Counsel, Ltd.*, No. 15-CV-01763-TEH, 2015 WL 4089853, at *3 (N.D. Cal. July 6, 2015) (declining to find that the language in an arbitration

28   clause amounted to a "clear and unmistakable waiver of their right to a jury trial").

1    mentioned.[64] Further, while the arbitration clause states that the parties agree to resolve disputes

2    through arbitration "instead of in courts of general jurisdiction," this does not adequately explain

3    that consumers have, and are giving up, the fundamental right to petition courts. Reasonable

4    consumers would not understand what a court "of general jurisdiction" is or how a prohibition on

5    bringing claims in such courts might impact their ability to obtain redress for *all* claims that they

6    could possibly assert in a public court. The arbitration clause's exception for small claims court

7    actions only heightens the confusion, as most consumers do not understand the differences

8    between small claims courts and courts of general jurisdiction, or that they would not be able to

9    bring certain claims or obtain certain relief in small claims court. In addition, the clause does not

10   adequately explain the critical ways in which arbitration differs from court, such as the

11   inapplicability of the rules of evidence in arbitration. Nor does the arbitration clause point out that

12   its class action waiver could result in consumers potentially having no effective remedy at all for

13   complex or costly-to-prosecute claims seeking relatively small damages.

14       Because AT&T's arbitration clause does not present Plaintiffs with full understanding of

15   the consequences or significance of their purported waiver, no waiver of Plaintiffs' First

16   Amendment right to petition courts can be properly found in this case.

17       **B.**   **The Small Claims Court Exception to AT&T's Arbitration Clause Does Not
18                Provide the Access to or Redress in Court Required by the Petition Clause.**

19       The fact that AT&T's arbitration clause allows consumers to bring claims in small claims

20   court does not save it from violating the Petition Clause as to the Plaintiffs because Plaintiffs are

21   barred from adjudicating certain claims and seeking certain relief in such courts. The Alabama

22   Plaintiffs, for instance, would be unable to bring their claim under to the Alabama Deceptive

23   Trade Practices Act because Alabama Circuit Courts (*i.e.* Alabama's courts of general

24   jurisdiction) have *exclusive* subject matter jurisdiction over those claims.[65] In addition, none of

25   the Plaintiffs would be able to obtain equitable relief—including even an injunction that would

26   apply to them *individually*[66]—as such relief is not available in either Alabama or California small

---

[64] *See* Decl. of Beth Headley (Dkt. No. 30), Ex. 1 at 13-14.
[65] Ala. Code § 8-19-10(c).
[66] This exclusion is thus distinguishable from cases finding that the fact that *public* injunctive relief may not be available in arbitration does not preclude the enforcement of consumer

*Footnote continued on next page*

1  claims courts.[67] Further, those Plaintiffs who may have claims for monetary damages that exceed

2  the small claims courts' jurisdictional maximum claim amount (*e.g.*, those Plaintiffs who could

3  properly bring claims for punitive damages) would be forced to arbitrarily minimize their

4  damages in small claims court.[68] Conversely, those Plaintiffs who may have more modest

5  damages would be hard-pressed to file their claims in small claims court, given that the filing fees

6  may constitute a significant portion of their likely damages.[69]

7      That AT&T's arbitration clause hinders Plaintiffs' ability to obtain redress in courts—

8  despite the small claims court exception—is borne out by the negligible numbers of small claims

9  court actions that consumers have filed since the *Concepcion* opinion. AT&T could identify only

10  634 instances of consumer lawsuits instigated against it in small claims court since *Concepcion*,

11  and only 248 of those lawsuits involved claims "regarding the functioning, quality, or value of a

12  mobile phone service or AT&T's alleged breach of a representation or agreement to provide such

13  a service."[70] Accordingly, the small claims court exception in AT&T's arbitration clause does not

14  save it from violating Plaintiffs' right to petition courts for redress of their claims.

15  **IV.    Interpreting the FAA to Require Enforcement of Consumer Adhesion Arbitration
16         Clauses Conflicts with the Petition Clause, a Result that is Impermissible Under the
          Constitutional Avoidance Doctrine.**

17      The constitutional avoidance doctrine precludes the FAA from being interpreted in a

18  manner that would allow the enforcement of AT&T's arbitration clause contained within a

19  purported customer "agreement" which is actually, as AT&T concedes, nothing more than a one-

20  sided, imposed contract of adhesion. Under these circumstances, AT&T would have the FAA

21  infringe on the Constitutional right to petition courts by staying this case and obstructing

*Footnote continued from previous page*

22  arbitration agreements. *See Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 934 (9th Cir.

23  2013). Here, if AT&T arbitration clause were enforced, Plaintiffs would not be able to seek *any* equitable relief in court.

24  [67] Cal. Code Civ. Proc. § 116.220(a)(5) (injunctive relief only available where statute expressly authorizes small claims courts to issue such relief); Ala. Code §§ 12-12-30, 12-11-31 (circuit

25  courts have exclusive jurisdiction over equitable remedies).
    [68] The jurisdictional maximum is $6,000 in Alabama small claims courts, Ala. Code § 12-12-

26  31(a), and $10,000 in California small claims courts, Cal. Code Civ. Proc. § 116.221.
    [69] Fees for filing claims in Alabama small claims courts are between $35 and $109, Ala. Code §

27  12-19-71, and are between $30 and $100 in California small claims court, Cal. Code Civ. Proc. 116.230.

28  [70] Sobol Decl., Exhibit 1 (AT&T's Resp. to ROGs 3 & 4).

Plaintiffs' right to obtain redress of their claims in court.[71] Under constitutional law principles, courts cannot "'lightly impute to Congress an intent to invade . . . freedoms' protected by the Bill of Rights, such as . . . 'the right of access to the courts.'"[72] Courts must also "give the benefit of any doubt to protecting rather than stifling" First Amendment rights.[73] Accordingly, courts facing constitutional challenges must try to interpret statutes in a manner that avoids potential constitutional problems. The Supreme Court has long held that if a statute that can be construed as limiting a constitutional right is "reasonably susceptible of two interpretations," and the second one does not potentially limit a constitutional right, it is the judiciary's "plain duty to adopt that construction which will save the statute from constitutional infirmity."[74] This "doctrine of constitutional avoidance"[75] is a "cardinal principle" and "has so long been applied" by the Court "that it is beyond debate."[76]

Under the constitutional avoidance doctrine, if an interpretation of a statute "would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."[77] To ascertain whether Congress intended the potentially problematic interpretation, courts must assess "every reasonable construction" of the statutory text "in order to save [it] from unconstitutionality,"[78] and must

---

[71] By definition, the "stay" of this litigation and removal of the court's discretion to hear its merits mandated by the FAA "abridge" and "obstruct" Plaintiffs' First Amendment right to have their grievances "redressed" in court. *Webster's* at 1862.

[72] *BE&K Constr.*, 536 U.S. at 525 (citations omitted).

[73] *Citizens United*, 558 U.S. at 327 (internal quotations and citations omitted).

[74] *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909) (citation omitted). *Accord* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247-51 (2012) (discussing "Constitutional-Doubt Canon" of construction).

[75] *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 565-66 (2009) (Breyer, J., dissenting) (citing *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.")).

[76] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citations omitted).

[77] *Id.* at 575.

[78] *Id.* (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)). *See also id.* at 577 (even if a potentially unconstitutional reading of a statute is "a permissible one, . . . we must independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed" to the statute).

1  adopt a constitutional construction "unless there is *the clearest indication*" in the statutory text or

2  legislative history that Congress intended the potentially unconstitutional interpretation.[79]

3      The constitutional avoidance doctrine applies here because the FAA is susceptible to two

4  different plausible interpretations. The FAA's text states that the statute applies to arbitration

5  clauses that are contained "in any maritime transaction or a contract evidencing a transaction

6  involving commerce." [80] As discussed in detail below, that text can be reasonably interpreted to

7  exclude consumer adhesion contracts from its scope, and it can also be interpreted as applying to

8  such contracts (which infringes the Petition Clause), depending on whether the word "commerce"

9  is given its 1925 meaning or its much broader modern-day meaning.

10      The Supreme Court has itself acknowledged in another context the ambiguity of the word

11  "commerce" in the FAA. In *Circuit City Stores, Inc. v. Adams*, Justice Souter stated that "there

12  are two quite different ways of reading the scope of the Act's provisions," one based on

13  Congress's 1925 understanding of its "far narrower" commerce power, and an "elastic

14  understanding" based on the commerce power's "modern conception."[81] The *Circuit City*

15  majority also acknowledged the two alternatives.[82] In *Allied-Bruce Terminix Cos., Inc. v. Dobson*,

16  the Court recognized the same ambiguity.[83] In these and other cases involving statutory

17  construction of the FAA, rather than constitutional analysis, the Supreme Court had leeway to

18  employ "dynamic" statutory interpretation of the FAA based on what its text means today rather

19  than what it meant in 1925. This Court, however, has no such leeway under the avoidance

20  doctrine if a dynamic interpretation would render application of the statute unconstitutional.

21      Two Supreme Court cases applying the avoidance doctrine should guide this Court's

22  inspection of the FAA under the Petition Clause. In *Edward J. DeBartolo Corp. v. Florida Gulf*

23  *Coast Building & Construction Corp.*, the Court addressed whether the National Labor Relations

24  [79] *Id.* at 577 (quoting *NLRB v. Drivers*, 362 U.S. 274, 284 (1960)) (emphasis added).

25  [80] 9 U.S.C. § 2.
   [81] 532 U.S. 105, 133-34 (2001) (Souter, J., dissenting).

26  [82] *Id.* at 116-17, 119.
   [83] 513 U.S. 265, 275 (1995) ("The pre-New Deal Congress that passed the Action in 1925 might
   well have thought the Commerce Clause did not stretch as far as has turned out to be the case.").

27  *See also id.* at 286, 292 (Thomas, J., dissenting) (the FAA must be interpreted as of "the time of
   [its] passage in 1925"—a "later development" in the law "does not mean [it was] so understood in

28  1925" and "could not change the original meaning of the statute that Congress enacted in 1925").

1    Board ("NLRB" or "Board") had interpreted the National Labor Relations Act ("NLRA") in a

2    way that infringed a union's freedom of speech. Because the NLRA makes it unlawful to "'coerce

3    or restrain any person' to cease doing business with another,"[84] the Board ruled that the union

4    could not distribute handbills urging shoppers to boycott a mall's retail stores.[85] The Court ruled

5    that the statutory language "need not be read" the way the Board read it; although the Board's

6    reading was reasonable, it also could be interpreted in a manner that did not threaten the First

7    Amendment.[86] Further, the legislative record fell "far short of revealing" a "clear intent" to

8    "proscribe peaceful handbilling, unaccompanied by picketing," which would infringe the

9    Constitution.[87] Because a reading consistent with the First Amendment was "*not foreclosed* either

10   by the language of the section or its legislative history," the Court adopted that construction to

11   avoid "the serious constitutional questions that would be raised by the Board's understanding of

12   the statute."[88]

13          In *BE&K Construction Co. v. NLRB*, the Court addressed the Petition Clause itself, and it

14   refused to read the NLRA in a way that infringed an employer's right to access the courts. The

15   Board had ruled that the employer's retaliatory lawsuit violated the NLRA's ban against

16   "interfering with, restraining, or coercing employees" who were engaging in protected union

17   activity.[89] While the Court agreed that the statutory language "might be read" to reach such

18   retaliatory lawsuits, the Court declined to adopt the Board's interpretation "[b]ecause there is

19   nothing in the statutory text indicating that [it] *must be read*" that way.[90] In language equally

20   pertinent to the FAA as the NLRA, the Court stated that "any concerns related to the right to

21   petition must be greater when enjoining . . . litigation than when penalizing completed litigation"

22   because "the First Amendment historically provides greater protections from prior restraints than

23   after-the-fact penalties, . . . and enjoining a lawsuit could be characterized as a prior restraint."[91]

24   _____

25   [84] 485 U.S. at 578; *see also id*. at 572 n.2 (quoting NLRA, 29 U.S.C. § 158(b)(4)(ii)(B)).
     [85] *Id*. at 570-74.

26   [86] *Id*. at 582-83.
     [87] *Id*. at 588.

27   [88] *Id*. (emphasis added).
     [89] 536 U.S. at 536 (emphasis added). *See also id*. at 524-33 (analyzing Petition Clause).

28   [90] *Id*. at 536.
     [91] *Id*. at 530 (citing *Alexander v. United States*, 509 U.S. 544, 553-54 (1993)).

These two cases demonstrate that, under the constitutional avoidance doctrine, the FAA cannot be construed as directing federal courts to enforce consumer adhesion arbitration contracts that deprive citizens of their right to petition the courts unless the 1925 Congress clearly intended that result. To find the requisite "clear intent,"[92] every reasonable construction that would preserve the right to petition the courts "*must be*"[93] "*foreclosed*"[94] by the FAA's text or legislative history. As shown below, the requisite "clear intent" cannot be found in either.

### A.    The FAA's Text  Does Not Evidence a Clear Congressional Intent to Infringe the Petition Clause.

Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable . . . ."[95] Three canons of statutory construction are relevant to the analysis of this text: *First*, terms that are not defined in the statute are typically construed in accordance with the ordinary dictionary meanings of those words at the time Congress enacted the statute.[96] *Second*, statutory text is typically construed in light of Congress's understanding of the law at the time of its enactment.[97] *Third*, statutory words cannot be viewed in isolation and must be construed in context with "the provisions of the whole law, and to its object and policy."[98]

Applying these principles, it becomes clear that Congress did not intend consumer adhesion arbitration contracts to fall within the FAA's scope. Section 2 does not say the FAA applies to "any contract," but rather that it applies to "a contract evidencing a transaction involving commerce." Critically, the bill that became the FAA *did* initially use the words "any

---

[92] *Edward J. DeBartolo*, 485 U.S. at 584-88.
[93] *BE&K Constr.*, 536 U.S. at 536 (emphasis added).
[94] *Edward J. DeBartolo*, 485 U.S. at 588 (emphasis added).
[95] 9 U.S.C. § 2.
[96] *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002-03 (2012) (citation omitted). *Accord* Scalia & Garner, *supra* note 74, at 78-92 ("Fixed-Meaning Canon"). *See also id.* at 85 (construing a statute as of the time it was written "prevents . . . [a] nine-person (or indeed five-person) . . . revision" of the statute by the Supreme Court).
[97] *Thompson v. Thompson*, 484 U.S. 174, 180 (1988) ("We examine initially the context of the [statute] with an eye toward determining Congress' perception of the law that it was shaping or reshaping . . . [a]t the time Congress passed the [statute].") (citation omitted). *See also Allied-Bruce*, 513 U.S. at  286, 292 (Thomas, J., dissenting) (the FAA must be interpreted as of "the time of [its] passage in 1925"—a "later development" in the law "does not mean [it was] so understood in 1925" and "could not change the original meaning of the statute that Congress enacted in 1925").
[98] *Maracich v. Spears*, 133 S. Ct. 2191, 2203 (2013) (citations omitted).

1     contract," but Congress revised the final text to narrow the FAA's scope.[99] While the ordinary

2     meanings of the first six words in the phrase were largely the same then as they are now, the

3     meaning of "commerce" was different. Section 1 of the FAA defines "commerce" as follows:

4     "'commerce' . . . means commerce among the several States or with foreign nations" (or in U.S.

5     Territories, in the District of Columbia, or among and between any of them and any State or

6     foreign nation).[100] Because the statutory definition of "commerce" itself uses the generic word

7     "commerce," resort to the ordinary meaning of "commerce" is necessary: In 1925 "commerce"

8     was defined as the "interchange of merchandise on a large scale between nations or

9     individuals."[101] Thus, a reasonable reading of the phrase "a contract evidencing a transaction

10    involving commerce," is that the FAA was meant to apply only to contracts involving an

11    interstate or foreign exchange of merchandise on a large scale; that is, contracts among large-

12    scale merchants who have relatively equal bargaining power, and not to compulsory adhesion

13    agreements imposed by corporations on individual consumers.

14        The reasonableness of this interpretation is enhanced by the fact that in 1925, the

15    Commerce Clause's reach was judicially limited to what was then considered "commerce"—

16    interstate and foreign business transactions. All manufacturing of goods, employment of workers,

17    and the provision of individual services such as insurance contracts, for example, were deemed at

18    that time to be intrastate activities outside of Congress' regulatory purview, even if the goods or

19    services were ultimately intended for out-of-state or foreign markets.[102] Likewise, the intrastate

20

21

---

[99] *See infra*, Section IV.B.

22   [100] 9 U.S.C. § 1.

[101] Judicial Notice, Exhibit C (*Webster's New Modern English Dictionary (Illustrated)* 188

23   (1925)) ("*Webster's* 1925").

[102] *See Hammer v. Dagenhart*, 247 U.S. 251, 271-72 (1918) (while the Commerce Clause enabled

24   Congress to "regulate transportation among the States" and the interstate purchase and sale of

goods, it did not extend to laws regarding the employment of child labor to manufacture goods,

25   even if the goods are ultimately "intended for interstate commerce"); *Paul v. Virginia*, 75 U.S.

168, 183-84 (1869) (insurance policies not "articles of commerce" even if made between parties

26   in different states; nor would "a contract for the purchase and sale of goods in Virginia by a

citizen of New York whilst in Virginia . . . constitute a portion of such commerce"). The Supreme

27   Court has recognized that "[t]he pre-New Deal Congress that passed the [FAA] in 1925 might

well have thought the Commerce Clause did not stretch as far as has turned out to be the case."

28   *Allied-Bruce Terminix*, 513 U.S. at 275.

1  sale of goods or services did not fall under the 1925 purview of the Commerce Clause.[103]

2      The FAA's operative language, therefore, does not evince a "clear intent" by Congress to

3  permit powerful firms to deprive consumers of their First Amendment right to petition a

4  government court. While the FAA's text "might be read" to reach consumer adhesion arbitration

5  contracts that infringe the right of petition, "it need not be read so broadly."[104] Certainly, a

6  reasonable construction that is consistent with the Petition Clause—*i.e.*, that the FAA does not

7  apply to adhesion arbitration contracts—is not "foreclosed."[105]

8          **B.**    <u>**The FAA's Legislative History Does Not Evidence a Clear Congressional**</u>
                  <u>**Intent to Infringe the Petition Clause.**</u>

9

10      Plaintiffs' interpretation of the FAA's statutory text is further supported by the FAA's

11  legislative history, which unambiguously reveals a complete absence of any Congressional intent

12  to infringe the Petition Clause by including consumer adhesion contracts within the FAA's

13  scope.[106] Indeed, the legislative history reveals the opposite: Congress *expressly rejected* allowing

14  powerful parties to use adhesion contracts to force weaker parties into compulsory arbitration.

15      The FAA's enactment was spearheaded by a New York cotton merchant, Charles

16  Bernhemier, and a New York lawyer, Julius Cohen, who sought a federal complement to a New

17  York statute that made arbitration agreements enforceable in New York state courts.[107] Their only

18  aim was "to get a Federal law to cover interstate and foreign commerce and admiralty."[108]

19      The bill that became the FAA was initially the subject of a hearing held on January 31,

20  1923 before a subcommittee of the Senate Committee on the Judiciary.[109] Bernheimer testified

---

21  [103] *See, e.g., Wiloil Corp. v. Commonwealth*, 294 U.S. 169, 175 (1935) (citing cases) (goods sold
within a state not within Commerce Clause's reach, even where goods were originally transported

22  from another state or where the contracts for sale were made in another state).
[104] *See BE&K Constr.*, 536 U.S. at 536.

23  [105] *See Edward J. DeBartolo*, 485 U.S. at 588.
[106] "One rarely finds a legislative history as unambiguous as the FAA's." *Southland Corp. v.*

24  *Keating*, 465 U.S. 1, 25 (1984) (O'Connor, J., dissenting).
[107] *See* Moses, *supra* note 32, at 101-03. *See also* David S. Schwartz, *Correcting Federalism*

25  *Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67
L<small>AW</small> & C<small>ONTEMP</small>. P<small>ROB</small>. 5, 16-17 (2004).

26  [108] *See* Judicial Notice, Exhibit D, *Arbitration of Interstate Commercial Disputes: Hearings on S.*
*1005 and H.R. 646 Before the J. Comm. of Subcomms. on the Judiciary*, 68th Cong. 16 (1924)

27  ("1924 *Joint Hearing*") (statement of Julius Henry Cohen).
[109] *See* Judicial Notice, Exhibit E, *Sales and Contracts to Sell in Interstate and Foreign*

28  *Commerce, and Federal Commercial Arbitration: Hearings on S. 4213 and S. 4214 Before a*

*Footnote continued on next page*

1  that he had studied both "compulsory arbitration" arising from membership in a trade

2  organization and "arbitration in the form of a completely voluntary act, by insertion of an

3  arbitration clause in the contract."[110] Bernheimer did not ask Congress to approve compulsory

4  arbitration, but instead repeatedly emphasized that the bill's purpose solely was to "enable

5  business men to settle their disputes expeditiously and economically"[111] by making enforceable

6  "written agreements voluntarily entered into" between merchants or businesses.[112]

7       The notion that the FAA would apply to *all* contracts, including adhesion contracts

8  between a powerful party and a weaker party, was explicitly rejected by both the Senate

9  subcommittee members and the bill's proponents through their rejection of proposed text that

10  would have enforced "a written provision in *any* contract *or* maritime transaction *or* transaction

11  involving commerce to settle by arbitration . . . ."[113] Senator Thomas J. Walsh,[114] for example,

12  objected to this language because it would include adhesion contracts (called "take it or leave it"

13  contracts at the time). Senator Walsh had the following exchange with W.H.H. Piatt, who chaired

14  the American Bar Association Committee on Commerce, Trade and Commercial Law, a bill

15  proponent:[115]

16
17       Mr. PIATT: . . . [The bill] is purely an act to give the merchants the right or
   privilege of sitting down and agreeing with each other as to what their damages
   are, if they want to do it. Now, that is all there is in this.

---

18  *Footnote continued from previous page*
   *Subcomm. of the S. Comm. on the Judiciary*, 67th Cong. (1923) ("1923 *Senate Hearing*").

19  [110] *Id.* at 1.

   [111] *Id.* at 2 (quoting Report of Committee on Commerce, Trade and Commercial Law of the

20  American Bar Association (1922)). *See also id.* (bill was "[i]n the interest of the preservation of
   commodities, particularly foodstuffs and the elimination of waste in all commercial endeavors");

21  *id.* at 3 (bill will "establish and maintain business amity"); *id.* at 3-7 (always discussing
   "merchants," "merchants' arbitrators," or arbitrations before "a trade body"); *id.* at 8, 9 (bill

22  advanced "commercial" arbitration; "It is purely an act to give the merchants the right or the
   privilege of sitting down and agreeing with each other as to what their damages are, if they want

23  to do it. Now, that is all there is in this."). *See also* Moses, *supra* note 32, at 106 ("The hearings
   make clear that the focus of the Act was merchant-to-merchant arbitrations, never merchant-to-

24  consumer arbitrations.").
   [112] 1923 *Senate Hearing* at 2.

25  [113] *See id.* at 2 (statement of Charles Bernheimer, reading original bill language) (emphasis
   added). *See also* Schwartz, *supra* note 107, at 21 (quoting H.R. 646, 65 Cong. Rec. 11,081   (daily

26  ed. June 6, 1924)).
   [114] Senator Walsh was a former plaintiff's lawyer and a powerful Democratic Senator who later

27  chaired both the 1924 and 1932 Democratic National Conventions. *See*
   http://en.wikipedia.org/wiki/Thomas_J._Walsh. *See also* Schwartz, *supra* note 107, at 21.

28  [115] 1923 *Senate Hearing* at 7.

---

Senator WALSH: . . . I see no reason at all . . . why, when two men voluntarily agree to [s]ubmit their controversy to arbitration, they should not be compelled to have it decided that way. . . . The trouble about the matter is that a great many of these contracts that are entered into *are really not voluntary things at all*. Take an insurance policy; there is a blank in it. You can take that or you can leave it. . . . Either you can make that contract or you can not make any contract. It is the same with a good many contracts of employment. A man says "These are our terms. All right, take it or leave it." Well, there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court, and has to have it tried before a tribunal in which he has no confidence at all.

Mr. PIATT: That would be the case in that kind of a case, I think; but it is not the intention of this bill to cover insurance cases.[116]

Senator Walsh then mentioned other adhesion contracts, such as a "regular form of contract for the shipment of goods" and other examples of form agreements that "are not really voluntary contracts, in a strict sense."[117] Senator Walsh compared such contracts to then-recently outlawed contracts that shortened statutes of limitations, where the drafter's "*tendency is to put terms in that will give him* [the weaker contracting party] *no real opportunity to prosecute his action*.[118] Senator Walsh concluded by stating that "I really believe that in the class of cases that Mr. Bernheimer has in mind" (*i.e.*, voluntary contracts between merchants), the bill "would be a very useful thing, and I would be disposed to favor it; but I can see that difficulty," and Piatt responded that he "can see it, too" and would raise the issue "at once" with the other FAA proponents.[119]

A revised bill was considered at a January 9, 1924 joint hearing before subcommittees of the House and Senate Committees on the Judiciary.[120] The bill's supporters again emphasized that the bill's purpose was to enforce arbitration agreements among commercial merchants and trade association members engaged in interstate commerce[121] that were "voluntarily" and "solemnly"

---

[116] *Id.* at 9 (emphasis added).
[117] *Id.* at 9-10.
[118] *Id.* at 10 (emphasis added).
[119] *Id.* at 11.
[120] *See* 1924 *Joint Hearing* at 1, 11.
[121] *See id.* at 7 (statement of Charles Bernheimer) ("the ordinary, everyday trade disputes, … it is for them that this legislation is proposed"; enforcing arbitration among merchants "preserves business friendships … raises business standards … [and] maintains business honor"); *id.* at 12 (statement of R.S. French) (bill will enable enforcement of arbitration provisions in constitutions and by-laws of several trade organizations whose members "are large exporters and importers of perishable goods"); *id.* at 13, 14 (statement of Julius Henry Cohen) (purpose of bill is "to make the disposition of business in the commercial world less expensive and more expeditious"; if "we have confidence in [a man's] ability to understand complex commercial situations and in his sense of right and justice" and "agree to settle on the terms that these gentlemen say is proper," that agreement should not be subject to repudiation); *id.* at 41 (brief in support of bill written by
*Footnote continued on next page*

1  entered into.[122] Senator Thomas Sterling, who chaired the hearing, asked Cohen why courts had

2  refused to specifically enforce arbitration agreements. Cohen replied that "the real fundamental"

3  reason was that they often appeared in *adhesion contracts*, or in Cohen's words, because "the

4  stronger men would take advantage of the weaker" when contracting:

5      [T]he real fundamental cause was that at the time this rule was made people were
       not able to take care of themselves in making contracts, and the stronger men
6      would take advantage of the weaker, . . . and the courts said, "If you let the people
       sign away their rights, the powerful people will come in and take away the rights
7      of the weaker ones." And that's still true to a certain extent.[123]

8  Cohen's point that courts disliked adhesion arbitration contracts was supported by the case law of

9  the day.[124] This exchange between Senator Sterling and Cohen reveals that—insofar as the 1925

10  Congress that enacted the FAA was concerned—the "judicial hostility" to arbitration to which the

11  Supreme Court presently often refers[125] arose largely from the courts' disdain for enforcing

12  adhesion arbitration clauses. Moreover, it shows that the bill's supporters and Chairman Sterling

13  (as well as Senator Walsh) *shared that disdain*.

14      Congress codified that disdain by excluding adhesion arbitration contracts from the FAA's

15  scope and enacting a statute that required judicial enforcement *only* of arbitration contracts that

16  were voluntarily signed by merchants engaged in interstate and foreign commerce. By May 1924,

17  the phrase "any contract or" was amended to limit the bill's scope to "a contract evidencing a

18  transaction involving commerce."[126] This change was "made at the behest of Senator . . .

19  Walsh"[127] and has been referred to as "the Walsh Amendment."[128] Congress thus restricted the

---

20  *Footnote continued from previous page*
Julius Henry Cohen) ("If business men desire to submit their disputes to speedy and expert
21  decision, why should they not be enabled to do so?").
   [122] *Id.* at 26 (statement of Alexander Rose) ("Arbitration . . . is a purely voluntary thing. It is only
22  the idea that arbitration may now have the aid of the court to enforce these provisions which men
   voluntarily enter into."); *id.* at 35 (brief in support of bill written by Julius Henry Cohen) (refusal
23  to arbitrate often results from a man's "having no respect for his obligation solemnly assumed").
   [123] *Id.* at 14-15.
24  [124] *See, e.g., Parsons v. Ambos*, 48 S.E. 696, 697 (Ga. 1904) ("By first making the contract and
   then declaring who should construe it, the strong could oppress the weak, and in effect so nullify
25  the law as to secure the enforcement of contracts usurious, illegal, immoral, or contrary to public
   policy.").
26  [125] *E.g., Italian Colors*, 133 S. Ct. at 2308-09.
   [126] *See* Judicial Notice, Exhibit F, S. Rep. 68-536, at 1-2 (1924) ("Senate
27  Report"); *See also* Judicial Notice, Exhibit G, 66 Cong. Rec. 2759
   (1925) ("House Report").
28  [127] Schwartz, *supra*, note 107 at 21 & n.103 (citing 66 Cong. Rec. 2761 (1925)). *See also* House

*Footnote continued on next page*

scope of the FAA, transforming it from a statute providing a "blanket . . . rule" applying to "all contracts" to one that applied only to contracts involving interstate commerce (as then understood) or admiralty.[129]

Indeed, the Senate Report styled the bill as one "To Make Valid and Enforceable *Certain* Agreements for Arbitration."[130] Importantly, the Senate Report emphasized that the bill had defined "maritime transactions" and "commerce" in section 1 as a limiting device: that is, to "show[] *to what contracts in interstate or foreign commerce* the bill will be applicable."[131] The chair of the House Judiciary Committee, Representative George S. Graham of Pennsylvania, confirmed Congress' intent, stating: "This bill simply provides for one thing, and that is to give an opportunity to enforce an agreement in commercial contracts and admiralty contracts – an agreement to arbitrate, when voluntarily placed in the document by the parties to it."[132]

Because neither the text nor the legislative history of the FAA reflects a "clear intent" by Congress to cover consumer adhesion arbitration contracts, and because interpreting the FAA in such a manner would deprive Plaintiffs of their First Amendment right to right to petition courts, requiring Plaintiffs to arbitrate their claims would violate the constitutional avoidance doctrine.

## **CONCLUSION**

For the foregoing reasons, AT&T's motion to compel arbitration should be denied, and this class action should be permitted to proceed in this court.

---

*Footnote continued from previous page*
Report at 2761.
[128] Schwartz, *supra* note 107, at n.109 (citations omitted).
[129] *Id.* (citations omitted).
[130] Senate Report at 1 (emphasis added).
[131] *Id.* at 2 (emphasis added). The Senate Report also stated that the record "shows not only the great value of *voluntary* arbitrations but the practical justice of enforced arbitration of disputes where written agreements for that purpose have been *voluntarily* and *solemnly* entered into." *Id.* at 3 (emphasis added). A written agreement "voluntarily and solemnly" entered into – in 1925 – meant that it had to result from a serious and formal exercise "of choice or free will." *Webster's* 1925 at 768, 894.
[132] *See* Judicial Notice, Exhibit H, 65 Cong. Rec. 1931 (1924).

Dated: January 4, 2016                 Respectfully submitted,

                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


                                       By:/s/ Michael W. Sobol
                                             Michael W. Sobol

                                       Michael W. Sobol (State Bar No. 194857)
                                       Roger N. Heller (State Bar No. 215348)
                                       Nicole D. Sugnet (State Bar No. 246255)
                                       LIEFF CABRASER HEIMANN & BERNSTEIN LLP
                                       275 Battery Street, 29th Floor
                                       San Francisco, CA 94111
                                       (415) 956-1000
                                       (415) 956-1008 (fax)


                                       By:/s/ Alexander H. Schmidt
                                             Alexander H. Schmidt

                                       Alexander H. Schmidt (Admitted Pro Hac Vice)
                                       Michael M. Liskow (State Bar No. 243899)
                                       WOLF HALDENSTEIN ADLER FREEMAN & HERZ
                                       LLP
                                       270 Madison Avenue
                                       New York, New York 10016
                                       (212) 545-4600
                                       (212) 545-4677 (fax)

                                       Rachele R. Rickert (State Bar No. 190634)
                                       WOLF HALDENSTEIN ADLER FREEMAN & HERZ
                                       LLP
                                       750 B. Street, Suite 2770
                                       San Diego, California 92101
                                        (619) 239-4599
                                       (619) 234-4599 (fax)

                                       John A. Yanchunis*
                                       Florida Bar No. 324681
                                       Rachel Soffin*
                                       Florida Bar No. 0018054
                                       MORGAN & MORGAN
                                       COMPLEX LITIGATION GROUP
                                       201 North Franklin Street 7th Floor
                                       Tampa, Florida 33602
                                       (813) 223-5505
                                       (813) 223-5402 (fax)

1                                       Jean Sutton Martin (Admitted *Pro Hac Vice*)

LAW OFFICE OF JEAN SUTTON MARTIN PLLC

2                                       North Carolina Bar No. 25703

2018 Eastwood Road, Suite 225

3                                       Wilmington, North Carolina 28403

(910) 292-6676

4                                       (888) 316-3489 (fax)

5                                       Daniel M. Hattis (State Bar No. 232141)

HATTIS LAW

6                                       1171 Bellevue Way NE #1645

Bellevue, WA 98009

7                                       Telephone: (650) 980-1990

D. Anthony Mastando*

8                                       Eric J. Artrip*

9                                       MASTANDO & ARTRIP, LLC

301 Washington St., Suite 302

10                                     Huntsville, Alabama 35801

Telephone: (256) 532-2222

11

12                                     Douglas C. Martinson, II*

MARTINSON & BEASON, PC

13                                     115 Northside Square

Huntsville, Alabama 35801

14                                     Telephone: (256) 776-7006

15

16                                     *Attorneys for Plaintiffs and the Proposed Class*

17                                     *\* Pro Hac Vice application to be submitted*

**ATTESTATION**

18        I, Michael W. Sobol, am the ECF user whose identification and password are being used

19  to file this Joint Case Management Conference Statement.  I hereby attest that Alexander H.

20  Schmidt has concurred in this filing.

21

22                                        */s/ Michael W. Sobol*

23                                          Michael W. Sobol

24

25

26

27

28