UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS A. ROBERTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T MOBILITY LLC,<br><br>Defendant. | Case No. 15-cv-03418-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION; AND STAYING PROCEEDINGS**<br><br>Docket No. 25 |

Plaintiffs Marcus A. Roberts, Kenneth A. Chewey, Ashley M. Chewey, and James Krenn (collectively, "Plaintiffs") have filed a class action against Defendant AT&T Mobility LLC ("AT&T"), asserting statutory, tort, and warranty claims based on AT&T's "deceptive and unfair trade practice of marketing its wireless service plans as being 'unlimited,' when in fact those plans are subject to a number of limiting conditions [in particular, throttling[1]] that either are not disclosed or inadequately disclosed to consumers." FAC ¶ 1. Currently pending before the Court is AT&T's motion to compel arbitration. AT&T's motion relies largely on the fact that the Supreme Court upheld AT&T's arbitration provision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (holding that arbitration agreement should be enforced under the Federal Arbitration Act ("FAA"); California's *Discover Bank* rule – which deemed class waivers in consumer arbitration agreements substantively unconscionable – was preempted by the FAA). In response, Plaintiffs argue that the *Concepcion* Court never addressed the specific issues now raised – *i.e.*, that enforcement of the arbitration agreements would violate their rights as protected

---

[1] Throttling is the intentional slowing of customers' data speed once they reach certain data usage thresholds. *See* Mot. at 2.

by the Petition Clause of the First Amendment.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** AT&T's motion to compel arbitration. The Court further stays this lawsuit pending arbitration. *See* 9 U.S.C. § 3.

## I.   DISCUSSION

The parties do not dispute that Plaintiffs entered into contracts with AT&T in order to obtain wireless service. The parties also do not dispute that each of the agreements contained an arbitration provision.

In its motion, AT&T contends that the Court should enforce the arbitration agreements and compel arbitration. In response, Plaintiffs essentially raise three arguments as to why arbitration should not be compelled: (1) because, if this Court were to compel arbitration, that would be state action that would violate their First Amendment rights – more specifically, the right to petition a court for a redress of grievances[2]; (2) because, even though the arbitration provision allows a claim to be brought in small claims court, that court is not an adequate forum and therefore their First Amendment rights have still been abridged; and (3) because the FAA must be construed as not applying to consumer actions in order to avoid a constitutional problem (*i.e.*, the constitutional avoidance doctrine).

Each of the above arguments turns on the applicability of the First Amendment. But, as both parties recognize, in order for Plaintiffs to have a First Amendment claim, they must first show state action. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263 (2d Cir. 2014) ("Because the United States Constitution regulates only the Government, not private parties, a litigant like Grogan who alleges that her constitutional rights have been violated must first establish that the challenged conduct constitutes state action.") (internal quotation marks

---

[2] *See* U.S. Const., amend. 1 (providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"); *see also Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (stating that "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes[;] '[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government'").

1  omitted)); *cf. Hudgens v. NLRB*, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that
2  the constitutional guarantee of free speech is a guarantee only against abridgment by government,
3  federal or state."). Plaintiffs acknowledge that the arbitration agreements are contracts between
4  private actors. Nevertheless, they assert, there would still be state action in the instant case upon
5  this Court's enforcement of that private agreement.

A.  <u>Judicial Enforcement</u>

As a starting point, the Court finds no merit to Plaintiffs' assertion that the mere fact of judicial enforcement automatically establishes state action. The Ninth Circuit rejected that position in *Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013). More specifically, in *Ohno*, the Ninth Circuit rejected the defendant's contention that judicial enforcement of a foreign-country money judgment against it – through application of California's Uniform Foreign Country Money Judgments Recognition Act – "constitute[d] domestic state action triggering constitutional scrutiny."[3] *Id.* at 986. The court stated:

> [T]here is no doubt that the district court's decision in this case applying California's Uniform Act – legislation that is itself the result of governmental action – constitutes state action for purposes of constitutional scrutiny. But that truism does not resolve our question, which is: Should the *substance* of the underlying Japanese monetary damages judgment, resulting from a lawsuit in Japan between two private parties, be ascribed to the district court's enforcement of the judgment under the Uniform Act and so subjected to constitutional scrutiny?

*Id.* at 994 (emphasis in original).

The *Ohno* court further explained:

> *Recognizing and enforcing* a foreign-country judgment is distinct from *rendering* that judgment in the first place. The district court, in giving effect to the judgment issued in Japan, *has not participated in the action the [defendant] claims is unconstitutional* – namely, judging the truth or falsity of the [defendant's] religious teachings or imposing liability for the consequences of religious expression.

*Id.* at 993 (emphasis in original and added). "[T]he source of the alleged constitutional harm is . . .

---
[3] The defendant argued that "the Religion Clauses [of the First Amendment] would bar a court in the United States from rendering the same judgment in the first instance." *Ohno*, 723 F.3d at 992.

3

1 Japanese tort law, created and enforced through Japanese governmental entities," and so "the
2 claimed constitutional deprivation cannot be traced to a right, privilege, or rule of conduct
3 imposed by a domestic governmental entity or individual." *Id.* at 994.  The act of enforcement of
4 the Japanese judgment by the U.S. court did not constitute state action causing a constitutional
5 deprivation.

6 To the extent Plaintiffs have relied on *Shelley v. Kraemer*, 334 U.S. 1 (1948),[4] *see* Mot. at
7 3-4, to support the position that judicial enforcement itself provides the requisite state action
8 necessary to establish a constitutional claim, the Court is not persuaded.  In *Ohno*, the Ninth
9 Circuit made clear that "*Shelley*'s attribution of state action to judicial enforcement has generally
10 been confined to the context of discrimination claims under the Equal Protection Clause." *Id.* at
11 998.

12 Indeed, in discussing the reach of *Shelley*, the *Ohno* court pointed out that, "[i]n the
13 context of First Amendment challenges to speech-restrictive provisions in private agreements or
14 contracts, domestic judicial enforcement of terms that could not be enacted by the government has
15 *not* ordinarily been considered state action." *Id.* (emphasis added.)  In addition, and more on point
16 to the case at bar, the Ninth Circuit stated that, "in the context of judicial confirmation of arbitral
17 awards, . . . [courts have] held that 'mere confirmation of a private arbitration award by a district
18 court is insufficient state action to trigger the application of the Due Process Clause.'" *Id.* at 999.
19 While the Ninth Circuit did state that it did "not mean to adopt or sanction any of [these] cases,"
20 *id.* at 999 n.17, its reference to the cases – particularly the latter group – is still telling.

21 Furthermore, a Ninth Circuit decision that pre-dates *Ohno* is in strong accord with the
22 above cases.  More specifically, in *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir.
23 1998), *overruled on other grounds*, *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742
24 (9th Cir. 2003), the plaintiff – a broker-dealer in the securities industry – sued her employer for

---

[4] In *Shelley*, the Supreme Court noted that racially restrictive covenants applicable to real properties were, in and of themselves, private agreements but that, once the agreements were judicially enforced by state courts, there was the requisite state action to give rise to a constitutional claim.  *See Shelley*, 334 U.S. at 19 (stating that, "but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint").

4

employment discrimination. The plaintiff had signed a securities industry form that included an arbitration provision. The form also required the plaintiff to abide by the rules of the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD"), and each of these organizations had a rule that required arbitration. The plaintiff argued, nevertheless, that she could not be compelled to arbitration because "the arbitration agreement imposes an unconstitutional condition of employment," requiring her "to forfeit her Fifth Amendment right to due process, her Seventh Amendment right to a jury trial, and her right to an Article III judicial forum." *Id.* at 1200. According to the district court, "the essential prerequisite of state action was lacking" for the due process claim, and the Ninth Circuit agreed, stating "no state action is present in simply enforcing that agreement." *Id.* at 1201.

Plaintiffs have pointed to no authority holding that judicial enforcement, particularly of an arbitration award, constitutes state action.[5] In fact, as the *Ohno* court noted, the authority is to the contrary. For example, in *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir. 1995), the defendant appealed to the Eleventh Circuit after the district court confirmed the arbitration panel's award of punitive damages. The defendant argued, *inter alia*, that the punitive damages award violated its due process rights, more specifically, "because arbitration lacks the procedural protections and meaningful judicial review required for the imposition of punitive damages." *Id.* at 1190. The Eleventh Circuit rejected the argument. It noted first that "the state action element of a due process claim is absent in private arbitration cases" because private arbitration is by itself "a voluntary contractual agreement of the parties." *Id.* at 1191. As to the defendant's assertion that the district court's *confirmation* of the punitive damages award provided the requisite state action, the court disagreed. The Eleventh Circuit echoed the Ninth Circuit's analysis in *Ohno* that the defendant was offering a "*Shelley v. Kraemer* theory that a court's enforcement of a private contract constitutes state action" but "[t]he holding of *Shelley* . . . has not been extended beyond

---

[5] To the extent Plaintiffs have suggested that enforcement here is the equivalent of or comparable to a court-ordered injunction, the Court does not agree. The enforcement of the arbitration agreements would not "require[] the [C]ourt to take such an active role in, or to exercise sustained supervision of, the [arbitration agreements or even the arbitrations themselves] that it becomes appropriate to review the [C]ourt's activities as governmental actions." *Ohno*, 723 F.3d at 1000.

5

the context of race discrimination." *Id. See also Katz v. Cellco P'ship*, No. 12 CV 9193 (VB), 2013 U.S. Dist. LEXIS 176784, at *10, 17 (S.D.N.Y. Dec. 12, 2013) (in a case where plaintiff argued that "application of the FAA to his state law claims violates Article III of the Constitution – both the structural protections of our tripartite system of government (i.e., separation of powers) and his personal right to have his claims adjudicated before an independent Article III judge," agreeing with defendant that "there is insufficient state action for plaintiff to maintain an action under Article III"; stating that "the fact that Verizon sought a court order compelling arbitration does not transform enforcement of the parties' arbitration agreement into state action"), *vacated in part on other grounds*, No. 14-138, 2015 U.S. App. LEXIS 13055 (2d Cir. July 28, 2015); *Smith v. Argenbright, Inc.*, No. 99 C 7368, 1999 U.S. Dist. LEXIS 19827, at *8 (N.D. Ill. Dec. 27, 1999) (stating that "[w]e do not believe that our limited power to conduct an after-the-fact review of an arbitration panel for bias constitutes the requisite governmental action to implicate *Batson*"); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1468 (N.D. Ill. 1997) (rejecting contention that defendant was "using a government official, i.e., this Court, to enforce the arbitration rules that will inevitably deprive her of due process"; "refus[ing] to hold that every time a Court enforces a private arrangement it potentially violates one party's constitutional rights"); *United States v. Am. Soc'y of Composers, Authors & Publ'rs*, 708 F. Supp. 95, 97 (S.D.N.Y. 1989) (stating that "[t]he mere approval by this Court of the use of arbitration did not create any state action[;] [i]ndeed, under [party's] strained interpretation . . . , all arbitrations could be subject to due process limitations through the simple act of appealing the arbitrator's decisions to the court system"). At bottom, "[government] permission of a private choice cannot support a finding of state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999).

Finally, the Court takes note that, in many private contracts, there are provisions that arguably affect access to the courts or otherwise implicate significant rights, such as choice-of-venue, choice-of-law, statute-of-limitations, and limitations-on-damages provisions. Although these provisions may be subject to restrictions imposed by statutory and/or common law (*e.g.*, the doctrine of unconscionability, violation of public policy), courts have not held that judicial enforcement of these provisions, particularly as found in contracts between private parties, raises

6

constitutional claims. *See, e.g.*, *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1045 (9th Cir. 2001) (holding that a six-month statute-of-limitations provision was enforceable); *Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 92 (4th Cir. 2015) (rejecting assertion that consequential damages exclusion in contract was not enforceable).

B.     The FAA and Its Interpretation

In their papers, Plaintiffs argued that, nevertheless, there is state action based on Congress's enactment of the FAA. *See* Opp'n at 4. This argument is similar to that rejected by the Ninth Circuit in *Duffield*. There, the plaintiff argued that "state action is present because 'federal law requires all broker-dealers to register with a national securities exchange (i.e., the NYSE or NASD), and to abide by the rules of that exchange – including its mandatory arbitration rules – as a condition of their continued employment.'" *Id.* at 1200. The Ninth Circuit rejected the argument, stating that

> [t]he rules of NASD and the NYSE are not fairly attributable to the government unless they carry the force of federal law. *And prior to 1993*, no federal statute or regulation required [the plaintiff] to register with the securities exchanges, much less to sign Form U-4 or to arbitrate employment disputes. Thus, when [the plaintiff] signed her Form U-4 *in 1988* and thereby waived her rights to litigate employment-related disputes in a judicial forum, she did not do so because of any state action.

*Id.* at 1201 (emphasis added).

The court acknowledged that, in 1993 – two years before the plaintiff's employer actually invoked the arbitration agreement – the Securities and Exchange Commission ("SEC") had "adopted a regulation that required all broker-dealers to be registered with at least one of the securities organizations of which [the plaintiff's employer] was a member – i.e., the NASD and the NYSE – before effecting any securities transaction." *Id.* That "current requirement that new employees register with a national securities exchange 'constitutes government action of the purest sort.'" *Id.* Nevertheless, the Ninth Circuit was not persuaded by the plaintiff's argument that this new regulation provided the requisite state action. The court noted:

> State action can be present . . . only to the extent that there is "a sufficiently *close nexus* between the State and the *challenged*

7

> *action*"; the action that [the plaintiff] challenges in her constitutional claims is the requirement that she waive her right to litigate employment-related disputes. Since agreements to arbitrate are "valid, *irrevocable*, and enforceable" to the same extent as any other contract, it is immaterial that years after [the plaintiff] signed her Form U-4 containing the arbitration provision, federal law required other employees like her to register with securities exchanges or even that it compelled her to remain registered. No federal law required [the plaintiff] to waive her right to litigate employment-related disputes by signing the Form U-4 in 1988, *and no state action is present in simply enforcing that agreement*. Insofar as [the plaintiff] argues that the "challenged action" is the requirement that she actually arbitrate her lawsuit, that requirement is found in her private contract, not in federal law.

*Id.* at 1201 (emphasis in original and added).

The instant case is similar to *Duffield* in that, here, while Congress did enact the FAA, the mere enactment of the statute did not *cause* the deprivation of their constitutional rights. *See Duffield*, 144 F.3d at 1201 (noting that "[s]tate action can be present . . . only to the extent that there is 'a sufficiently close nexus between the State and the *challenged action*'") (emphasis in original).

In any event, the Court takes note that, at the hearing, Plaintiffs conceded that they did actually not have a problem with passage of the FAA per se. Rather, Plaintiffs took the position that it was judicial interpretation of the FAA that provided the requisite state action.[6] In particular, Plaintiffs argued that, if this Court were to compel arbitration, it would be interpreting the FAA as applying to consumer adhesion contracts (and not just contracts between businessmen or merchants), and this interpretation would be the source of Plaintiffs' constitutional injury. But this asserted constitutional injury is predicated on the contract being one of adhesion – *i.e.*, where the consumer did not knowingly and/or voluntarily agree to arbitration and forfeits access to the courts. Thus, the source of the alleged constitutional deprivation when a consumer is involved is

---

[6] The Court acknowledges that, at the hearing, Plaintiffs emphasized that the enactment of the FAA by Congress was significant in that, prior to that time, arbitration agreements were typically not enforced, not only with respect to consumer contracts but also with respect to commercial contracts. *Cf. Concepcion*, 563 U.S. at 339 (noting that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements"). However, the Court does not understand Plaintiffs to be taking the position that the enactment of the FAA, in and of itself, is a constitutional problem. Furthermore, it would be inconsistent for Plaintiffs to take that position given that, as discussed below, Plaintiffs' main contention is that the FAA should be considered unconstitutional only with respect to its application vis-à-vis consumer contracts, and not, *e.g.*, commercial contracts.

1 not the judicial interpretation of the FAA; rather, the source is AT&T's private conduct in
2 purportedly forcing arbitration on an unwitting consumer. *See Am. Mfrs.*, 526 U.S. at 50 (asking
3 whether "the allegedly unconstitutional conduct [is] fairly attributable to the State") (emphasis
4 omitted). As the court held in *Ohno*, a court giving effect to a private contract does not
5 constitutionalize the contract. *See Ohno*, 723 F.3d at 993 (stating that "[t]he district court, in
6 giving effect to the judgment issued in Japan, has not participated in the action the [defendant]
7 claims is unconstitutional – namely, judging the truth or falsity of the [defendant's] religious
8 teachings or imposing liability for the consequences of religious expression").

At the hearing, Plaintiffs protested that, if the Court were to compel arbitration, then it would be interpreting the FAA as heavily favoring arbitration and encouraging private parties to employ pre-dispute arbitration clauses, and this interpretation would also be the source of Plaintiffs' constitutional injury. Because this specific argument was not raised in Plaintiffs' papers, the Court could disregard it as waived.

But even if the Court were to consider the merits, Plaintiffs would fare no better. Plaintiffs' argument rests on authority holding that

> "[a] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed that of the State.' Mere approval or acquiescence in the initiatives or a private party is not sufficient to justify holding the State responsible for these initiatives."

*Duffield*, 144 F.3d at 1200 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)[7]).

In *Duffield* itself, the court held that the SEC did not sufficiently influence private conduct because it had not:

> moved beyond mere approval of private action into the realm of "encouragement, endorsement, and participation" of that action . . . with regard to the NASD's and NYSE's compulsory arbitration requirements. "To begin with the obvious, there is nothing in the [Securities Exchange Act of 1934] and there is no Commission rule

---

[7] *Lugar* identifies two additional state action tests, *i.e.*, as to whether the actions of private entities are fairly attributable to the state. *See Duffield*, 144 F.3d at 1200. Plaintiffs have not invoked either of these tests, relying instead only on the encouragement test.

9

> or regulation that specifies arbitration as the favored means of resolving employer-employee disputes." . . . This puts the role of the SEC in a critically different light than that of the Federal Railroad Administration in *Skinner*, which drafted regulations making plain its "strong preference for [drug] testing," explicitly conferred on railroads the authority to conduct such tests, *required* railroads and employees to perform such tests, and codified its right to receive certain biological samples.

*Id.* at 1202 (emphasis added).[8]

Although Plaintiffs' position in the instant case has some force – factually, there is a stronger case for encouragement here compared to, *e.g.*, *Duffield*, 114 F.3d at 1202 (there was no SEC rule or regulation that "'specifies arbitration *as the favored means* of resolving employer-employee disputes'") (emphasis added) – it is not legally persuasive.

First, the FAA on its face indicates that an arbitration agreement – like any other agreement – may be challenged on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It purports to put arbitration agreements on equal, not more favorable, ground with other contracts.

Second, the Supreme Court's interpretation of the FAA, while acknowledging a general policy favoring of arbitration, is expressly predicated on the stated purpose of putting arbitration agreements on equal footing with all other contracts and preventing the disfavorable treatment of such agreements. As explained by the Supreme Court in *Concepcion*:

> The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements. Section 2, the "primary substantive provision of the Act," provides, in relevant part, as follows:
>
> > "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save

---

[8] In *Duffield*, the plaintiff also invoked state action based on a completely different test – *i.e.*, "'the private party has exercised powers that are traditionally the exclusive prerogative of the State.'" *Duffield*, 144 F.3d at 1200. The Ninth Circuit explained that argument lacked merit because "[w]e have long held that, since dispute resolution is not an 'exclusive' governmental function, neither private arbitration nor the judicial act of enforcing it under the FAA constitutes state action." *Id.* Plaintiffs have not invoked the government function state action test in the instant case.

10

> upon such grounds as exist at law or in equity for the revocation of any contract."
>
> We have described this provision as reflecting both a "liberal federal policy favoring arbitration," and the "fundamental principle that arbitration is a matter of contract." In line with these principles, courts must place arbitration agreements on an *equal footing* with other contracts, and enforce them according to their terms.

*Concepcion*, 563 U.S. at 339 (emphasis added); *see also Hall St. Assocs., L.L.C. v. Mattel, Ic.*, 552 U.S. 576, 581 (2008) (stating that "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements *on equal footing* with all other contracts'") (emphasis added); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (stating that, "[b]ecause the FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements,' we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement").

The problem as identified in *Concepcion* was that arbitration agreements were being singled out simply because arbitration was the subject matter of the agreement. *See Concepcion*, 563 U.S. at 339 (stating that the "savings clause" in § 2 of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue"). While it may be argued (as Plaintiffs have here) that, in safeguarding the enforceability of arbitration clauses against even well-established defenses based, *e.g.*, on unconscionability and countervailing policy concerns embodied in other laws and statutes (*see, e.g.*, *id.* at 357 (Breyer, J., dissenting); *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313 (2013) (Kagan, J., dissenting)), the Supreme Court's interpretation of the FAA has swung the pendulum to the point of actually encouraging businesses to impose pre-dispute arbitration clauses, no court has yet to hold or suggest there is sufficient encouragement or coercion by virtue of the FAA to implicate state action under *Lugar*.[9] Whatever

---

[9] Moreover, it is worth noting that Plaintiffs' argument here would apply not just to consumer contracts but commercial contracts as well. Accordingly, Plaintiffs' sweeping argument would constitutionalize enforcement of all arbitration agreements made possible by the FAA.

11

encouragement the FAA gives to the implementation of pre-dispute arbitration clauses, it falls short of government conduct in cases where state action has been found. *Cf. Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989) (concluding that state action for purposes of the Fourth Amendment was present because the "specific features of the regulations [imposed by the Federal Railroad Administration] did more than adopt a passive position toward the underlying private conduct"; "[t]he Government has removed all legal barriers to the [drug] testing authorized by Subpart D, . . . has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions[,] . . . and has mandated that the railroads not bargain away the authority to perform tests granted by Subpart D"); *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (noting that "'[t]here may be a deprivation within the meaning of § 1983 not only when there has been an actual "taking" of property by a police officer, but also when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession'").

Finally, the Court notes that, at the hearing, it asked Plaintiffs for their best case to support their claim of state action. Plaintiffs cited *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) (addressing plaintiffs' challenge on constitutional grounds to three provisions in the Cable Television Consumer Protection and Competition Act of 1992). However, *Denver Area* is of little support to Plaintiffs' position. *Denver Area* simply stated the unremarkable proposition that the enactment of a statute by Congress constitutes state action. *See id.* at 737 (noting that "petitioners attack (as 'abridging . . . speech') a congressional statute – which, by definition, is an Act of 'Congress'" – and therefore state action). But here Plaintiffs have, as noted above, disavowed a challenge to the enactment of the FAA. Rather, their focus is on the judicial interpretation of the statute, and that particular argument lacks merit for the reasons discussed above.

## II. CONCLUSION

Because there is no state action in the instant case, Plaintiffs lack a viable First Amendment challenge to the arbitration agreements. As Plaintiffs have not challenged the arbitration agreements on any other bases, the Court grants AT&T's motion to compel arbitration.

12

1  Furthermore, as requested by AT&T, the Court stays this action pending the resolution of the
2  arbitration.  *See* 9 U.S.C. § 3.
3      This order disposes of Docket No. 25.
5  **IT IS SO ORDERED**.

7  Dated: February 29, 2016

                                  EDWARD M. CHEN
                                  United States District Judge