1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    MARCUS A. ROBERTS, et al.,              Case No.  15-cv-03418-EMC

8                    Plaintiffs,
                                             AMENDED ORDER GRANTING
9          v.                                DEFENDANT'S MOTION TO COMPEL
                                             ARBITRATION; AND STAYING
10   AT&T MOBILITY LLC,                       PROCEEDINGS

11                   Defendant.              Docket No. 25

12

13         Plaintiffs Marcus A. Roberts, Kenneth A. Chewey, Ashley M. Chewey, and James Krenn

14   (collectively, "Plaintiffs") have filed a class action against Defendant AT&T Mobility LLC

15   ("AT&T"), asserting statutory, tort, and warranty claims based on AT&T's "deceptive and unfair

16   trade practice of marketing its wireless service plans as being 'unlimited,' when in fact those plans

17   are subject to a number of limiting conditions [in particular, throttling[1]] that either are not

18   disclosed or inadequately disclosed to consumers."  FAC ¶ 1.  Currently pending before the Court

19   is AT&T's motion to compel arbitration.  AT&T's motion relies largely on the fact that the

20   Supreme Court upheld AT&T's arbitration provision in *AT&T Mobility LLC v. Concepcion*, 563

21   U.S. 333 (2011) (holding that arbitration agreement should be enforced under the Federal

22   Arbitration Act ("FAA"); California's *Discover Bank* rule – which deemed class waivers in

23   consumer arbitration agreements substantively unconscionable – was preempted by the FAA).  In

24   response, Plaintiffs argue that the *Concepcion* Court never addressed the specific issues now

25   raised – *i.e.*, that enforcement of the arbitration agreements would violate their rights as protected

26

27   _____

     [1] Throttling is the intentional slowing of customers' data speed once they reach certain data usage
28   thresholds.  *See* Mot. at 2.

United States District Court

For the Northern District of California

1  by the Petition Clause of the First Amendment.

2  Having considered the parties' briefs and accompanying submissions, as well as the oral

3  argument of counsel, the Court hereby **GRANTS** AT&T's motion to compel arbitration.[2]  The

4  Court further stays this lawsuit pending arbitration.  *See* 9 U.S.C. § 3.

5  **I.     DISCUSSION**

6  The parties do not dispute that Plaintiffs entered into contracts with AT&T in order to

7  obtain wireless service.  The parties also do not dispute that each of the agreements contained an

8  arbitration provision.

9  In its motion, AT&T contends that the Court should enforce the arbitration agreements and

10 compel arbitration.  In response, Plaintiffs essentially raise three arguments as to why arbitration

11 should not be compelled: (1) because, if this Court were to compel arbitration, that would be state

12 action that would violate their First Amendment rights – more specifically, the right to petition a

13 court for a redress of grievances[3]; (2) because, even though the arbitration provision allows a

14 claim to be brought in small claims court, that court is not an adequate forum and therefore their

15 First Amendment rights have still been abridged; and (3) because the FAA must be construed as

16 not applying to consumer actions in order to avoid a constitutional problem (*i.e.*, the constitutional

17 avoidance doctrine).

18 Each of the above arguments turns on the applicability of the First Amendment.  But, as

19 both parties recognize, in order for Plaintiffs to have a First Amendment claim, they must first

20 show state action.  *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259,

21

22 [2] After the Court issued an order granting AT&T's motion to compel arbitration (Docket No. 50), Plaintiffs sought leave to file a motion to reconsider.  The Court granted leave (Docket No. 55),
23 and upon reconsideration, amends the order herein to address matters raised by the additional
24 briefs.

25 [3] *See* U.S. Const., amend. 1 (providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of
26 speech, or of the press; or the right of the people peaceably to assemble, and to petition the
   Government for a redress of grievances"); *see also Borough of Duryea v. Guarnieri*, 131 S. Ct.
27 2488, 2494 (2011) (stating that "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes[;] '[t]he
28 right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government'").

**United States District Court**
For the Northern District of California

2

1  263 (2d Cir. 2014) ("Because the United States Constitution regulates only the Government, not

2  private parties, a litigant like Grogan who alleges that her constitutional rights have been violated

3  must first establish that the challenged conduct constitutes state action.") (internal quotation marks

4  omitted)); *cf. Hudgens v. NLRB*, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that

5  the constitutional guarantee of free speech is a guarantee only against abridgment by government,

6  federal or state.").  Plaintiffs acknowledge that the arbitration agreements are contracts between

7  private actors.  Nevertheless, they assert, there would still be state action in the instant case upon

8  this Court's enforcement of that private agreement.

9  A.    <u>Judicial Enforcement</u>

10         As a starting point, the Court finds no merit to Plaintiffs' assertion that the mere fact of

11  judicial enforcement automatically establishes state action.  The Ninth Circuit rejected that

12  position in *Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013).  More specifically, in *Ohno*, the Ninth

13  Circuit rejected the defendant's contention that judicial enforcement of a foreign-country money

14  judgment against it – through application of California's Uniform Foreign Country Money

15  Judgments Recognition Act – "constitute[d] domestic state action triggering constitutional

16  scrutiny."[4]  *Id.* at 986.  The court stated:

18         [T]here is no doubt that the district court's decision in this case
           applying California's Uniform Act – legislation that is itself the
19         result of governmental action – constitutes state action for purposes
           of constitutional scrutiny.  But that truism does not resolve our
20         question, which is: Should the *substance* of the underlying Japanese
           monetary damages judgment, resulting from a lawsuit in Japan
21         between two private parties, be ascribed to the district court's
           enforcement of the judgment under the Uniform Act and so
22         subjected to constitutional scrutiny?

23  *Id.* at 994 (emphasis in original).

24         The *Ohno* court further explained:

26         *Recognizing and enforcing* a foreign-country judgment is distinct
           from *rendering* that judgment in the first place.  The district court, in

27  ───────────────────────

28  [4] The defendant argued that "the Religion Clauses [of the First Amendment] would bar a court in
    the United States from rendering the same judgment in the first instance."  *Ohno*, 723 F.3d at 992.

United States District Court
For the Northern District of California

giving effect to the judgment issued in Japan, *has not participated in the action the [defendant] claims is unconstitutional* – namely, judging the truth or falsity of the [defendant's] religious teachings or imposing liability for the consequences of religious expression.

*Id.* at 993 (emphasis in original and added).  "[T]he source of the alleged constitutional harm is . . . Japanese tort law, created and enforced through Japanese governmental entities," and so "the claimed constitutional deprivation cannot be traced to a right, privilege, or rule of conduct imposed by a domestic governmental entity or individual."  *Id.* at 994.  The act of enforcement of the Japanese judgment by the U.S. court did not constitute state action causing a constitutional deprivation.

To the extent Plaintiffs have relied on *Shelley v. Kraemer*, 334 U.S. 1 (1948),[5] *see* Mot. at 3-4, to support the position that judicial enforcement itself provides the requisite state action necessary to establish a constitutional claim, the Court is not persuaded.  In *Ohno*, the Ninth Circuit made clear that "*Shelley*'s attribution of state action to judicial enforcement has generally been confined to the context of discrimination claims under the Equal Protection Clause."  *Id.* at 998.

Indeed, in discussing the reach of *Shelley*, the *Ohno* court pointed out that, "[i]n the context of First Amendment challenges to speech-restrictive provisions in private agreements or contracts, domestic judicial enforcement of terms that could not be enacted by the government has *not* ordinarily been considered state action."  *Id.* (emphasis added.)  In addition, and more on point to the case at bar, the Ninth Circuit stated that, "in the context of judicial confirmation of arbitral awards, . . . [courts have] held that 'mere confirmation of a private arbitration award by a district court is insufficient state action to trigger the application of the Due Process Clause.'"  *Id.* at 999.  While the Ninth Circuit did state that it did "not mean to adopt or sanction any of [these] cases," *id.* at 999 n.17, its reference to the cases – particularly the latter group – is still telling.

Furthermore, a Ninth Circuit decision that pre-dates *Ohno* is in strong accord with the

---

[5] In *Shelley*, the Supreme Court noted that racially restrictive covenants applicable to real properties were, in and of themselves, private agreements but that, once the agreements were judicially enforced by state courts, there was the requisite state action to give rise to a constitutional claim.  *See Shelley*, 334 U.S. at 19 (stating that, "but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint").

**United States District Court**
For the Northern District of California

above cases.  More specifically, in *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998), *overruled on other grounds*, *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003), the plaintiff – a broker-dealer in the securities industry – sued her employer for employment discrimination.  The plaintiff had signed a securities industry form that included an arbitration provision.  The form also required the plaintiff to abide by the rules of the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD"), and each of these organizations had a rule that required arbitration.  The plaintiff argued, nevertheless, that she could not be compelled to arbitration because "the arbitration agreement imposes an unconstitutional condition of employment," requiring her "to forfeit her Fifth Amendment right to due process, her Seventh Amendment right to a jury trial, and her right to an Article III judicial forum."  *Id.* at 1200.  According to the district court, "the essential prerequisite of state action was lacking" for the due process claim, and the Ninth Circuit agreed, stating "no state action is present in simply enforcing that agreement."  *Id.* at 1201.

Plaintiffs have pointed to no authority holding that judicial enforcement, particularly of an arbitration award, constitutes state action.[6]  In fact, as the *Ohno* court noted, the authority is to the contrary.  For example, in *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir. 1995), the defendant appealed to the Eleventh Circuit after the district court confirmed the arbitration panel's award of punitive damages.  The defendant argued, *inter alia*, that the punitive damages award violated its due process rights, more specifically, "because arbitration lacks the procedural protections and meaningful judicial review required for the imposition of punitive damages."  *Id.* at 1190.  The Eleventh Circuit rejected the argument.  It noted first that "the state action element of a due process claim is absent in private arbitration cases" because private arbitration is by itself "a voluntary contractual agreement of the parties."  *Id.* at 1191.  As to the defendant's assertion that the district court's *confirmation* of the punitive damages award provided the requisite state

---

[6] To the extent Plaintiffs have suggested that enforcement here is the equivalent of or comparable to a court-ordered injunction, the Court does not agree.  The enforcement of the arbitration agreements would not "require[] the [C]ourt to take such an active role in, or to exercise sustained supervision of, the [arbitration agreements or even the arbitrations themselves] that it becomes appropriate to review the [C]ourt's activities as governmental actions."  *Ohno*, 723 F.3d at 1000.

United States District Court
For the Northern District of California

1    action, the court disagreed.  The Eleventh Circuit echoed the Ninth Circuit's analysis in *Ohno* that

2    the defendant was offering a "*Shelley v. Kraemer* theory that a court's enforcement of a private

3    contract constitutes state action" but "[t]he holding of *Shelley* . . . has not been extended beyond

4    the context of race discrimination." *Id.  See also Katz v. Cellco P'ship*, No. 12 CV 9193 (VB),

5    2013 U.S. Dist. LEXIS 176784, at *10, 17 (S.D.N.Y. Dec. 12, 2013) (in a case where plaintiff

6    argued that "application of the FAA to his state law claims violates Article III of the Constitution

7    – both the structural protections of our tripartite system of government (i.e., separation of powers)

8    and his personal right to have his claims adjudicated before an independent Article III judge,"

9    agreeing with defendant that "there is insufficient state action for plaintiff to maintain an action

10    under Article III"; stating that "the fact that Verizon sought a court order compelling arbitration

11    does not transform enforcement of the parties' arbitration agreement into state action"), *vacated in*

12    *part on other grounds*, No. 14-138, 2015 U.S. App. LEXIS 13055 (2d Cir. July 28, 2015); *Smith v.*

13    *Argenbright, Inc.*, No. 99 C 7368, 1999 U.S. Dist. LEXIS 19827, at *8 (N.D. Ill. Dec. 27, 1999)

14    (stating that "[w]e do not believe that our limited power to conduct an after-the-fact review of an

15    arbitration panel for bias constitutes the requisite governmental action to implicate *Batson*");

16    *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1468 (N.D. Ill. 1997)

17    (rejecting contention that defendant was "using a government official, i.e., this Court, to enforce

18    the arbitration rules that will inevitably deprive her of due process"; "refus[ing] to hold that every

19    time a Court enforces a private arrangement it potentially violates one party's constitutional

20    rights"); *United States v. Am. Soc'y of Composers, Authors & Publ'rs*, 708 F. Supp. 95, 97

21    (S.D.N.Y. 1989) (stating that "[t]he mere approval by this Court of the use of arbitration did not

22    create any state action[;] [i]ndeed, under [party's] strained interpretation . . . , all arbitrations could

23    be subject to due process limitations through the simple act of appealing the arbitrator's decisions

24    to the court system").  At bottom, "[government] permission of a private choice cannot support a

25    finding of state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999).

26         Finally, the Court takes note that, in many private contracts, there are provisions that

27    arguably affect access to the courts or otherwise implicate significant rights, such as choice-of-

28    venue, choice-of-law, statute-of-limitations, and limitations-on-damages provisions.  Although

these provisions may be subject to restrictions imposed by statutory and/or common law (*e.g.*, the doctrine of unconscionability, violation of public policy), courts have not held that judicial enforcement of these provisions, particularly as found in contracts between private parties, raises constitutional claims. *See, e.g.*, *Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1045 (9th Cir. 2001) (holding that a six-month statute-of-limitations provision was enforceable); *Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 92 (4th Cir. 2015) (rejecting assertion that consequential damages exclusion in contract was not enforceable).

B.      The FAA and Its Interpretation

        In their papers, Plaintiffs argued that, nevertheless, there is state action based on Congress's enactment of the FAA. *See* Opp'n at 4. This argument is similar to that rejected by the Ninth Circuit in *Duffield*. There, the plaintiff argued that "state action is present because 'federal law requires all broker-dealers to register with a national securities exchange (i.e., the NYSE or NASD), and to abide by the rules of that exchange – including its mandatory arbitration rules – as a condition of their continued employment.'" *Id.* at 1200. The Ninth Circuit rejected the argument, stating that

> [t]he rules of NASD and the NYSE are not fairly attributable to the government unless they carry the force of federal law. *And prior to 1993*, no federal statute or regulation required [the plaintiff] to register with the securities exchanges, much less to sign Form U-4 or to arbitrate employment disputes. Thus, when [the plaintiff] signed her Form U-4 *in 1988* and thereby waived her rights to litigate employment-related disputes in a judicial forum, she did not do so because of any state action.

*Id.* at 1201 (emphasis added).

        The court acknowledged that, in 1993 – two years before the plaintiff's employer actually invoked the arbitration agreement – the Securities and Exchange Commission ("SEC") had "adopted a regulation that required all broker-dealers to be registered with at least one of the securities organizations of which [the plaintiff's employer] was a member – i.e., the NASD and the NYSE – before effecting any securities transaction." *Id.* That "current requirement that new employees register with a national securities exchange 'constitutes government action of the purest sort.'" *Id.* Nevertheless, the Ninth Circuit was not persuaded by the plaintiff's argument that this

7

1   new regulation provided the requisite state action.  The court noted:

2

3          State action can be present . . . only to the extent that there is "a
           sufficiently *close nexus* between the State and the *challenged*
4          *action*"; the action that [the plaintiff] challenges in her constitutional
           claims is the requirement that she waive her right to litigate
5          employment-related disputes.  Since agreements to arbitrate are
           "valid, *irrevocable*, and enforceable" to the same extent as any other
6          contract, it is immaterial that years after [the plaintiff] signed her
           Form U-4 containing the arbitration provision, federal law required
7          other employees like her to register with securities exchanges or
           even that it compelled her to remain registered.  No federal law
8          required [the plaintiff] to waive her right to litigate employment-
           related disputes by signing the Form U-4 in 1988, *and no state*
9          *action is present in simply enforcing that agreement*.  Insofar as [the
           plaintiff] argues that the "challenged action" is the requirement that
10         she actually arbitrate her lawsuit, that requirement is found in her
           private contract, not in federal law.

11  *Id.* at 1201 (emphasis in original and added).

12         The instant case is similar to *Duffield* in that, here, while Congress did enact the FAA, the

13  mere enactment of the statute did not *cause* the deprivation of their constitutional rights.  *See id.*

14  (noting that "[s]tate action can be present . . . only to the extent that there is 'a sufficiently close

15  nexus between the State and the *challenged action*'") (emphasis in original).

16         Plaintiffs rely still on *Denver Area Educational Telecommunications Consortium, Inc. v.*

17  *Federal Communications Commission*, 518 U.S. 727 (1996), in arguing that a congressional

18  statute or a court's interpretation thereof "that enables private action to restrict citizens' First

19  Amendment rights constitutes a state action."  Opp'n at 4.[7]  In *Denver Area*, the plaintiffs sued,

20  _____

21  [7] This argument briefly alluded to in their initial brief is developed more thoroughly in Plaintiffs'
    motion for reconsideration.  *See* Docket No. 54 (motion to reconsider).  AT&T argues, in its
22  opposition to the motion to reconsider, that reconsideration should be denied because Plaintiffs'
    "*Denver Area* argument was not adequately 'presented to the Court.'"  Docket No. 59 (Opp'n at
23  6).  AT&T points out that Plaintiffs' purported best case (so identified at the hearing on the motion
    to compel arbitration) was embedded in one out of 132 footnotes in their opposition brief.  AT&T
24  also argues that Plaintiffs' fleshing out of *Denver Area* during the hearing on the motion to compel
    arbitration was improper.  *See King v. Hausfeld*, No. C-13-0237, 2013 U.S. Dist. LEXIS 51116, at
25  *17 (N.D. Cal. Apr. 9, 2013) (finding that plaintiff waived an argument because he raised the
    argument "for the first time in a supplemental filing submitted the day before the hearing and
26  without leave of court" and he "offer[ed] no explanation for failing to raise the argument").  The
    Court agrees with AT&T that it would well be within its rights in deeming the *Denver Area*
27  argument waived.  Although, in their opposition brief, Plaintiffs cited *Denver Area* in support of
    the above proposition, they certainly did not address the issue as it was argued at the hearing nor
28  did they brief the issue as it has now been briefed in the motion for reconsideration.  The twenty-
    five page limitation for the opposition brief, *see* Docket No. 54 (Mot. at 5 n.5), is no excuse.

United States District Court

For the Northern District of California

1    *inter alia*, the FCC, claiming that three provisions of the Cable Television Consumer Protection

2    and Competition Act of 1992 – which sought to regulate the broadcasting of "patently offensive"

3    sex-related material on cable television – violated their First Amendment rights.  The provisions at

4    issue applied to programs broadcast over cable on what are known as "leased access channels" and

5    "public, educational, or governmental channels."  "A 'leased channel' is a channel that federal law

6    requires a cable system operator to reserve for commercial lease by unaffiliated third parties.'"  *Id.*

7    at 734.  Public access channels "are channels that, over the years, local governments have required

8    cable system operators to set aside for public, educational, or governmental purposes as part of the

9    consideration an operator gives in return for permission to install cables under city streets and to

10    use public rights-of-way."  *Id.*  "Between 1984 and 1992, federal law (as had much pre-1984 state

11    law, in respect to public access channels) prohibited cable system operators from exercising *any*

12    editorial control over the content of any program broadcast over either leased or public access

13    channels."  *Id.* (emphasis in original).

14        Congress enacted the three challenged provisions "in an effort to control sexually explicit

15    programming over access channels."  *Id.*  The first provision, which concerned leased channels,

16    *permitted* a cable operator to enforce a policy of prohibiting programming that the operator

17    reasonably believed described or depicted sex-related material in a patently offensive manner.  *See*

18    *id.*  The second provision, which also concerned leased channels, *required* cable operators to

19    segregate and block similar programming if they decided to permit its broadcast rather than

20    prohibit it.  *See id.* at 735.  Finally, the third provision was similar to the first provision but applied

21    to public access channels.  *See id.*

22        A plurality of the Supreme Court held that the first provision was constitutional.  In

23    addressing the existence of state action, the plurality took note of the lower appellate court's

24    analysis that there was no First Amendment violation

25

26                  because the First Amendment prohibits only "Congress" . . . , not
                  private individuals, from "abridging the freedom of speech."

27

28    Nevertheless, given the importance of the issues herein, the Court addresses the merits of
    Plaintiffs' *Denver Area* argument.

> Although the court said that it found no "state action," it could not have meant that phrase literally for, of course, petitioners attack (as "abridging . . . speech") a congressional statute – which, by definition, is an Act of "Congress." More likely, the court viewed this statute's "permissive" provisions as not themselves restricting speech, but, rather, as simply reaffirming the authority to pick and choose programming that a private entity, say, a private broadcaster, would have had in the absence of intervention by any federal, or local, governmental entity.

*Id.* at 737.

The plurality acknowledged "the First Amendment, the terms of which apply to governmental action, ordinarily does not itself throw into constitutional doubt the decisions of private citizens to permit, or to restrict, speech – and this is so *ordinarily* even where those decisions take place within the framework of a regulatory regime such as broadcasting." *Id.* (emphasis in original). But apparently, the plurality assumed there was state action because the plaintiffs were challenging an act of Congress, *i.e.*, its enactment of the provision, which in turn was being carried out by the FCC. *See also* Docket No. 59 (Opp'n at 3) (AT&T arguing that "the FCC was the party 'charged with the deprivation' of the plaintiffs' First Amendment rights, [and thus] the enactment of the statute alone was sufficient state action to trigger constitutional protections under *Lugar*"). That being said, the plurality provided no clear analysis as to why congressional action permitting private conduct amounted to state action in that particular instance.

All that is clear is that the plurality refused to adopt the state action analysis suggested by other Supreme Court Justices – *e.g.*, Justice Kennedy's take that "leased access channels are like a common carrier." *Denver Area*, 518 U.S. at 739-40. The plurality also rejected Justice Thomas's reasoning that "the case is simply because the cable operator who owns the system over which access channels are broadcast, like a bookstore owner with respect to what it displays on the shelves, has a predominant First Amendment interest." *Id.* at 740. According to the plurality, "[b]oth categorical approaches suffer from the same flaws: They import law developed in very different contexts into a new and changing environment, and they lack the flexibility necessary to allow government to respond to very serious practical problems without sacrificing the free exchange of ideas the First Amendment is designed to protect." *Id.*; *see also id.* at 741-42 (stating

10

that "no definitive choice among competing analogies (broadcast, common carrier, bookstore) allows us to declare a rigid single standard, good for now and for all future media and purposes"). The plurality concluded that, "aware as we are of the changes taking place in the law, the technology, and the industrial structure related to telecommunications, we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now." *Id.* at 742.

> Rather than decide [such] issues, we can decide these cases more narrowly, by closely scrutinizing [the provision] to assure that it properly addresses an extremely important problem, without imposing, in light of the relevant interests, an unnecessary great restriction on speech. The importance of the interest at stake here – protecting children from exposure to patently offensive depictions of sex; the accommodation of the interests of programmers in maintaining access channels and of cable operators in editing the contents of their channels; the similarity of the problem and its solution to those at issue in *Pacifica*, and the flexibility inherent in an approach that *permits* cable operators to make editorial decisions, lead us to conclude that [the provision is a sufficiently tailored response to an extraordinarily important problem.

*Id.* at 743 (emphasis in original).

As indicated by the above, while the majority of the Justices assumed that the challenged Act's grant of authority to cable operators permitting them to prohibit or limit certain programs based on content constituted state action, *Denver Area* does not establish the broad pronouncement Plaintiffs assert. The plurality did not overturn (nor could it), *e.g.*, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978), where the Supreme Court addressed "whether a warehouseman's proposed sale of goods entrusted to him for storage, *as permitted by New York Uniform Commercial Code § 7-210*, is an action properly attributable to the State of New York," and concluded that there was no state action because "a State's mere acquiescence in a private action [does not] convert[] that action into that of the State" – even taking into account that "the State has embodied its decision not to act in statutory form." *Id.* at 164-65 (emphasis added). Subsequent to *Denver Area*, the Court has continued to adhere to the general proposition that a law permitting private conduct does not constitute state action. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53-54 (1999) (stating that, while "the State's decision to provide insurers the option of deferring payment for unnecessary and unreasonable treatment pending review can

11

**United States District Court**
For the Northern District of California

1   in some sense be seen as encouraging them to do just that[,] . . . this kind of subtle encouragement

2   is no more significant than that which inheres in the State's creation or modification of any legal

3   remedy"; adding that "our cases will not tolerate the imposition of Fourteenth Amendment

4   restraints on private action by the simple device of characterizing the State's inaction as

5   authorization or encouragement") (internal quotation marks omitted).

6          The plurality's assumption of state action in *Denver Area* must be seen in its proper

7   context.  The issue before the Court concerned regulatory legislation particular to cable operators

8   who are often given unique monopolistic power over a single cable system linking broadcasters

9   with the community, and who are "unusually involved" with the government via, *e.g.*, given rights

10  of way and access to governmental facilities.  *Denver Area*, 518 U.S. at 739.  Such operators are

11  arguably more like common carriers such as telephone companies rather than editors such as

12  newspapers.  While the plurality portion of the Court's opinion (in contrast to the opinion of

13  Justice Kennedy concurring in part and dissenting in part) did not commit to any clear rationale as

14  to why there is sufficient state action allowing application of the First Amendment, the plurality

15  opinion was driven by the particular context of the case, informed in part by technology and "the

16  industrial structural related to telecommunications,"  *id.* at 741, a structure which conferred

17  monopolistic-like power and involved a close interrelationship with governmental regulation.

18  Again, as noted above, the plurality opinion recognize that "the First Amendment, the terms of

19  which apply to governmental action, ordinarily does not itself throw into constitutional doubt the

20  decisions of private citizens to permit, or to restrict, speech – and this is so *ordinarily* even where

21  those decisions take place within the framework of a regulatory regime such as broadcasting."  *Id.*

22  at 737 (emphasis in original).

23         In any event, no clear state action analysis commanded the votes of a majority of the

24  Justices.  Thus, *Denver Area* did not establish a categorical rule that a statute which permits

25  private parties to restrict the speech or other rights of private citizens constitutes as a general

26  matter state action.[8]

27

28  [8] AT&T argues *Denver Area* is distinguishable because the defendant was the FCC – the
    government itself – charged with enforcement of the challenged law, not a private business as in

United States District Court
For the Northern District of California

1    At the hearing, Plaintiffs conceded that they did actually not have a problem with passage

2   of the FAA per se.  Rather, Plaintiffs took the position that it was judicial interpretation of the

3   FAA that provided the requisite state action.[9]  In particular, Plaintiffs argued that, if this Court

4   were to compel arbitration, it would be interpreting the FAA as applying to consumer adhesion

5   contracts (and not just contracts between businessmen or merchants), and this interpretation would

6   be the source of Plaintiffs' constitutional injury.  But this asserted constitutional injury is

7   predicated on the contract being one of adhesion – *i.e.*, where the consumer did not knowingly

8   and/or voluntarily agree to arbitration and forfeits access to the courts.  Thus, the source of the

9   alleged constitutional deprivation when a consumer is involved is not the judicial interpretation of

10   the FAA; rather, the source is AT&T's private conduct in purportedly forcing arbitration on an

11   unwitting consumer.  *See Am. Mfrs.*, 526 U.S. at 50 (asking whether "the allegedly

12   unconstitutional conduct [is] fairly attributable to the State") (emphasis omitted).  As the court

13   held in *Ohno*, a court giving effect to a private contract does not constitutionalize the contract.  *See*

14   *Ohno*, 723 F.3d at 993 (stating that "[t]he district court, in giving effect to the judgment issued in

15   Japan, has not participated in the action the [defendant] claims is unconstitutional – namely,

16   judging the truth or falsity of the [defendant's] religious teachings or imposing liability for the

17   consequences of religious expression").

18    At the hearing, Plaintiffs also argued that, if the Court were to compel arbitration, then it

19   would be interpreting the FAA as heavily favoring arbitration and encouraging private parties to

20   employ pre-dispute arbitration clauses, and this interpretation would also be the source of

21

22   _____

23   the instant case.  This distinction, however, does not fully explain why governmental permission
     of private conduct constituted state action.

24   [9] The Court acknowledges that, at the hearing, Plaintiffs emphasized that the enactment of the
     FAA by Congress was significant in that, prior to that time, arbitration agreements were typically
25   not enforced, not only with respect to consumer contracts but also with respect to commercial
     contracts.  *Cf. Concepcion*, 563 U.S. at 339 (noting that "[t]he FAA was enacted in 1925 in
26   response to widespread judicial hostility to arbitration agreements").  However, the Court does not
     understand Plaintiffs to be taking the position that the enactment of the FAA, in and of itself, is a
27   constitutional problem.  Furthermore, it would be inconsistent for Plaintiffs to take that position
     given that, as discussed below, Plaintiffs' main contention is that the FAA should be considered
28   unconstitutional only with respect to its application vis-à-vis consumer contracts, and not, *e.g.*,
     commercial contracts.

United States District Court
For the Northern District of California

1    Plaintiffs' constitutional injury.  Because this specific argument was not raised in Plaintiffs'

2    papers, the Court could disregard it as waived.

3          However, this argument for state action presents a plausible theory and should be

4    examined.  Plaintiffs' argument rests on authority holding that

6          "[a] State normally can be held responsible for a private decision
           only when it has exercised coercive power or has provided such
           significant encouragement, either overt or covert, that the choice
7          must be deemed that of the State.'  Mere approval or acquiescence
           in the initiatives or a private party is not sufficient to justify holding
8          the State responsible for these initiatives."

9    *Duffield*, 144 F.3d at 1200 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)[10]).

10         In *Duffield* itself, the court held that the SEC did not sufficiently influence private conduct

11   because it had not:

13         moved beyond mere approval of private action into the realm of
           "encouragement, endorsement, and participation" of that action . . .
14         with regard to the NASD's and NYSE's compulsory arbitration
           requirements.  "To begin with the obvious, there is nothing in the
15         [Securities Exchange Act of 1934] and there is no Commission rule
           or regulation that specifies arbitration as the favored means of
16         resolving employer-employee disputes." . . . This puts the role of the
           SEC in a critically different light than that of the Federal Railroad
17         Administration in *Skinner*, which drafted regulations making plain
           its "strong preference for [drug] testing," explicitly conferred on
18         railroads the authority to conduct such tests, *required* railroads and
           employees to perform such tests, and codified its right to receive
           certain biological samples.

20   *Id.* at 1202 (emphasis added).[11]

21         Plaintiffs' position in the instant case is not without force – factually, there is a stronger

23   _____

24   [10] *Lugar* identifies two additional state action tests, *i.e.*, as to whether the actions of private entities
     are fairly attributable to the state.  *See Duffield*, 144 F.3d at 1200.  Plaintiffs have not invoked
     either of these tests, relying instead only on the encouragement test.

25   [11] In *Duffield*, the plaintiff also invoked state action based on a completely different test – *i.e.*,
26   "'the private party has exercised powers that are traditionally the exclusive prerogative of the
     State.'"  *Duffield*, 144 F.3d at 1200.  The Ninth Circuit explained that argument lacked merit
27   because "[w]e have long held that, since dispute resolution is not an 'exclusive' governmental
     function, neither private arbitration nor the judicial act of enforcing it under the FAA constitutes
     state action."  *Id.*  Plaintiffs have not invoked the government function state action test in the
28   instant case.

case for encouragement here compared to, *e.g.*, *Duffield*, 114 F.3d at 1202 (there was no SEC rule or regulation that "'specifies arbitration *as the favored means* of resolving employer-employee disputes'") (emphasis added).  Here, as discussed below, the Supreme Court has held that the FAA embodies a policy favoring arbitration.  And Plaintiffs have cited evidence suggesting that evolution of recent jurisprudence in this area has in fact led to increasing use of arbitration to displace judicial remedies, particularly in the field of consumer rights.  *See* Opp'n at 9 (noting, *e.g.*, that the AAA's "statistics on consumer arbitrations filed after January 1, 2003 . . . lists only 1,335 total consumer-initiated arbitrations against AT&T," and 86% of "those arbitrations were initiated by clients of the law firm Bursor & Fisher, who were attempting to prevent a proposed merger between AT&T and T-Mobile").

Nonetheless, Plaintiffs have not established the requisite degree of government coercion or encouragement sufficient under existing case law to establish state action.  First, the FAA on its face indicates that an arbitration agreement – like any other agreement – may be challenged on "such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  It purports to put arbitration agreements on equal, not more favorable, ground with other contracts.

Second, the Supreme Court's interpretation of the FAA, while acknowledging a general policy favoring of arbitration, is expressly predicated on the stated purpose of putting arbitration agreements on equal footing with all other contracts and preventing the disfavorable treatment of such agreements.  As explained by the Supreme Court in *Concepcion*:

> The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements.  Section 2, the "primary substantive provision of the Act," provides, in relevant part, as follows:
>
> > "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
>
> We have described this provision as reflecting both a "liberal federal policy favoring arbitration," and the "fundamental principle that arbitration is a matter of contract."  In line with these principles,

15

> courts must place arbitration agreements on an *equal footing* with other contracts, and enforce them according to their terms.

*Concepcion*, 563 U.S. at 339 (emphasis added); *see also Hall St. Assocs., L.L.C. v. Mattel, Ic.*, 552 U.S. 576, 581 (2008) (stating that "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements *on equal footing* with all other contracts'") (emphasis added); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (stating that, "[b]ecause the FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements,' we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement").

The problem as identified in *Concepcion* was that arbitration agreements were being singled out simply because arbitration was the subject matter of the agreement. *See Concepcion*, 563 U.S. at 339 (stating that the "savings clause" in § 2 of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue"). While it may be argued (as Plaintiffs have here) that, in safeguarding the enforceability of arbitration clauses against even well-established defenses based, *e.g.*, on unconscionability and countervailing policy concerns embodied in other laws and statutes (*see, e.g.*, *id.* at 357 (Breyer, J., dissenting); *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313 (2013) (Kagan, J., dissenting)), the Supreme Court's interpretation of the FAA has swung the pendulum to the point of actually encouraging businesses to impose pre-dispute arbitration clauses (and Plaintiffs have cited some empirical evidence so indicating), no court has yet to hold or suggest there is sufficient encouragement or coercion by virtue of the FAA to implicate state action under *Lugar*.[12]  Whatever encouragement the FAA gives to the implementation of pre-dispute arbitration clauses, it falls short of government conduct in cases where state action has been found. *See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) (stating that "a challenged activity may be state action when it

---

[12] Moreover, it is worth noting that Plaintiffs' argument here would apply not just to consumer contracts but commercial contracts as well.  Accordingly, Plaintiffs' sweeping argument would constitutionalize enforcement of all arbitration agreements made possible by the FAA.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents'"); *Flagg Bros.*, 436 U.S. at 164 (stating that "'a State is responsible for the . . . act of a private party when the State, by its law, has compelled the fact'" but "a State's mere acquiescence in a private action [does not] convert[] that action into that of the State"; adding that "[i]t is quite immaterial [when] a State has embodied its decision not to act in statutory form"); *see also Grapentine v. Pawtucket Credit Union*, 755 F.3d 29, 33 (1st Cir. 2014) (taking note of "the principle set out in *Flagg Brothers* . . . that mere legislative sanction of a private remedy does not constitute state action"); *Apao v. Bank of N.Y.*, 324 F.3d 1091, 1094 (9th Cir. 2003) (stating that, in *Flagg Brothers*, "the state's statutory authorization of self-help provisions [was held insufficient] to convert private conduct into state action[;] [t]he statute neither encourages nor compels the procedure, but merely recognizes its legal effect").  *Cf. Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989) (concluding that state action for purposes of the Fourth Amendment was present because the "specific features of the regulations [imposed by the Federal Railroad Administration] did more than adopt a passive position toward the underlying private conduct"; "[t]he Government has removed all legal barriers to the [drug] testing authorized by Subpart D, . . . has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions[,] . . . and has mandated that the railroads not bargain away the authority to perform tests granted by Subpart D"); *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (noting that "'[t]here may be a deprivation within the meaning of § 1983 not only when there has been an actual "taking" of property by a police officer, but also when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession'").  As noted above, no court has found that judicial enforcement of a private arbitration clause constitutes state action for purposes of stating a federal constitutional claim. [13]

---

[13] The Eleventh Circuit relied on, *inter alia*, *Flagg Bros.* in holding that, "[i]n light of this narrow interpretation of state action, courts considering the issue have rejected the argument that the limited state action inherent in the confirmation of private arbitration awards mandates compliance with the Due Process Clause."  *Davis*, 59 F.3d at 1192.

## II.   CONCLUSION

Because under the current state of the law, there is no state action in the instant case, Plaintiffs lack a viable First Amendment challenge to the arbitration agreements.  As Plaintiffs have not challenged the arbitration agreements on any other bases, the Court grants AT&T's motion to compel arbitration.  Furthermore, as requested by AT&T, the Court stays this action pending the resolution of the arbitration.  *See* 9 U.S.C. § 3.

This order disposes of Docket No. 25.


**IT IS SO ORDERED**.


Dated: April 27, 2016

_____
EDWARD M. CHEN
United States District Judge