REESE MARKETOS LLP
Pete Marketos (*pro hac vice* pending)
pete.marketos@rm-firm.com
Tyler Bexley (*pro hac vice* pending)
tyler.bexley@rm-firm.com
Brett Rosenthal (*pro hac vice* pending)
brett.rosenthal@rm-firm.com
Sean Gallagher (*pro hac vice* pending)
sean.gallagher@rm-firm.com
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201
Telephone: (214) 382-9810
Facsimile: (214) 501-0731

MAYER BROWN LLP
Andrew J. Pincus (*pro hac vice*)
apincus@mayerbrown.com
Archis A. Parasharami (SBN 321661)
apincus@mayerbrown.com
Kevin Ranlett (*pro hac vice*)
kranlett@mayerbrown.com
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

Attorneys for AT&T Mobility LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARCUS A. ROBERTS, KENNETH A. CHEWEY, ASHLEY M. CHEWEY, AND JAMES KRENN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T MOBILITY LLC,<br><br>Defendant. | Case No. 3:15-cv-03418-EMC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS**<br><br><br>Date:   June 18, 2020<br>Time:   1:30 p.m.<br>Judge:   Hon. Edward M. Chen<br>Courtroom:  5 |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT .......................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................2

INTRODUCTION ......................................................................................................2

FACTUAL BACKGROUND ........................................................................................5

    A. AT&T Announces the MBR Program .....................................................5

    B. AT&T Implements MBR and Plaintiffs Renew Their Service ................6

    C. The FTC Litigation and Settlement.........................................................7

    D. Procedural History ................................................................................8

LEGAL STANDARDS ...............................................................................................8

ARGUMENT ...........................................................................................................9

I. COUNTS II–VI SHOULD BE PARTIALLY DISMISSED UNDER THE STATUTES OF
    LIMITATIONS .....................................................................................................9

    A. The Time-Barred Claims Accrued Before the Limitations Dates............9

    B. The Complaint Does Not Adequately Plead Any Basis for Tolling .......11

II. THE COMPLAINT DOES NOT ADEQUATELY PLEAD BREACH OF WARRANTY
    OR CONTRACT................................................................................................15

III. PLAINTIFFS LACK STANDING FOR INJUNCTIVE RELIEF, AND THERE IS NO
    PLAUSIBLE ALLEGATION OF FUTURE HARM TO SUPPORT SUCH RELIEF
    GIVEN THIS COURT'S PRIOR ORDERS .............................................................19

    IV. Unjust Enrichment Is Not a Standalone Cause of Action.....................21

    V. The California Plaintiffs Cannot Assert the Alabama Law Claim..........22

CONCLUSION.......................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Animation Workers Antitrust Litig.*,
123 F.Supp.3d 1175 (N.D. Cal. 2015) ................................................................. 14

*Aryeh v. Canon Bus. Solutions, Inc.*,
292 P.3d 871 (Cal. 2013) ...................................................................... 10, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................. 8, 9

*Baltazar v. Apple, Inc.*,
2011 WL 588209 (N.D. Cal. Feb. 10, 2011) ....................................... 16, 17

*Beasley v. Lucky Stores, Inc.*,
400 F.Supp.3d 942 (N.D. Cal. 2019) ...................................................... 9, 12

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 8

*Cammarata v. Kelly Cap., LLC*,
339 F.Supp.3d 1033 (S.D. Cal. 2018) .................................................... 10

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal. 4th 342 (1992) ............................................................................ 19

*Chapman v. Skype Inc.*,
202 Cal. App. 4th 217 (2013) ................................................................ 21

*Cheramie v. HBB, LLC*,
545 F. App'x 626 (9th Cir. 2013) .......................................................... 21

*In re ConAgra Foods, Inc.*,
90 F.Supp.3d 919 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods,
Inc.*, 844 F.3d 1121 (9th Cir. 2017) ...................................................... 20

*Conmar Corp. v. Mitsui & Co. (USA), Inc.*,
858 F.2d 499 (9th Cir. 1988) ................................................................. 14

*Cotter v. Lyft*,
60 F.Supp.3d 1059 (N.D. Cal. 2014) ..................................................... 22

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ................................................................. 20

i

*Doe v. SuccessfulMatch.com*,
    70 F.Supp.3d 1066 (N.D. Cal. 2014) .................................................................9

*Dougherty v. Bank of America, N.A.*,
    177 F.Supp.3d 1230 (E.D. Cal. 2016).................................................................10

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)...........................................................................................22

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ............................................................................18

*Fayer v. Vaughn*,
    649 F.3d 1061 (9th Cir. 2011) ............................................................................9

*Federal Trade Commission v. AT&T Mobility LLC*,
    Case No. 14-CV-04785-EMC (N.D. Cal.)......................................................7, 20

*Fox v. Ethicon Endo-Surgery, Inc.*,
    110 P.3d 914 (Cal. 2005) ...............................................................................9, 12

*G&G Prods. LLC v. Rusic*,
    902 F.3d 940 (9th Cir. 2018) ............................................................................10

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)...........................................................................................22

*Hill v. Roll Int'l Corp.*,
    195 Cal. App. 4th 1295 (2011) .........................................................................21

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ..............................................................................9

*Klein v. Chevron U.S.A., Inc.*,
    202 Cal. App. 4th 1342 (2012) .........................................................................21

*Lopez-Velazquez v. Johnson*,
    2016 WL 4073338 (N.D. Cal. Aug. 1, 2016) (Chen, J.)....................................20

*Nabors v. Google, Inc.*,
    2011 WL 3861892 (N.D. Cal. Aug. 30, 2011) ..................................................16

*Oasis West Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ......................................................................................18

*Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*,
    522 F.3d 1049 (9th Cir. 2008) ...............................................................10, 12, 15

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ............................................................................8

ii

*Ryan v. Microsoft Corp.*,
   147 F.Supp.3d 868 (N.D. Cal. 2015) ...................................................................10, 11

*Shaw v. Hahn*,
   56 F.3d 1128 (9th Cir. 1995) ......................................................................................9

*Slovensky v. Friedman*,
   142 Cal. App. 4th 1518 (2006) .................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).....................................................................................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 273761 (N.D. Cal. Jan. 30, 2012) ............................................................14

*Thibodeaux v. Teamsters Local 853*,
   263 F.Supp.3d 772 (N.D. Cal. 2017) .......................................................................15

*Thomas v. Abbott Labs.*,
   2013 WL 12114096 (C.D. Cal. Mar. 18, 2013) ..................................................15, 16

*Vernon v. Heckler*,
   811 F.2d 1274 (9th Cir. 1987) ....................................................................................9

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003) ..................................................................................20

*Wilson v. Brown*,
   2015 WL 8515412 (S.D. Cal. Dec. 11, 2015), *aff'd*, 693 F. App'x 712 (9th Cir.
   2017) .........................................................................................................................21

*Yummul v. Smart Balance, Inc.*,
   733 F.Supp.2d 1117 (C.D. Cal. 2010) ......................................................................10

*Zamora v. Solar*,
   2016 WL 3512439 (C.D. Cal. June 27, 2016) ..........................................................19

**Statutes**

Ala. Code § 8-19-3.......................................................................................................22

Cal. Civ. Code. § 338(d) ..............................................................................................10

## <u>NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: Please take notice that Defendant AT&T Mobility LLC ("AT&T") hereby files this motion to dismiss (the "Motion") certain claims and counts alleged in Plaintiffs' First Amended Complaint (the "Complaint"). Pursuant to the Court's Order (Dkt 166), the Motion will be heard via teleconference and/or video conference on June 18, 2020 at 1:30 PM PST before the Honorable Judge Edward M. Chen.

In accordance with Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the Motion seeks dismissal of certain counts in their entirety (Counts VIII and IX), as well as partial dismissal of the remaining counts (Counts I–VII). In particular, the Motion seeks:

1. Dismissal with prejudice of the Time-Barred Claims—that is, Counts II, III, V, and VI insofar as they relate to purchases and renewals that occurred before July 2012, and Count IV insofar as it relates to purchases and renewals that occurred before July 2013;

2. Dismissal with prejudice of the breach of express warranty and contract claim (Count VII) because it is inadequately pled and contrary to the plain language of the contracts;

3. Dismissal of the requests for injunctive relief due to the Plaintiffs' lack of standing to seek forward-looking relief and failure to allege a likelihood of future harm;

4. Dismissal with prejudice of the unjust enrichment claim (Count VIII) because unjust enrichment is not a viable cause of action under California law; and

5. Determination that the Alabama DTPA claim (Count IX) does not apply to Plaintiffs Roberts and the Cheweys, or to the extent it does, that it must be dismissed with prejudice as to these Plaintiffs because their transactions are not subject to Alabama law.

This Motion is targeted only at the claims of the California plaintiffs (*i.e.*, Plaintiffs Roberts and the Cheweys) because the Court ordered in 2016, and reaffirmed in 2018, that the Alabama plaintiff Krenn's claims are stayed pending the outcome of arbitration. (*See* Dkts 60, 103.) Notably, in the four years since the Court issued these orders, Krenn has not commenced arbitration.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

When the first iPhone launched over a decade ago, few could have predicted the extent to which it would change the world and revolutionize the way that people share information, conduct business, consume entertainment, and interact with one another. Fewer still could have imagined how this technological and cultural watershed would soon place previously inconceivable demands for data capacity and transmission on the shared wireless networks that made this interconnectivity possible for tens or hundreds of millions of users. This case, which was filed nearly five years ago and seeks damages for events that took place years before that, challenges network management practices that AT&T, along with every other major U.S. telecom carrier, implemented long ago to prevent its network from being debilitated by a fraction of users whose disproportionate, and unanticipated, demands on the network threatened to disrupt service for the vast majority of users.

In the early years, AT&T was the exclusive wireless provider of the iPhone. Before 2010, AT&T marketed the iPhone with "Unlimited" data plans that, like the "unlimited" minutes plans of the cellular phone era, placed no limit on the amount of data that users could consume for a fixed price. In 2010, due to the unforeseen explosion of data consumption on the wireless network, AT&T stopped marketing the Unlimited data plans to new customers. It decided, however, to give existing customers the option to continue their Unlimited plans. By 2011, AT&T realized that a small fraction of Unlimited users were consuming an outsized and ever-increasing share of the overall network bandwidth, often through exceptionally high use of data-rich streaming video applications, which was contributing to a variety of negative network effects such as dropped calls, dropped or muddled data connections, and slower data speeds for many users.

To correct these problems, and in keeping with guidance from the Federal Communications Commission (FCC) and network management practices of other major national carriers, AT&T exercised its rights under the Wireless Customer Agreements to implement network management protocols to improve network performance for the benefit of all customers. In particular, AT&T enacted a policy called Maximum Bit Rate (MBR, or as it is sometimes called, "throttling") under

which users would be subject to temporary reductions in data *speed* (or "throughput") once they reached a certain level of data usage in a given billing period consistent with historical usage benchmarks for the top percentiles of the customer base. Notably, the MBR protocol did not restrict the *amount* of data that could be consumed for a fixed price, which remained unlimited.

Before activating the MBR protocol, AT&T engaged in a massive public information campaign to inform customers about the policy, some of which is acknowledged in the Complaint. For example, as noted in the Complaint, AT&T included a statement about MBR on Unlimited customers' monthly bill where they would be likely to see it and directed customers to additional information about the policy on AT&T's website. AT&T also sent text message alerts to every user who approached and exceeded the relevant data-usage thresholds, first during a grace period before the MBR policy was in force and later when the MBR policy was active. In addition, AT&T made numerous media appearances and issued several press releases about the MBR policy that were extensively covered in over 2,000 public news reports in late 2011 and early 2012, one of which is referenced in the Complaint (¶ 43) and itself references AT&T's press releases and other public reports. Many commentators commended AT&T for "being transparent" in addressing the emerging problem of the few so-called "data hogs" whose lopsided consumption impaired the shared network resource to the detriment of others. (*See, e.g.*, Ranlett Ex. 4 at 28–29.)[1]

The Plaintiffs here allege that they purchased Unlimited data plans and "reasonably believed that [they] would have unlimited data services, and not be subject to data usage restrictions or throttling when [they] reached an internally-mandated data usage threshold" (Compl. ¶¶ 69, 79), notwithstanding the fact that their contracts with AT&T contemplated use restrictions and did not speak to data speed. They allege that AT&T's MBR, or throttling, practice had "the effect of significantly limiting customers' access to data and services, rendering internet access and

---

[1] In this brief, reference is made to certain exhibits that are incorporated by reference in the Complaint and/or judicially noticeable. *See* Defendant's Motion for Judicial Notice concurrently herewith. These exhibits are compiled in the Declaration of Kevin Ranlett and the Declaration of Randolph Shackelford, also filed herewith. For the convenience of the Court, Defendant has numbered these exhibits and added continuous pagination for the Ranlett Declaration exhibits, beginning at page "A-001" on Exhibit 1. Throughout this brief, these materials are referenced using the following format: "[Declarant] Ex. [##] at [###]."

1    other wireless functions on their phones difficult or impossible, and thus unreasonably interfering

2    with the supposedly 'unlimited' service that the consumers paid for." (*Id.* ¶ 3.) Despite these

3    complaints, the Plaintiffs each allege that they continuously renewed their Unlimited plans multiple

4    times, including several times *after* they claim to have been "throttled." (*Id.* ¶¶ 77, 84.)

5        The Plaintiffs' allegations are rife with inaccuracies and misstatements. In accordance with

6    the historical industry meaning of the term "unlimited," which originally referred to a fixed price

7    for monthly services regardless of the number of call minutes and text messages used, MBR never

8    imposed any limit on the amount of data that Unlimited users could consume, and data speeds for

9    heavy users were not reduced to the point that their devices were unusable for most purposes, such

10   as browsing the Internet, sending and receiving email, or using GPS mapping services. AT&T also

11   *never* enacted data speed restrictions without sending the user advance warning via text about their

12   data consumption. Ironically, the total network outages and interruptions that the Plaintiffs

13   complain about were most likely the result not of MBR itself, but of the very congestion effects

14   that MBR was designed to combat. If this case progresses, AT&T will show unequivocally that

15   MBR was a fair and effective tool that benefitted *all* network users, that AT&T properly disclosed

16   the practice, and that the Plaintiffs renewed their Unlimited plans again and again, despite being

17   free to elect a different plan or leave AT&T entirely, because their grandfathered plan was a terrific

18   value.

19       These issues cannot all be resolved on a motion to dismiss. Thus, the primary purpose of

20   this motion is to focus the case, clearing away extraneous issues. *First*, several claims (Counts II,

21   III, IV, V, and VI) are barred on limitations grounds to the extent they relate to Unlimited plan

22   purchases or renewals before the relevant accrual date. *Second*, the express warranty contract claim

23   (Count VII) fails because the Complaint does not identify the particular terms of the alleged

24   express warranty, and because Plaintiffs' wireless agreements allowed AT&T to place some

25   limitations on their use. *Third*, the Plaintiffs lack standing to seek injunctive relief because they do

26   not allege that they intend to purchase AT&T's Unlimited plans in the future, and in any event, the

27   injunctive relief is moot due to this Court's prior order regulating AT&T's conduct in the related

28

FTC action. *Fourth*, the unjust enrichment claim (Count VIII) fails because unjust enrichment is not an independent cause of action and not an available remedy where, as here, valid contracts exist. *Fifth*, the Alabama law claim (Count IX) should be declared inapplicable, or else partially dismissed, because the Court compelled the only Alabama plaintiff to arbitrate and the remaining plaintiffs cannot assert that claim.

## FACTUAL BACKGROUND

### A.    AT&T Announces the MBR Program.

AT&T is a retail provider of mobile telephone service, providing voice and data plans to millions of subscribers nationwide. (Compl. ¶ 13.) Customers who subscribe to AT&T's data services may browse the Internet, send and receive email, and utilize various other applications by using their smartphones to access AT&T's wireless network. (*Id.*) From 2007 to 2010, in conjunction with its voice service, AT&T offered service plans that allowed its wireless customers to use unlimited data for a fixed monthly price. In the contracts related to these plans (the "Wireless Customer Agreements"), Plaintiffs agreed that AT&T had the right to limit service if the customer's use "adversely impacts [AT&T's] wireless network," and to "protect its wireless network from harm," even where those protective steps "may impact legitimate data flows." (Ranlett Ex. 13 at 108–09.) Plaintiffs agreed to these terms (and substantially similar ones) in the Wireless Customer Agreements when they renewed their Unlimited plans. (*Id.* at 108–09, 159–61, 218–19.)

Following the introduction of the iPhone—particularly the launch of iPhone 3G in 2008—data consumption on AT&T's mobile network exploded in unprecedented fashion. Basic broadband transmissions gave way to new "apps" that enabled rich web browsing, turn-by-turn navigation, and streaming video. This revolution caused data usage on AT&T's network to increase exponentially between 2007 and 2011. In the face of this massive challenge, AT&T discontinued its Unlimited data plans in June 2010 for new customers, but offered to grandfather existing customers so that they could continue their Unlimited plans going forward. (Compl. ¶ 16.)

Even after AT&T discontinued Unlimited data plans prospectively, a small percentage of grandfathered Unlimited customers continued to consume a disproportionate amount of capacity on AT&T's network, contributing substantially to an elevated incidence of network failures. (Ranlett Exs. 2, 4 & 5.) To address this ongoing resource challenge, AT&T announced its MBR program in a July 29, 2011 press release informing consumers of potential throttling:

> Starting October 1, smartphone customers with unlimited data plans may experience reduced speeds once their usage in a billing cycle reaches the level that puts them among the top 5 percent of heaviest data users. These customers can still use unlimited data and their speeds will be restored with the start of the next billing cycle.

(Ranlett Ex. 2 at 23.) The announcement was widely reported in hundreds of publications ranging from CNN, *Washington Post*, and *Wall Street Journal* to trade and tech journals and blogs, including an article referenced in the Complaint. (Compl. ¶ 43; Ranlett Exs. 3–12.) In addition, AT&T included a message on Unlimited plan customers' July/August 2011 billing statements, including the Plaintiffs' bills (*see* Shackelford Exs. 1–2), explaining the MBR program. (*See also* Compl. ¶ 29.)

**B.      AT&T Implements MBR and Plaintiffs Renew Their Service.**

Following the July 2011 announcement and notices to customers, AT&T implemented the MBR program and, in October 2011, began slowing speed for Unlimited data customers whose usage during a given billing cycle placed them among the top few percentiles of the customer base. Plaintiffs allege they noticed slowing of their data as early as 2011. (Compl. ¶ 74.) Before reducing any Unlimited customer's speeds, AT&T provided notice via text message informing the customer of their high data usage and the potential for throttling. (Ranlett Ex. 3.) Plaintiffs received such text notices starting in December 2011. (Ranlett Ex. 14 at 267.) The Complaint alleges that the Cheweys also discussed their concerns with an AT&T representative "in approximately 2011." (Compl. ¶ 75.)

Despite these notices and their own alleged personal experiences of severely reduced data speeds for extended periods starting "around the middle of the month," each Plaintiff voluntarily renewed their AT&T service contract multiple times. (*Id.* ¶¶ 63, 67, 69, 74–75, 77.) In the Wireless

Customer Agreements, Plaintiffs agreed that AT&T could implement network management, and that "AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle." (Ranlett Ex. 13 at 161, 219.)

## C. The FTC Litigation and Settlement

On October 28, 2014, the Federal Trade Commission ("FTC") sued AT&T regarding the MBR program and AT&T's advertising of Unlimited plans. *See Federal Trade Commission v. AT&T Mobility LLC*, Case No. 14-CV-04785-EMC (N.D. Cal.) (the "FTC Litigation"). The FTC Litigation involved similar claims and allegations to those Plaintiffs make here. AT&T ultimately reached a settlement with the FTC, culminating in this Court's entry of the Stipulated Order for Permanent Injunction and Monetary Judgment on December 4, 2019, permanently enjoining:

A. Making any representation about the amount or speed of mobile data, including that the mobile data is unlimited, without disclosing, Clearly and Conspicuously and in Close Proximity to the representation, all Material Restrictions imposed by Defendant. For the purposes of this Order:

  1. For a general representation that mobile data is unlimited without advertising any specific data plan, the advertisement must disclose Clearly and Conspicuously and in Close Proximity to the triggering representation that restrictions, if any, on the amount of speed of mobile data may apply. For a representation that a specific mobile data plan is unlimited, the advertisement must disclose Clearly and Conspicuously and in Close Proximity to the triggering representation the specific type of restriction and the amount of data usage, if any, triggering the restriction;

  2. For a Space-Constrained Advertisement, a disclosure will be deemed to be compliant with Section I.A. of this Order as long as:

      a. The disclosure indicates the type of restriction and the amount of data usage, if any, triggering the restriction; and
      b. The disclosure is made Clearly and Conspicuously and in Close Proximity to at least one prominent representation of the triggering term; and

  3. For a television or other video advertisement where the triggering representation is made orally, the advertisement must state orally the disclosure required by Section I.A. unless the duration of the advertisement prevents such disclosure, in which case, the advertisement must: (a) disclose orally, in a volume, speed, and cadence that ordinary consumers an easily hear and understand, that restrictions, if any, on speed or the amount of data, apply, and (b) disclose Clearly and Conspicuously in the visual portion of the advertisement the specific type(s) of restriction(s), if any, and the amount of data triggering the restriction(s).

B. Misrepresenting the performance or central characteristics of the Mobile Data Plan.

(Ranlett Ex. 1 at 5–6.)

**D. Procedural History**

On July 24, 2015, Plaintiffs filed this putative class action. The Complaint (Dkt 11) alleges violations of the UCL (Count I), FAL (Count II), and CLRA (Count III), negligent misrepresentation (Count IV), misrepresentation (Count V), fraudulent concealment (Count VI), breach of express warranty (Count VII), and unjust enrichment (Count VIII) under California law, and an Alabama DTPA claim (Count IX). (Compl. ¶¶ 88–161.) Plaintiffs sought to represent a nationwide class and California and Alabama subclasses. (*Id.* ¶¶ 51–53.) In April 2016, the Court entered an order staying the case pending arbitration of all four Plaintiffs' claims. (Dkt 60.) On March 14, 2018, the Court reconsidered that order for the three California Plaintiffs due to issues of California law, but left the stay pending arbitration for Plaintiff James Krenn from Alabama. (Dkt 103.) In all the years since the Court compelled arbitration of his claims, Krenn has not commenced arbitration.

**LEGAL STANDARDS**

A complaint must plead sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Analyzing facial plausibility requires the Court "to draw on its judicial experience and common sense." *Id.* at 679. "In determining whether the complaint has satisfied these standards, [courts] 'consider the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).

Although factual allegations generally are presumed true, "the Court need not accept as true allegations contradicted by judicially noticeable facts, and the 'Court may look beyond the plaintiff's complaint to matters of public record' without converting the Rule 12(b)(6) motion into

one for summary judgment." *Doe v. SuccessfulMatch.com*, 70 F.Supp.3d 1066, 1074 (N.D. Cal. 2014) (quoting *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995)). "Nor is the Court required to 'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Id.* (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011)); *accord Iqbal*, 556 U.S. at 677–78.

"If the running of the statute [of limitations] is apparent on the face of the complaint, the defense may be raised by a motion to dismiss." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); *Vernon v. Heckler*, 811 F.2d 1274, 1278 (9th Cir. 1987). "In assessing the sufficiency of the allegations of delayed discovery [under the discovery rule], the court places the burden on the plaintiff to show diligence; conclusory allegations will not withstand a motion to dismiss." *Beasley v. Lucky Stores, Inc.*, 400 F.Supp.3d 942, 958 (N.D. Cal. 2019) (citing *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005)).

## ARGUMENT

### I.     Counts II–VI Should Be Partially Dismissed Under the Statutes of Limitations.

Because the complaint was filed in July 2015, Counts II, III, V, and VI are time-barred as to all claims that accrued before July 2012, and Count IV is barred as to claims that accrued before July 2013 (the "Limitations Date(s)"). To the extent the Plaintiffs' allegations relate to Unlimited plans the Plaintiffs purchased or renewed *before* those dates, these claims (the "Time-Barred Claims") accrued outside the limitations period. The Complaint does not adequately plead any grounds for tolling limitations, and such allegations would be implausible in any event because the Complaint itself shows that the plaintiffs knew or should have known about AT&T's throttling by late 2011 or early 2012 at the latest. Therefore, Counts II, III, V, and VI should be dismissed with respect to any pre-July 2012 sales, and Count IV should be dismissed with respect to any pre-July 2013 sales.

### A.     The Time-Barred Claims Accrued Before the Limitations Dates.

The statutes of limitations for Count II (FAL), Count III (CLRA), Count IV (negligent misrepresentation), Count V (misrepresentation), and Count VI (fraudulent concealment) are all

three years or less. Specifically, the limitations period under the California FAL and CLRA is three years. *See Yummul v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1129 (C.D. Cal. 2010) (applying statutory default limitations period for FAL claims and applying Cal. Civ. Code § 1783 for CLRA claims). The limitations period for misrepresentation and fraudulent concealment is also three years. Cal. Civ. Code. § 338(d); *Cammarata v. Kelly Cap., LLC*, 339 F.Supp.3d 1033, 1040 (S.D. Cal. 2018). The limitations period for negligent misrepresentation is two years. *Dougherty v. Bank of America, N.A.*, 177 F.Supp.3d 1230, 1244 (E.D. Cal. 2016).

"Unless a statute provides otherwise, the statute of limitations begins to run at the time when a complete cause or right of action accrues. In common parlance, a right is said to accrue when it comes into existence." *G&G Prods. LLC v. Rusic*, 902 F.3d 940, 946 (9th Cir. 2018) (applying California law; citations and quotations omitted); *see also Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) (quoting *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1528 (2006)) ("A cause of action accrues when the claim is complete with all of its elements."). "Under the 'continuous accrual' doctrine, 'a series of wrongs or injuries may be viewed as each triggering its own limitations period.'" *Ryan v. Microsoft Corp.*, 147 F.Supp.3d 868, 895 (N.D. Cal. 2015) (quoting *Aryeh v. Canon Bus. Solutions, Inc.*, 292 P.3d 871 (Cal. 2013)).

Here, the Time-Barred Claims accrued outside the limitations period. The Complaint alleges that AT&T "began to 'throttle' (i.e., slow down)" users "in 2011" (Compl. ¶ 21.) In addition, AT&T informed customers in "July or August 2011" that, "starting 10/01/11, smartphone customers with unlimited data plans whose usage is in the top 5% of users can still use unlimited data but may see reduced data speeds for the rest of their monthly billing cycle." (*Id.* ¶ 29.) The Complaint also cites an article from February 2012 about AT&T's alleged throttling practices. (Compl. ¶ 43.) That February 2012 article states that, "[i]n 2011 AT&T announced they'd start throttling wireless data customers who consumed 'more than their fair share' of network data." (Ranlett Ex. 3 at 25.) Further, "[n]ow that AT&T has been throttling for some time, more users are noting that they're getting warnings from AT&T after around 2GB of usage each month." (*Id.*)

In addition to the acknowledged customer notices and public reports, the Complaint alleges that *the named plaintiffs personally* were throttled in 2011 and 2012. Specifically, "[i]n approximately 2011, Plaintiffs Kenneth and Ashley Chewey began noticing that by around the middle of the month, their internet connection for their iPhone was significantly slower." (Compl. ¶ 74.) Similarly, "[i]n approximately 2012, Plaintiff Marcus Roberts began noticing that by approximately the middle of the month his internet connection was much slower and his ability to download was hampered severely." (*Id.* ¶ 63.) AT&T's customer records indicate that Plaintiffs received text message notices about throttling as far back as December 2011. (Ranlett Ex. 14 at 267.) Plaintiffs allege that, after receiving such messages around "the middle of the month" (Compl. ¶¶ 63, 74), they were "effectively unable to access data for the remainder of a [monthly] billing cycle." (*Id.* ¶ 4.)

Each of the Time-Barred Claims accrued prior to the relevant Limitations Date because all elements of the respective claims (assuming the truth of the factual allegations in the Complaint) came into existence before the relevant Limitations Date. Moreover, the claims related to the pre-Limitations Date transactions are severable from the subsequent renewals under California's continuous accrual doctrine because the "complaint identifies a series of discrete, independently actionable alleged wrongs" or "separate, recurring invasions" with respect to each renewal. *See Aryeh*, 292 P.3d at 879–82; *Ryan*, 147 F.Supp.3d at 895–96. Therefore, the Court should find that all of the Time-Barred Claims are barred by limitations unless the Plaintiffs have adequately pled a basis for tolling.

**B.    The Complaint Does Not Adequately Plead Any Basis for Tolling.**

Because the Time-Barred Claims accrued before the applicable Limitations Dates, these claims are barred by limitations unless the Complaint adequately pleads a basis for tolling. It does not. There are two tolling grounds that Plaintiffs may contend are applicable: the discovery rule and fraudulent concealment. However, the Complaint fails to plead either theory with the requisite particularity, and in any event, such tolling arguments would be wholly implausible in light of Plaintiffs' actual and constructive notice about the alleged throttling practices.

***No Discovery Rule Delay.*** "Under California law, to rely on the discovery rule for delayed accrual of a cause of action, the plaintiff must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Beasley v. Lucky Stores, Inc.*, 400 F.Supp.3d 942, 958 (N.D. Cal. 2019) (citing *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005)). "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, [courts] look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Platt*, 522 F.3d at 1055 (quotation omitted). "Plaintiffs are required to conduct a reasonable investigation after becoming aware of any injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Id.* at 1054 (quotation omitted).

Here, the Complaint alleges that each of the named plaintiffs learned about throttling via text message notices from AT&T in July 2015. (Compl., ¶¶ 66–67, 78.) However, the Complaint also alleges that the Plaintiffs were initially throttled back in 2011 and 2012. (*Id.* ¶¶ 63, 74.) Given that this practice allegedly rendered Plaintiffs' devices "effectively unable to access data for the remainder of the billing cycle" (*id.* ¶ 4), which the Complaint alleges typically lasted for about half of each month (*id.* ¶¶ 63, 74), Plaintiffs had "reason to at least suspect that a type of wrongdoing [had] injured them" from the moment they first experienced these alleged effects. *See Fox*, 110 P.3d at 920.

Despite the burden to plead diligence, the Complaint says little to nothing about whether the Plaintiffs investigated their potential claims after allegedly being throttled. For Plaintiff Roberts, the Complaint does not allege that he took any steps whatsoever to investigate his claims. On the contrary, Plaintiff Roberts appears to have presumed that "the slowed speed was due to overall service issues by Defendant, as his friends with service through other carriers seemingly had faster service." (Compl., ¶ 63.) Meanwhile, after allegedly experiencing slower speeds in 2011, Plaintiff Kenneth Chewey allegedly "called [AT&T] to inquire about the issue" during which the AT&T "representative affirmatively stated to [Mr. Chewey] that the problem was <u>not</u> due to

throttling by Defendant." (*Id.* ¶ 75). While the Complaint does not allege that AT&T's affirmative representation was false, this allegation shows that Plaintiff Kenneth Chewey was on notice about alleged "throttling" by AT&T way back in 2011. The Cheweys do not allege that they engaged in any further investigation following this call, despite alleging that their services were later "slowed on other occasions, including sometimes to the point that there [was] no internet connection at all." (*Id.* ¶ 76.) These allegations make clear that Plaintiffs failed to bring suit or exercise reasonable diligence in a timely manner.

Further, additional facts alleged in the Complaint and incorporated by reference (or judicially noticeable) show that any contention premised on the discovery rule is implausible. AT&T's throttling practice was widely reported publicly in late 2011 and early 2012. For example, the February 2012 article referenced in the Complaint (¶ 43) discusses AT&T's 2011 press release about throttling and concludes: "In other words, pay $30 for 'unlimited' service where you're actually only getting 2GB of data before your phone becomes useless, or sign up for a 3GB tier for the same price so you're in line to get socked with the usage overages of tomorrow." (Ranlett Ex. 2 at 25.) The article also quotes another contemporaneous public report stating that "AT&T's throttling program seems to target customers who are just over the 2GB threshold. And its new higher priced data plans that offer 3GB of data for $30 look like an attempt to get customers to switch from their unlimited data plans to the 3GB plan for the same price." (*Id.*, quoting an article from the tech publication, CNET.) In addition, the Court may take judicial notice of the fact that there were numerous other public reports about AT&T's "throttling" practice in late 2011 and early 2012. (*See, e.g.*, Ranlett Exs. 3–12.)

Based on the foregoing, Plaintiffs could have easily discovered through the exercise of reasonable diligence—and, at least in the case of the Cheweys, actually *did* discover—AT&T's alleged "throttling" practice several years before they sued. Instead, they sat on their rights until after the FCC's Notice of Apparent Liability issued on June 3, 2015. (Compl. ¶ 39.) Given that the Plaintiffs claim to have been severely affected by slowed data speeds starting in 2011 and early 2012, their lack of reasonable diligence precludes any potential reliance on the discovery rule.

**No Fraudulent Concealment.** Plaintiffs cannot toll the limitations period through conclusory allegations of fraudulent concealment, especially because such allegations are directly contradicted by the Complaint itself and the judicially noticeable facts. As with the discovery rule, "plaintiff bears the burden of pleading and proving fraudulent concealment." *In re Animation Workers Antitrust Litig.*, 123 F.Supp.3d 1175, 1194 (N.D. Cal. 2015) (citations and quotations omitted). "To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise to the claim; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to the claim." *Id.* Under Rule 9(b), allegations of fraudulent concealment must be pled with particularity. *Conmar Corp. v. Mitsui & Co. (USA), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).

Here, the fraudulent-concealment doctrine does not toll limitations for many of the same reasons explained above with respect to the discovery rule: namely, the Complaint does not allege facts indicating reasonable diligence after Plaintiffs had notice. Moreover, the Complaint does not specifically plead that AT&T took steps to mislead the Plaintiffs. To the contrary, the Complaint alleges that AT&T sent bill notices to customers explaining the MBR program and directing customers to more information before throttling began. (Compl. ¶ 29.) It also incorporates the February 2012 article that states that "AT&T announced they'd start throttling wireless data customers" "[i]n 2011." (*Id.* ¶ 43; Ranlett Ex. 3 at 25.) This same article also notes that many users received "warnings from AT&T after around 2GB of usage each month" and includes a screenshot of the text messages. (*Id.*) Such voluntary public disclosures are irreconcilable with allegations of concealment. *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 273761, *3 (N.D. Cal. Jan. 30, 2012) ("when the conspiracy became publicly known in December 2006, any wrongful conduct on the part of the defendants stopped having its effect, removing the basis for plaintiff's tolling").

Further, while the Complaint equivocally admits that the billing notice was included "in *some* customers' July or August 2011 monthly bill" (Compl. ¶ 29, emphasis added), the Court may take judicial notice of the fact that the Plaintiffs themselves received this bill notice, as well as

several text message notices beginning in December 2011. (Shackelford Exs. 1–2; Ranlett Ex. 14 at 261–99.) In light of Plaintiffs' allegations that the "imposition of data usage thresholds and speed reductions is antithetical to the term 'unlimited'" (Compl. ¶ 38) and their alleged belief that their plan entitled them to "receive 'unlimited' data without restriction" (*id.* ¶¶ 61, 72), the billing notices that disclosed "reduced data speeds" for "smartphone customers with unlimited data plans" (*id.* ¶ 29), and the text messages that disclosed potentially "reduced speeds" because "[y]our data use this month places you in the top 5% of users" (Ranlett Ex. 14 at 261–99), were more than sufficient to put Plaintiffs on "inquiry notice" of their claims. *See Platt*, 522 F.3d at 1055–56.

In short, this is a case where "the Court is not faced with fact-intensive allegations of fraudulent concealment, but with a few conclusory allegations that are not pleaded with particularity and/or that contradict documents Plaintiff has incorporated by reference in the [Complaint]." *Thibodeaux v. Teamsters Local 853*, 263 F.Supp.3d 772, 780 (N.D. Cal. 2017). Because there is no basis to toll limitations and the noticeable facts regarding public and personal disclosures render such claims implausible, the Time-Barred Claims should be dismissed with prejudice.

## II. The Complaint Does Not Adequately Plead Breach of Warranty Or Contract.

Plaintiffs' seventh cause of action should be dismissed for two primary reasons. First, Plaintiffs fail to allege the specific terms of the purported express warranty, as required by law. And second, even if Plaintiffs had adequately alleged that their Unlimited plan was warranted to be entirely "without restriction," Plaintiffs' reliance on such a warranty would be unreasonable given the plain language of the wireless customer agreement, which expressly granted AT&T the right to restrict Plaintiffs' use.

To state a claim for breach of express warranty, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury. *Thomas v. Abbott Labs.*, 2013 WL 12114096, at *2 (C.D. Cal. Mar. 18, 2013) (citations omitted). "General assertions about representations or impressions given by [defendant] … are not equivalent to a recitation of the exact terms of the underlying warranty." *Id.*

(citing *Nabors v. Google, Inc.*, 2011 WL 3861892, at *4 (N.D. Cal. Aug. 30, 2011)). "At the least, [plaintiff] must identify the particular commercial or advertisement *upon which he relied* and must describe with the requisite specificity the content of *the particular commercial or advertisement*." *Id.* (citing *Baltazar v. Apple, Inc.*, 2011 WL 588209, at *2 (N.D. Cal. Feb. 10, 2011)) (emphases added).

In the Complaint, Plaintiffs allege that AT&T expressly warranted that its wireless data services would be "unlimited"—that is, "without restriction"—as the result of "the promises and affirmations of fact made by Defendant through their marketing materials and statements." (Compl. ¶¶ 61, 72, 144). These conclusory allegations are insufficient to establish an actionable express warranty under California law because Plaintiffs neither identified the specific terms of the express warranty nor identified the "particular commercial or advertisement" "upon which [they] relied." *Thomas*, 2013 WL 12114096, at *2. Instead, the Complaint "only generally alleges that [defendant] made various 'warranties' through a series of … promotional materials and advertising," which is insufficient to state a warranty claim and thus grounds for dismissal. *Id.*

While the Complaint cites an example of an advertisement allegedly used by AT&T in marketing the Unlimited plans (Compl. ¶ 16), it does not allege that *any* Plaintiff ever relied, or even viewed, this particular advertisement prior to making their purchase. Instead, Plaintiffs generally allege that they "viewed and heard advertisements for the Unlimited data plan sold with the iPhone" and "[a]ll of the advertisements indicated that [they] would receive 'unlimited' data without restriction." (*Id.* ¶¶ 61, 72.) Such amorphous allegations do not rise to the standard of particularity required to establish an express warranty under California law. As recognized in *Baltazar*,

> General assertions that Plaintiffs relied on "a commercial" or "the commercial" or "advertisements online" are not equivalent to a recitation of the exact terms of the underlying warranty. At the least, Plaintiffs must identify the particular commercial or advertisement upon which they relied and must describe with the requisite specificity the content of that particular commercial or advertisement. Moreover, each named Plaintiff must allege with greater specificity his or her reasonable reliance on the particular commercial or advertisement.

1    *Baltazar*, 2011 WL 588209, at *2. Thus, even accepting all of the allegations in the Complaint as

2    true, Plaintiffs have failed to allege facts supporting their "express warranty" claim beyond general

3    assertions that Plaintiffs viewed and heard advertisements for the unlimited data plan.

4    Consequently, Plaintiffs' purported breach of express warranty claim is inadequately pled.

5          Moreover, even if Plaintiffs had alleged particular advertisements they relied on for their

6    warranty claim, Plaintiffs' claim should still be dismissed because the plain language of the

7    contracts makes clear that AT&T did *not* warrant to provide unrestricted service. Indeed, as

8    acknowledged in the Complaint, AT&T's unlimited plans were governed by a Wireless Customer

9    Agreement, which expressly "prohibits the usage of data for certain activities, such as tethering

10   phones to a computing device so that the computing device may use the phones' data." (Compl. ¶

11   28.) While Plaintiffs mention only "tethering" as an example of prohibited activity, the Wireless

12   Customer Agreement also prohibited "any activity that adversely affects the ability of other people

13   or systems to use either AT&T's wireless service or other parties' internet-based resources."

14   (Ranlett Ex. 13 at 108–09.) Further, the Wireless Customer Agreement in effect when AT&T

15   began the MBR policy also granted AT&T the right to "deny, disconnect, modify, and/or terminate

16   Service, without notice, to anyone it believes is using the Service in any manner prohibited or

17   whose usage adversely impacts its wireless network." (*Id.* at 109.) Specifically, Section 6.2 of the

18   agreement provided:

19        **Prohibited and Permissible Uses**: Except as may otherwise be specifically permitted or
         prohibited for select data plans, data sessions may be conducted only for the following
20       purposes: (i) internet browsing; (ii) email; and (iii) intranet access . . . **While most
         common uses for Internet browsing, email and intranet access are permitted by**
21       **your data plan, there are certain uses that cause extreme network capacity issues
         and interference with the network and are therefore prohibited. Examples of**
22       **prohibited uses include, without limitation, the following: . . . (v) any activity that
         adversely affects the ability of other people or systems to use either AT&T's**
23       **wireless services or other parties' internet-based resources . . .** Accordingly, AT&T
         reserves the right to (i) deny, disconnect, modify, and/or terminate Service, without
24       notice, to anyone it believes is using the Service in any manner prohibited or whose
         usage adversely impacts its wireless network or service levels or hinder access to its
25       wireless network, including without limitation, after a significant period of inactivity or
         after sessions of excessive usage and (ii) otherwise protect its wireless network from
26       harm, compromised capacity or degradation in performance, which may impact
         legitimate data flows.

27

28

(*Id.*) (emphasis in original).

Further, these rights to limit data throughput for the heaviest data users, as well as the meaning of the term "unlimited" as applied in the contract, were further detailed in Plaintiffs' subsequent renewal contracts after the announcement of AT&T's MBR policy:

> AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means.
>
> . . .
>
> **Unlimited Data Customers.** If you are a grandfathered AT&T unlimited plan data service customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use. You further agree that "unlimited" does not mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.

(*Id.* 159–61, 219.) These additional provisions were included in the Wireless Customer Agreements that were in effect at the time Plaintiffs filed this lawsuit in 2015.

In summary, the plain language of the Wireless Customer Agreements gave AT&T the right to limit Plaintiffs' wireless service to, among other things, protect its network from excessive usage by customers or limit activity that adversely affected the ability of other people to use the network. The agreements also specified what the term "unlimited" means in a manner that refutes the Plaintiffs' allegations that they reasonably believed their data service would be "without restriction." (Compl. ¶¶ 61, 72.) On the contrary, given these terms, Plaintiffs were constructively aware that their "Unlimited" data plans, in fact, were restricted in relevant ways under the express terms of their contracts. (*Id.* ¶ 28; *see also* Ranlett Ex. 13 at 108–09, 159–61, 218–19.)

Lastly, to the extent Plaintiffs allege a contract claim separate from the warranty claim, this claim should also be dismissed. To state a claim for breach of contract, a plaintiff must establish (1) the existence of a contract, (2) plaintiff's performance under that contract, (3) defendant breached that contract, and (4) plaintiff suffered damages as a result. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020) (citing *Oasis West Realty, LLC v.*

*Goldman*, 51 Cal. 4th 811, 821 (2011)). Here, Plaintiffs' contract claim should be dismissed for two reasons. First, the contract expressly gave AT&T the right to modify Plaintiffs' wireless service. (Ranlett Ex. 13 at 108–09, 159–61, 218–19.) Given these rights, the allegation that AT&T breached the Wireless Customer Agreement by imposing some limits on an ostensibly "unlimited" plan is not viable. *Zamora v. Solar*, 2016 WL 3512439, at \*3 (C.D. Cal. June 27, 2016) (granting motion to dismiss contract claim where defendant's action was expressly permitted by the contract) (citing *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 375 (1992) ("If defendants were given the right to do what they did by the express provisions of the contract there can be no breach.")).

Second, according to the allegations in the Complaint, AT&T first began "throttling" Unlimited plan customers sometime after "July or August 2011," the time period in which the Complaint alleges that AT&T delivered notice to Unlimited customers "regarding throttling prior to implementing its throttling practice." (Compl. ¶ 21.) As such, even if AT&T's alleged "throttling" were contractually actionable, Plaintiffs could only maintain a claim for breach of contract related to contracts in existence after AT&T's alleged breach—*i.e.*, after August 2011. Put differently, Plaintiffs do not allege that any *breach* of the applicable contracts occurred *before August 2011*.

Based on the inadequate pleading, Plaintiffs' breach of express warranty claims should be dismissed. Further, to the extent the Court finds Plaintiff has alleged a separate cause of action for breach of contract, Plaintiffs' breach of contract claims should also be dismissed in their entirety due to the plain language of the contracts, or at minimum, the Court should dismiss Plaintiffs' contract claims to the extent those claims relate to contracts in effect before August 2011.

### III. Plaintiffs Lack Standing for Injunctive Relief, and There Is No Plausible Allegation of Future Harm to Support Such Relief Given This Court's Prior Orders.

Plaintiffs seek injunctive relief in the form of an order enjoining AT&T from making allegedly material misrepresentations or failing to disclose its throttling practices in certain ways. (Compl. ¶ 120.) However, Plaintiffs lack Article III standing to seek injunctive relief because the Complaint does not allege that these Plaintiffs intend to purchase AT&T Unlimited plans in the

future. Under federal law, a plaintiff cannot establish Article III standing for injunctive relief absent a real and immediate threat of repeated injury. *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 979 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ("[W]hile courts have rejected the argument that a plaintiff cannot establish standing if he has learned that a label is misleading and therefore will not be fooled by it again, they 'do require plaintiffs . . . express an intent to purchase the products in the future.'"). As the court recognized in *ConAgra Foods*, even an allegation that a plaintiff "may consider" or "will consider" purchasing a product in the future is insufficient to meet Article III's standing requirements. *Id*. at 981.

Here, although Plaintiffs allege that they have often renewed their Unlimited plans *in the past*, Plaintiffs do not allege that they intend to do so again *in the future*. *Cf. Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970–72 (9th Cir. 2018) (finding that plaintiff had "standing for prospective injunctive relief" where the complaint alleged, *inter alia*, that plaintiff "continued to desire to purchase" defendant's product and "would purchase [the product] if it were possible"). Moreover, evidence already in the record shows that at least two of the remaining plaintiffs, the Cheweys, have terminated their service with AT&T. (Dkt 91-1, ¶ 6.)[2] Consequently, based on the current pleading, these Plaintiffs lack standing under Article III to pursue forward-looking injunctive relief.

In addition, even if Plaintiffs had Article III standing, Plaintiffs' claims for injunctive relief would still be subject to dismissal in light of the recent permanent injunction in the FTC Litigation. As this Court will recall, on December 4, 2019, this Court entered the Stipulated Order for Permanent Injunction and Monetary Judgment (Dkt 201) in the FTC Litigation, which permanently enjoined AT&T from (1) "[m]aking any representation about the amount or speed of mobile data"

---

[2] Because Article III standing is required for the Court to have subject matter jurisdiction, the Court may properly consider extrinsic evidence. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) ("[I]n ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence."); *Lopez-Velazquez v. Johnson*, 2016 WL 4073338, at *3 (N.D. Cal. Aug. 1, 2016) (Chen, J.) (court may consider extrinsic evidence).

without making certain defined disclosures; or (2) "[m]isrepresenting the performance or central characteristics of [AT&T's] Mobile Data Plan." (*See* Ranlett Ex. 1.)

In other words, the permanent injunction provides for the same kind of relief Plaintiffs seek in the Complaint. Given that this very Court recently imposed this order with AT&T's consent and the FTC's blessing, there is no plausible, non-speculative basis to assert that AT&T is now likely to violate the substantive law the Complaint relies on for its forward-looking claims. As such, Plaintiffs' claim for injunctive relief should be dismissed. *Cf. Wilson v. Brown*, 2015 WL 8515412, at *5 (S.D. Cal. Dec. 11, 2015), *aff'd*, 693 F. App'x 712 (9th Cir. 2017) ("In other words, preventative measures to reduce the incidence of severity of valley fever among California inmates—the very relief Plaintiff seeks here—is already provided for by *Plata*. Plaintiff's request for relief is thus duplicative of *Plata*. Accordingly, the Court dismisses Plaintiff's claim for injunctive relief.").

## IV.    Unjust Enrichment Is Not a Standalone Cause of Action.

Plaintiffs' claim for unjust enrichment (Count VIII) should be dismissed because unjust enrichment is not an independent claim. *See Cheramie v. HBB, LLC*, 545 F. App'x 626, 628 (9th Cir. 2013) ("the weight of California authority indicates that '[u]njust enrichment is not a cause of action, just a restitution claim.'") (citing *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011)). To the contrary, unjust enrichment is an equitable remedy available under California law where goods or services were rendered and accepted in the absence of a valid express contract. Plaintiffs have not, and could not, plead such a "quasi-contract" theory here because they do not dispute that a valid contract between the parties exists. *See id.* ("[plaintiff] cannot plead [unjust enrichment] because he does not dispute that a valid contract was formed") (citing *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012); *Chapman v. Skype Inc.*, 202 Cal. App. 4th 217, 232–34 (2013) ("Restitution based on unjust enrichment is not available, however, if an enforceable express contract determines the parties' rights and obligations.")). Therefore, Plaintiffs' cause of action for unjust enrichment should be dismissed.

### V. The California Plaintiffs Cannot Assert the Alabama Law Claim.

Count IX of the Complaint asserts a claim for an alleged violation of the Alabama Deceptive Trade Practices Act (the "Alabama DTPA") "on behalf of the Alabama Subclass." (Compl. ¶¶ 154–61.) The Complaint defines the "Alabama Subclass" as "[a]ll consumers residing in Alabama who purchased an unlimited data plan from AT&T Mobility LLC and whose data usage was throttled prior to the expiration of the service plan." (*Id.* ¶ 53.) Plaintiff Krenn is the only one of the Plaintiffs that allegedly resides in Alabama. (Compl. ¶¶ 7–9.) The Court previously granted a stay pending arbitration of Krenn's claims, and that stay remains in effect. (Dkts 60, 103.) The remaining Plaintiffs are each alleged to be residents of California, and therefore are apparently not part of the putative Alabama Subclass that purports to bring the Alabama DTPA claim. (Compl. ¶¶ 7–8.)

Moreover, the remaining Plaintiffs from California could not assert the Alabama DTPA claim. By its terms, the Alabama DTPA applies only to "trade or commerce affecting the people *of this state*." Ala. Code § 8-19-3; *cf. Cotter v. Lyft*, 60 F.Supp.3d 1059, 1062–63 (N.D. Cal. 2014) (finding that California statutory "provisions do not apply to people who perform work exclusively in other states" based on the language of "the provisions themselves"). Furthermore, "State statutes are presumed not to have extraterritorial effect." *Cotter*, 60 F.Supp.3d at 1061–63. And even if the Alabama DTPA purported to apply in other states, under the Commerce Clause, it could not be applied extraterritorially "to commerce that takes place wholly outside of the State's borders." *See Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982); *see also Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid.").

Accordingly, the Court should find that the Alabama DTPA claim (Count IX) does not apply to the remaining Plaintiffs, or to the extent it does, that it must be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, AT&T respectfully requests that the Court grant the following relief pursuant to Federal Rule of Civil Procedures 12(b)(1) and 12(b)(6):

1. Dismiss with prejudice the Time-Barred Claims, that is, Counts II, III, V, and VI as to purchases and renewals that occurred before July 2012 and Count IV as to purchases and renewals that occurred before July 2013;

2. Dismiss with prejudice the breach of express warranty and contract claim (Count VII) as inadequately pled and contrary to the plain language of the parties' contracts;

3. Dismiss the claims for injunctive relief for lack for standing and/or for failure to allege a likelihood of future harm;

4. Dismiss with prejudice the unjust enrichment claims (Count VIII) because unjust enrichment is not a viable cause of action under California law; and

5. Find that the Alabama DTPA claim (Count IX) does not apply to Plaintiffs Roberts and the Cheweys, or to the extent it does, that this claim must be dismissed with prejudice as to these Plaintiffs because their transactions are not subject to Alabama law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: May 14, 2020

MAYER BROWN LLP


By:/s/ Archis A. Parasharmi

REESE MARKETOS LLP
Pete Marketos (*pro hac vice* pending)
pete.marketos@rm-firm.com
Tyler Bexley (*pro hac vice* pending)
tyler.bexley@rm-firm.com
Brett Rosenthal (*pro hac vice* pending)
brett.rosenthal@rm-firm.com
Sean Gallagher (*pro hac vice* pending)
sean.gallagher@rm-firm.com
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201
Telephone: (214) 382-9810
Facsimile: (214) 501-0731

MAYER BROWN LLP
Andrew J. Pincus (*pro hac vice*)
apincus@mayerbrown.com
Archis A. Parasharami (SBN 321661)
apincus@mayerbrown.com
Kevin Ranlett (*pro hac vice*)
kranlett@mayerbrown.com
1999 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300

*Attorneys for AT&T Mobility LLC*